UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
                                    :    MDL Docket No. 1780
                                    :
In re DIGITAL MUSIC ANTITRUST       :
LITIGATION                          :
                                    :    Assigned to: Judge Loretta A. Preska
                                    :
———————————————————— x


**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS AND TO STRIKE PORTIONS OF
PLAINTIFFS' SECOND CONSOLIDATED AMENDED COMPLAINT**

Christopher Lovell (CL-2595)          John Stoia
Craig Essenmacher                     Christopher Burke
Imtiaz A. Siddiqui (IS-4090)          COUGHLIN STOIA GELLER
LOVELL STEWART HALEBIAN LLP           RUDMAN & ROBBINS LLP
500 Fifth Avenue, Floor 58           655 West Broadway, Suite 1900
New York, New York, 10110            San Diego, CA 92101
(212) 608-1900                        (619) 231-1058

*Additional Counsel Listed on Signature Page*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ............................................................................................... 1

ARGUMENT ..................................................................................................... 4

I.      PLAINTIFFS ADEQUATELY ALLEGE THEIR CLAIMS UNDER *TWOMBLY* .......... 4

     A.      Plaintiffs Plead Economic Facts Supporting the Inference of Conspiracy ............. 8

     B.      Defendants Improperly Propose a "Probability" Standard ................................... 15

II.     PLAINTIFFS' ANTITRUST CLAIMS HAVE NOT BEEN RELEASED ..................... 16

     A.      Defendants Overstate the Breadth of the *Ottinger* Class ...................................... 16

     B.      Defendants Overstate the Scope of the *Ottinger* Class ......................................... 19

     C.      Applying the Ottinger Release to the Instant Claims Would Violate Due Process ........................................................................................................... 20

III.    PLAINTIFFS STATE A CLAIM REGARDING END PURCHASER CD DAMAGES CLASS ........................................................................................... 21

     A.      Plaintiffs Allege that the CD Purchasers Suffered Antitrust Injury in the Form of Supracompetitive Prices for CDs, and, Therefore Have Antitrust Standing ....................................................................................................... 22

     B.      The Other Factors Relevant to Antitrust Standing Are Satisfied .......................... 23

IV.     PLAINTIFFS STATUTORY STATE LAW CLAIMS SHOULD NOT BE DISMISSED ON STANDING GROUNDS .................................................................. 25

V.      PLAINTIFFS STATE CLAIMS UNDER THE LAWS OF ALL TWENTY-ONE JURISDICTIONS SET FORTH IN COUNT II OF THE COMPLAINT ....................... 27

     A.      None of the State Claims Should Be Dismissed Due to Intrastate Limitations .................................................................................................... 28

     B.      None of the State Claims Should Be Dismissed Due to a Presumed Constitutional Limitation to Intrastate Activity .................................................. 31

     C.      No State Claims Should Be Dismissed Based on a Limitation to Deceptive Conduct ......................................................................................................... 32

D.   Plaintiffs Are Not Seeking Damages Under the California Unfair Competition Law ...................................................................34

E.   Plaintiffs Have Properly Asserted a Claim Under N.Y. GBL §349 ......................34

VI.   PLAINTIFFS STATE A VALID CLAIM FOR UNJUST ENRICHMENT....................35

A.   Plaintiffs May Plead Unjust Enrichment Claims in the Alternative ....................35

B.   Unjust Enrichment Is a Claim Not a Remedy........................................................36

C.   A Massachusetts Claim Is Properly Pled .................................................................38

D.   Privity or Direct Benefit Is Not a Prerequisite to a Valid Claim for Unjust Enrichment.................................................................................................................38

E.   Defendants Were Unjustly Enriched at Plaintiffs' Expense ..................................40

VII.   THE JOINT VENTURES DO NOT SHIELD DEFENDANTS FROM THE ANTITRUST LAWS .........................................................................................................41

VIII.   DEFENDANTS' MOTION TO STRIKE SHOULD BE DENIED .................................43

CONCLUSION.............................................................................................................................45

## **TABLE OF AUTHORITIES**

Federal Cases

*A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc.*, 263 F.3d 239 (3d Cir. 2001)....................23

*Abrams v. Trans World Airlines, Inc.*, 728 F. Supp. 162 (S.D.N.Y. 1989) ..................................31

*AD/SAT v. Associated Press*, 181 F.3d 216 (2d Cir. 1999) ..........................................................23

*In re African-American Slave Descendents Litig.*, 471 F. 3d 754 (7th Cir. 2006) .......................44

*Allegheny General Hosp. v. Phillip Morris, Inc.*, 228 F.3d 429 (3d Cir. 2000) ...........................39

*Allied Signal v. B.F. Goodrich Co.*, 183 F. 3d 568 (7th Cir. 1999)..................................................7

*Amarel v. Connell*, 102 F.3d 1494 (9th Cir. 1996) .......................................................................22

*American Academic Suppliers, Inc. v. Beckley-Cardy, Inc.*,
    699 F. Supp. 152 (N.D. Ill. 1988) ............................................................................................32

*Andrx Pharm., Inc. v. Kroger Co.*, 543 U.S. 939 (2004).............................................................37

*Anziulewicz v. Bluefield Cmty. Hosp., Inc.*, 531 F.Supp. 49 (S.D.W.Va. 1981)...........................30

*Apex Oil Co. v. Di Mauro*, 822 F.2d 246 (2d Cir. 1987) .................................................................9

*Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332 (1982) ...................................................42

*Associated Gen. Contractors, Inc., v. California State Council of Carpenters*,
    459 U.S. 519 (1983)................................................................................................................23

*Atkins v. School Bd.*, 379 F. Supp. 1060 (D. Va. 1974)................................................................43

*In re Auction Houses Antitrust Litig.*, 2001 WL 170792 (S.D.N.Y. Feb. 22, 2001) ....................21

*Aurora Cable Communications, Inc. v. Jones Intercable, Inc.*,
    720 F. Supp. 600 (W.D. Mich. 1989) ....................................................................................29

*Bates v. Northwestern Human Servs. Inc.*, 466 F. Supp. 2d 69 (D.D.C. 2006)............................36

*Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007) ....................................................... *passim*

*Behrend v. Comcast Corp.*, 2007 U.S. Dist. LEXIS 55952 (E.D. Pa. July 31, 2007) ....................4

*Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F. 2d 263 (2d Cir. 1979).......................................7

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
    65 F. 3d 1406 (7th Cir. 1995) ...................................................................................................6

*Blue Shield of Virginia v. McReady*, 457 U.S. 465 (1982) ........................................2, 22

*Blum v. Yaretsky*, 457 U.S. 991 (1982).............................................................................27

*Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1 (1979) ....................42

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ...........................23

*In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363 (S.D.N.Y. 2002) .................2, 25, 26

*In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618 (E.D. Mich. 2001) ...................... *passim*

*California v. ARC Am. Corp.*, 490 U.S. 93 (1989) .......................................................36

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
    33 F.3d 181 (2d Cir. 2005).........................................................................................27

*Citizen Publ'g Co. v. United States*, 394 U.S. 131 (1969) ...........................................42

*City and County of San Francisco v. Phillip Morris, Inc.*,
    57 F. Supp. 1130 (N.D. Cal. 1997) ...........................................................................39

*Clark v. McDonald's Corp.*, 213 F.R.D. 198 (D. N. J. 2003) ......................................27

*In re Compact Disc Antitrust Litig.*, MDL No. 1216 (C.D. Cal.)..................................16

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
    216 F.R.D. 197 (D. Me. 2003).................................................................................44

*Consolidated Edison, Inc. v. Northeast Utilities*, 332 F. Supp. 2d 639 (S.D.N.Y. 2004)........20, 21

*Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962)...........................9

*C-O-Two Fire Equip. Co. v. United States*, 197 F.2d 489 (9th Cir. 1952).............................10, 11

*Crimpers v. Home Box Office*, 724 F.2d 290 (2d Cir. 1983) ........................................22

*In re Ditropan XL Antitrust Litig.*, 2007 WL 1411617 (N.D. Cal. May 11, 2007) ................34, 35

*D.R. Ward Const. Co. v. Rohm and Haas Co.*, 470 F. Supp. 2d 485 (E.D. Pa. 2006)..................38

*Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408 (2d Cir. 2005)............................23

*In re Elevator Antitrust Litig.*, 2007 WL 2471805 (2d Cir. Sept. 4, 2007) ....................................5

*Erickson v. Pardus*, __ U.S. __, 127 S. Ct. 2197 (2007) ..............................................4

*Eskofot A/S v. E.I. Du Pont De Nemours & Company*, 872 F. Supp. 81 (S.D.N.Y. 1995) ...........13

iv

*Excellus Health Plan, Inc. v. Tran*, 287 F. Supp. 2d 167 (W.D.N.Y. 2003) .................................33

*First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253 (1968) .............................................................12

*Flood v. Kuhn*, 407 U.S. 258 (1972).................................................................................31, 32

*Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205 (2d Cir. 2004) ....................................................32

*Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003) .....................................43

*FTC  v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986)..............................................................42

*FTC v. Mylan Labs*, 62 F. Supp. 2d 25 (D.D.C. 1999).............................................................36, 37

*Fuentes v. South Hills Cardiology*, 946 F.2d 196 (3d Cir. 1991) ...................................................12

*Genesco Entm't v. Koch*, 593 F. Supp. 743 (S.D.N.Y. 1984) .........................................................33

*George v. Morton*, 2007 WL 680787 (D.Nev. Mar. 1, 2007)..........................................................36

*Geron v. County of Nassau*, 2004 WL 639615 (S.D.N.Y. Mar. 30, 2004).....................................20

*Goadby  v. Philadelphia Elec. Co.*, 639 F.2d 117 (3d Cir. 1981).....................................................36

*Grand River Enter. Six Nations, Ltd. v. Pryor*, 425 F.3d 158 (2d Cir. 2005).................................32

*In re Grand Theft Auto Video Game Consumer Litig.*,
    2006 WL 3039993 (S.D.N.Y. 2006)...................................................................................2, 26

*GTE New Media Servs., Inc. v. Ameritech Corp.*, 21 F. Supp. 2d 27 (D.D.C. 1998)...................29

*Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58 (2d Cir. 1999) ..........................................................44

*Heller v. Fortis Benefits Ins. Co.*, 142 F.3d 487 (D.C. Cir. 1998)..................................................41

*In re Hypodermic Products Antitrust Litig.*, 2007 WL 1959225 (D.N.J. 2007)............................38

*Ice Cream Liquidation, Inc. v. Land O' Lakes, Inc.*,
    253 F. Supp. 2d 262 (D. Conn. 2003)............................................................................. *passim*

*Iconco v. Jensen Constr. Co.*, 622 F.2d 1291 (8th Cir. 1980) .......................................................39

*In re Intel Corp. Microprocessor Antitrust Litig.*,
    2007 WL 2028113 (D.Del. July 12, 2007) .................................................................... *passim*

*IM Partners v. Debit Direct LTD*, 394 F. Supp. 2d 503 (D. Conn. 2005)......................................36

*Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939).......................................................12

*Iqbal v. Hasty*, 490 F.3d 155 (2d Cir. 2007) .................................................................4

*In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517 (D.N.J. 2004) ...........................36, 39

*Kaye v. Grossman*, 202 F.3d 611 (2d Cir. 2000) ......................................................40

*Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000) ........................22, 25, 31

*Krumme v. Westport Stevens, Inc.*, 238 F.3d 133 (2d Cir. 2000) ..................................20

*L.A.P.D., Inc. v. General Elec. Corp.*, 132 F.3d 402 (7th Cir. 1997) ............................23

*Ledford v. Rapid-Am. Corp.*, 1988 WL 3428 (S.D.N.Y. Jan. 8, 1988)........................13

*Leider v. Ralfe*, 2004 WL 1773330 (S.D.N.Y. July 30, 2004) ....................................35

*Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998)...........................44

*Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976) .........................13

*In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002) ................................2, 22

*Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002) ...........................22

*In re Lorazepam & Clorazepate Antitrust Litig.*, 295 F. Supp. 2d 30 (D.D.C. 2003) ........... *passim*

*Lum v. Bank of Am.*, 361 F.3d 217 (3d Cir. 2004) .....................................................15

*Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465 (S.D.N.Y. 2001) ...........................23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)....................12

*Merck & Co. v. Lyon*, 941 F. Supp. 1443 (M.D.N.C. 1996).........................................31

*In re Merrill Lynch & Co. Inc. Research Reports Sec. Litig.*, 218 F.R.D. 76 (S.D.N.Y. 2003)....13

*Monument Builders of Greater Kansas City, Inc. v. Am. Cemetery Ass'n of Kansas*, 891 F.2d 1473 (10th Cir. 1989) .............................................................................11

*In re Motel 6 Sec. Litig.*, 1997 WL 154011 (S.D.N.Y. Apr. 2, 1997) .....................39, 40

*Muehlbauer v. Gen. Motors Corp.*, 431 F. Supp. 2d 847 (N.D. Ill. 2006) ...................38

*In re Napster, Inc. Copyright Litig.*, 191 F. Supp. 2d 1087 (N.D. Cal. 2002).................10, 14, 15

*In re NASDAQ Market-Makers Antitrust Litig.*, 894 F. Supp. 703 (S.D.N.Y. 1995) .............11, 12

*National Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104 (2d Cir. 2001)........................31, 32

*Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9 (2d Cir. 1981)....................... *passim*

*NCAA v. Board of Regents of Oklahoma*, 468 U.S. 85 (1984) ........................................................42

*In re Neurontin Mktg., Sales Practices, and Prods Liab. Litig.*,
433 F. Supp. 2d 172 (D. Mass. 2006) ........................................................................................36

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
350 F. Supp. 2d 160 (D. Me. 2004) ...............................................................................28, 30, 32

*New York v. Feldman*, 210 F. Supp. 2d 294 (S.D.N.Y. 2002) ........................................................33

*Noble v. 93 University Place Corp.*, 224 F.R.D. 330 (S.D.N.Y. 2004) ...........................................35

*In re Northwest Airlines Corp. Antitrust Litig.*, 208 F.R.D. 174 (E.D. Mich. 2002) ....................12

*Northwestern Pub. Serv. v. Union Carbide Corp.*, 115 F. Supp. 2d 1164 (D.S.D. 2000) ..............36

*Ortiz v. Fibreboard*, 527 U.S. 815 (1999) ......................................................................................26

*In re OSB Antitrust Litig.*, 2007 U.S. Dist. LEXIS 56573 (E.D. Pa. Aug. 3, 2007) ........................4

*O'Shea v. Littleton*, 414 U.S. 488 (1974) .......................................................................................27

*Pantry, Inc. v. Stop-N-Go Foods, Inc.*, 777 F. Supp. 713 (S.D. Ind. 1991) ...................................36

*Payton v. County of Kane*, 308 F. 3d 673, 680 (7th Cir. 2002) .....................................................27

*Petruzzi's IGA Supermarkets v. Darling-Delaware Co.*, 998 F.2d 1224 (3d Cir. 1993) .................9

*Poller v. CBS*, 368 U.S. 464 (1962) ...............................................................................................12

*In re Plywood Antitrust Litig.*, 655 F.2d 627 (5th Cir. 1981) .......................................................10

*In re Propulsid Prods. Liab. Litig.*, 208 F.R.D. 133 (E.D.La. 2002) .............................................44

*Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660 F.2d 1195 (7th Cir. 1981) ................................15

*Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429 (1978) ...................................................31, 32

*Reingold v. Swiftships Inc.*, 210 F.3d 320 (5th Cir. 2000) .............................................................36

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979) .........................................................................2, 23

*In re Relafen Antitrust Litig.*, 221 F.R.D. 260 (D. Mass. 2004) ..............................................27, 38

*Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007) .............................................................................16

*Sample v. Gotham Football Club, Inc.*, 59 F.R.D. 160 (S.D.N.Y. 1973) .......................................44

*Sanner v. Board of Trade of Chicago*, 62 F.3d 918 (7th Cir. 1995) ..............................................22

*Shahzad v. H.J. Meyers & Co., Inc.*, 1997 WL 47817 (S.D.N.Y. Feb. 6, 1997) ..........................13

*Stephenson v. Dow Chem. Co.*, 273 F.3d 249 (2d Cir. 2001) ........................................................21

*In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13 (3d Cir. 1978)....................................................22

*Sun Dun, Inc. of Washington v. Coca Cola Co.*, 740 F. Supp. 381 (D. Md. 1990) .....................29

*TBK Partners, Inc. v. Western Union Corp.*, 675 F.2d 456 (2d Cir. 1982)............................17, 19

*Texaco, Inc. v. Dagher*, 547 U.S. 1 (2006) .....................................................................41, 42, 43

*Texas v. Allan Constr. Co.*, 851 F. 2d 1526 (5th Cir. 1988) .........................................................34

*The Inporters, S.A. v. Hanes Printables, Inc.*, 663 F.Supp. 494 (M.D.N.C. 1987) ......................31

*Timken Roller Bearing Co. v. United States*, 341 U.S. 593 (1951) ...............................................42

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) ..................................................................1, 5

*Tooltrend v. CMT Utensili SRL*, 198 F.3d 802 (11th Cir. 1999) ..................................................41

*Tucker v. Apple Computer*, 493 F. Supp.2d 1090 (N.D. Cal. 2006)................................................3

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt.*,
    438 F.3d 150 (2d Cir. 2006)......................................................................................................32

*United States v. Delta Dental of Rhode Island*, 943 F. Supp. 172 (D.R.I. 1996) ..........................6

*United States v. Rubin*, 999 F. 2d 194 (7th Cir. 1993)..................................................................34

*United States v. Sealy, Inc.*, 388 U.S. 350 (1967).........................................................................42

*United States v. Topco Assoc., Inc.*, 405 U.S. 596 (1972) ............................................................42

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005) ...................................2, 17

*Warth v. Seldin*, 422 U.S. 490 (1975) ...........................................................................................27

*Wrench LLC v. Taco Bell Corp.*, 36 F. Supp. 2d 787-88 (W.D. Mich. 1998).............................36

*Yankees Entm't & Sports Network, LLC v. Cablevision Sys. Corp.*,
    224 F. Supp. 2d 657 (S.D.N.Y. 2002).......................................................................................13

*Yellow Pages Solutions, Inc. v. Bell Atl. Yellow Pages Co.*,
    2001 U.S. Dist. LEXIS 18831 (S.D.N.Y. Nov. 19, 2001).......................................................16

<u>State Cases</u>

*Aladdin Elec. Assocs. v. Town of Old Orchard Beach*, 645 A.2d 1142 (Me. 1994) ....................39

*Anderson v. Dunn*, 4 N.W.2d 810 (S.D. 1942) ..............................................................................39

*Beauregard v. Orleans Trust Co.*, 182 A. 182 (Vt. 1936) ..............................................................39

*Ciardi v. Hoffmann-LaRoche, Ltd.*, 762 N.E.2d 303 (Mass. 2002) .........................................38, 39

*Cox v. Microsoft Corp.*, 778 N.Y.S.2d 147 (1st Dept. 2004) ................................................ *passim*

*Dunlap v. Hinkle*, 317 S.E.2d 508 (W.V. 1984) ...........................................................................39

*Fascione v. CNA Ins. Cos.*, 754 N.E. 2d 662 (Mass. 2001)...........................................................36

*Freeman Indus. v. Eastman Chem. Co.*, 172 S.W.3d 512 (Tenn. 1966)........................................39

*Gonzalez v. Assoc. Fin. Serv. Co. of Kansas, Inc.*, 967 P.2d 312 (Kan. 1998).............................33

*Goshen v. Mutual Life Ins. Co. of N.Y.*, 774 N.E.2d 1190 (N.Y. 2002) .......................................33

*Haz-Mat Response, Inc. v. Certified Waste Serv. Ltd.*, 910 P.2d 839 (Kan. 1996) .......................39

*Hyde v. Abbott Labs*, 123 N.C. App. 572 (N.C. Ct. App. 1996)....................................................33

*John A. Artukovich & Sons, Inc. v. Reliance Truck Co.*,126 Ariz. 246 (Az. 1980)......................38

*Jordan Keys & Jessamy, LLP v. St. Paul Fire and Marine Ins. Co.*, 870 A.2d 58 (D.C. 2005) ...38

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (Cal. 2003)................................34

*Lubner v. City of Los Angeles*, 53 Cal. Rtpr. 2d 24 (Cal. Ct. App. 1997) ....................................37

*Manufacturers Hanover Trust Co. v. Chemical Bank*,
    160 A.D.2d 113 (N.Y. App. Div. 1990) .......................................................................39, 40

*Meyers v. Bayer*, 735 N.W.2d  448 (Wis. 2007)......................................................................30, 31

*Monroe Beverage Co. v. Stroh Brewery Co.*, 559 N.W. 2d 297 (Mich. 1997)..............................37

*Olson v. Synergistic Techs. Bus. Sys., Inc.*, 628 N.W.2d 142 (Minn. 2001)..................................39

*Olstad v. Microsoft Corp.*, 700 N.W. 2d 139 (Wis. 2005).......................................................30, 31

*Ontiveros Insulation Co. v. Sanchez*, 3 P.3d 695 (N.M. 2000)....................................................39

*Ottinger v. EMI Music Dist.*, No. 24865-11 (Tenn. Cir. Court, Cocke Cty.) ....................... *passim*

*Parker v. W. Dakota Insurers*, 605 N.W. 2d 181 (S.D. 2000).........................................................40

*Paschall's, Inc. v. J.P. Dozier*, 407 S.W.2d 150 (Tenn. 1966) .................................................39, 41

*Puttkammer v. Minth*, 266 N.W.2d 361 (Wis. 1978).......................................................................39

*Quality Prods. & Concepts Co. v. Nagel Precision Inc.*,
    2000 Mich. App. LEXIS 2469 (Mich. App. Mar. 21, 2000) .....................................................39

*Rabinowitz v. People's Nat'l Bank*, 126 N.E. 289 (Mass. 1920)....................................................39

*Ridge Meadows Homeowners Assoc., Inc. v. Tara Development Company, Inc.*,
    665 N.Y.S. 2d 361 (N.Y. App. Div. 4th Dept. 1997) ...............................................................35

*Security Ben. Life Ins. Corp. v. Fleming Cos, Inc.*,
    21 Kan. App. 2d 833 (Kan. App. 1995)....................................................................................39

*Siebler Heating & Air Conditioning, Inc. v. Jenson*, 326 N.W.2d 182 (Neb. 1982)....................39

*Smith v. Hamilton*, 265 P.2d 214 (Nev. 1953) ...............................................................................39

*State ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142 (Iowa 2001)............................................37

*State ex rel. Palumbo v. Graley's Body Shop, Inc.*, 425 S.E.2d 177 (W.Va. 1992).....................30

*Trade 'N Post, LLC v. World Free Duty Ams.*, 628 N.W. 2d 707 (N.D. 2001) .............................37

*Wyman v. Terry Schulte Chevrolet, Inc.*, 584 N.W.2d 103 (S.D. 1998).......................................37

<u>Federal Statutes</u>

15 U.S.C. § 1 .............................................................................................................................4, 8, 11

15 U.S.C. §53(b).............................................................................................................................36

28 U.S.C. §1407.......................................................................................................................43, 44

<u>Federal Rules</u>

Fed. R. Civ. P. 8(a) .........................................................................................................................43

Fed. R. Civ. P. 8(e)(2)..................................................................................................................3, 35

Fed. R. Civ. P. 23(b)(1)(B) ............................................................................................................26

<u>State Statutes</u>

California Unfair Competition Law § 17200...................................................................................34

Cal. Civ. Code §987 ......................................................................................... 37

K.S.A. §50-101 ................................................................................................. 33

K.S.A. §50-623 ................................................................................................. 33

K.S.A. §50-627 ................................................................................................. 33

Michigan Antitrust Reform Act ........................................................................ 29

M.C.L.A. 445.772 ............................................................................................. 29

N.C.G.S.A. §75-1 .............................................................................................. 33

N.C.G.S.A. §75-1.1 ........................................................................................... 33

N.C.G.S.A. §75-16 ............................................................................................ 33

N.M. Stat. Ann. §57-12-3 ................................................................................. 32

N.M. Rev. Stat. §57-12-2(E)(2) ........................................................................ 33

New York Gen. Bus. Law § 349 ................................................................. *passim*

Other Authorities

Areeda & Hovenkamp, Antitrust Law (2d ed. 2003) ............................... 1, 8, 12

Blechman, Conscious Parallelism, Signaling and Facilitating Devices: The Problem
    of Tacit Collusion Under the Antitrust Laws, 24 N.Y.L. Sch. L. Rev. 881, 899
    (1979) ....................................................................................... *passim*

Karon, Undoing the Otherwise Perfect Crime – Applying Unjust Price-Fixing
    Claims,108 W. Va. L. Rev. 395, 405 (2005) ........................................ 37

Posner, Antitrust Law (2d ed. 2001) ........................................................ *passim*

## INTRODUCTION

The motion to dismiss and to strike portions of the Second Consolidated Amended Complaint ("Complaint") should be denied.  As set forth in greater detail below, none of the Defendants' dozen or so putative grounds for dismissal are meritorious.

The Complaint satisfies the pleading standards enunciated in *Bell Atlantic Corp. v. Twombly* because the Complaint alleges "further circumstances" in addition to parallel conduct, which make plausible the inference of an agreement to restrain trade.  *See Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964 & n.4 (2007); *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001); 6 P. Areeda & H. Hovenkamp, *Antitrust Law*, ¶1425 (2d ed. 2003); Blechman, *Conscious Parallelism, Signaling and Facilitating Devices: The Problem of Tacit Collusion Under the Antitrust Laws*, 24 N.Y.L. Sch. L. Rev. 881, 899 (1979); R. Posner, *Antitrust Law*, at 69-93 (2d ed. 2001); pp. 3-16, *infra*.

For example, the Complaint alleges the following: Defendants agreed to exchange prices and terms-of-sale information.  They reached revenue sharing agreements.  Defendants agreed among themselves to use seller-side Most Favored Nation clauses ("MFNs") and to conceal their use of them.  Defendants agreed to launch two joint venture music distribution companies, which had anticompetitive effects on the market.  They had opportunity to conspire to fix prices through their joint ventures and trade organizations.  They structured their joint ventures to fix prices instead of compete with one another.  Defendants agreed to maintain a price floor for Internet Music[1] and acted against their individual self interests by fixing prices.  Defendants are the subject of a pending investigation by the Office of the New York State Attorney General relating to wholesale pricing for Internet Music and are being investigated by the U.S. Department of Justice for possible collusion

---

[1]     Plaintiffs adopt the definitions of "Digital Music" and "Internet Music" set forth in the Complaint, ¶2.

and price fixing relating to Internet Music and for possible misrepresentations to the government in "White Papers" they submitted during an earlier investigation of MusicNet and pressplay.

Furthermore, the claims here were not released in *Ottinger v. EMI Music Distribution* because the release there cannot be construed (a) to reach Internet Music and (b) to release claims for CD purchases after the September 29, 2003 end of class period there. *See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 106 (2d Cir. 2005); *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 18 n.7 (2d Cir. 1981); and pp. 16-21, *infra*. The CD purchaser class has antitrust standing, for state law purposes, because its members paid inflated prices for CDs as a result of Defendants' conspiracy and there are no more immediate victims of their conspiracy to press the claims. *See Blue Shield of Virginia v. McReady*, 457 U.S. 465, 482-84 (1982); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979); *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 153-56 (3d Cir. 2002); *Ice Cream Liquidation, Inc. v. Land O' Lakes, Inc.*, 253 F. Supp. 2d 262, 272 (D. Conn. 2003); and pp. 21-25, *infra*. The adequacy of plaintiffs residing in one state to represent absent class members from other states is a question properly addressed at class certification; it is not a question of Article III standing at the pleading stage. *See In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 377 (S.D.N.Y. 2002) (Koetl, J.); *In re Grand Theft Auto Video Game Consumer Litig.*, 2006 WL 3039993, at *2 (S.D.N.Y. 2006) (Kram, J.); and pp. 25-27, *infra*.

The state law claims are not defective. The pertinent state laws do not confine their reach to purely *intra*state commerce. *See* pp. 28-31, *infra*. There is no negative Commerce Clause preemption of state antitrust law. *See* pp. 31-32, *infra*. The pertinent state consumer protection laws encompass price-fixing claims because price-fixing is a form of unfair, unconscionable or deceptive conduct. *See* pp. 32-34, *infra*. California Unfair Competition law allows claims for restitution, which is precisely what plaintiffs request; and New York GBL § 349 allows plaintiffs to waive

multiple damages in order to proceed as a class.  *See* pp. 34-35, *infra*.  The unjust enrichment claims are pleaded in the alternative, Fed. R. Civ. P. 8(e)(2), and thus not barred by the presence of statutory claims.  *See* pp. 35-36, *infra*.  Unjust enrichment is a common law cause of action recognized in the pertinent states.  *See* pp. 37-38, *infra*.   The law in none of the pertinent states requires that plaintiff be in privity with the defendant in order to pursue a claim for unjust enrichment.  *See* pp. 38-41, *infra*.[2]  The joint ventures are not free from antitrust scrutiny.  *See* pp. 42-43 *infra*.  Finally, Defendants' motion to strike should be denied.  *See* pp. 43-44 *infra*.

---

[2]      Defendants devote a paragraph of their introduction to the supposed inconsistencies between this action and an antitrust case against Apple, Inc., styled *Tucker v. Apple Computer, Inc.*, C-06-4457 (N.D. Cal.) ("*Tucker*")). D. Mem. at 4-5. The *Tucker* claims, however, are consistent with those here. *See generally Tucker*, 493 F. Supp.2d 1090 (N.D. Cal. 2006). The *Tucker* plaintiffs contend that Apple makes music sold on its online store inoperable on competitors to its iPod music player. The Apple class does not allege that Apple acted to sell Digital Music at supracompetitive prices and seeks damages **only** for purchasers of music players, not for Digital Music. There is nothing logically (or practically) inconsistent between the allegations in *Tucker* and the present litigation. Defendants' reference to overlap of counsel in this action and Tucker is an irrelevant *ad hominem* attack that, like all *ad hominem* arguments, is designed to divert attention from the weakness in the merits of its sponsors' arguments.

**ARGUMENT**

## I. PLAINTIFFS ADEQUATELY ALLEGE THEIR CLAIMS UNDER *TWOMBLY*

Fed. R. Civ. P. 8(a) requires only that a complaint make "a short and plain statement of the claim showing that the pleader is entitled to relief." *Erickson v. Pardus*, __ U.S. __, 127 S. Ct. 2197, 2200 (2007). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Id.* (quoting *Twombly*, 127 S. Ct. at 1964). Courts must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *Erickson*, 127 S. Ct. at 2200 (citing *Twombly*, 127 S. Ct. at 1964).

In *Twombly*, the Supreme Court addressed what a plaintiff must plead in order to state a claim under § 1 of the Sherman Act. *Twombly*, 127 S.Ct. at 1964. *Twombly* held that bare allegations of competitors' parallel conduct, without more, do not suffice to plead an antitrust violation under 15 U.S.C. § 1. *See Iqbal v. Hasty*, 490 F.3d 155 (2d Cir. 2007) (citing *Twombly*, 127 S.Ct. at 1961).[3] *Twombly* thus aligns Rule 8 pleading standards with substantive antitrust jurisprudence that holds mere conscious parallelism may be lawful but finds that parallel conduct, when combined with "plus factors," to be sufficient evidence of an unlawful agreement to restrain

---

[3]      In *Iqbal*, this Circuit recently analyzed the scope of *Twombly*. After careful consideration of what the Second Circuit called "conflicting signals," the court concluded that *Twombly* did not require "a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *Iqbal*, 490 F.3d at 157-58. The Second Circuit in *Iqbal* considered that *Twombly* may be "limited to, or at least applied most rigorously in, the context of either all section 1 allegations or perhaps only those section 1 allegations relying on competitors' parallel conduct." 490 F.3d at 156.

     *See Behrend v. Comcast Corp.*, No. 03-6604, 2007 U.S. Dist. LEXIS 55952 (E.D. Pa. July 31, 2007), and *In re OSB Antitrust Litig.*, No. 06-826, 2007 U.S. Dist. LEXIS 56573 (E.D. Pa. August 3, 2007), for recent decisions interpreting *Twombly*, upholding §1 complaints, and rejecting arguments requiring pleading specific details of an alleged illegal agreement.

trade defeating summary judgment and sustaining a jury verdict.  127 S.Ct at 1364.  *Twombly* nowhere purports to alter substantive antitrust law.  *Twombly* did not overrule, and in fact endorses, the "plus factor" line of antitrust cases, most recently explicated by the Second Circuit in *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001), a case on which the Second Circuit relied in its most recent decision applying *Twombly* to antitrust pleadings.  See *In re Elevator Antitrust Litg.*, No. 06-3128-CV, 2007 WL 2471805 (2d Cir. Sept. 4, 2007), *aff'g,* No. 04 CV 1178 (TPG)*,* 2006 WL 1470994 (S.D.N.Y May 30, 2006).

   *Twombly* holds that a complaint must plead a "further circumstance" in addition to parallel conduct to move Defendant's conduct out of "neutral territory."  The Court observed that a naked assertion of conspiracy "gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility." *Id.* at 1966.  *Twombly* does not require heightened fact pleading of specifics.  *Id* at 1974.  Requiring that the inference of agreement be plausible does not allow the court to examine whether the underlying factual allegations themselves are plausible.  *Id.* at 1965 ("[a]sking for plausible grounds to infer an agreement does not impose a plausibility requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement.").

   In *Twombly*, plaintiffs' claim of conspiracy was based solely on "parallel conduct and not on any independent allegation of actual agreement" among the defendants. *Id.* at 1970.  As the Court explained, "nothing contained in the complaint invests either the action or inaction alleged with a plausible suggestion of conspiracy." *Id.* at 1971.

   Plaintiffs here plead numerous "further circumstances" to provide the requisite "factual enhancement" to firmly "nudge" Plaintiffs' claims across the line from conceivable to plausible. *Id.*

at 1966, 1974.  Specifically, plaintiffs have alleged: (i) Defendants agreed to exchange price information and terms of sale information (¶¶68, 73)[4]; (ii) Defendants reached revenue sharing agreements (¶¶68, 73); (iii) Defendants agreed among themselves to use seller-side MFNs[5] (¶¶68, 73, 92, 96, 99); (iv) Defendants agreed to conceal the use of these MFNs (¶¶93-95); (v) Defendants agreed to launch two joint venture music distribution companies, MusicNet and pressplay, to restrain competition in the market (¶¶67, 72, 75-79); (vi) Defendants had the opportunity to conspire to fix prices through their participation in joint ventures and trade organizations (¶¶87-88);   (vii)

---

[4]      Unless otherwise noted, all citations are omitted and emphasis is added herein, and all paragraph citations are to the Complaint.

[5]      Defendants cite *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F. 3d 1406 (7th Cir. 1995) for the proposition that MFN clauses are standard devices that create "a ceiling on prices and not a floor."  Def. Mem. at 12.  Assuming it is lawful for Defendants to jointly create a price ceiling, there are two flaws in this argument.

First, Defendants conflate buyer side MFNs with seller side MFNs.  In *Marshfield Clinic*, the plaintiff complained that the defendant compelled physicians (i.e. sellers) to offer them the same price as it offered to other buyers of their services.  As the Panel explained, "'[m]ost favored nations' clauses are standard devices by which **buyers** try to bargain for low prices, by getting sellers to agree to treat them as favorably as any of their other customers." *Id*. at 1415 (emphasis added).  Such a provision aims at reducing the buyers' cost for services.  The amended complaint, however, alleges the use a different device that was not at issue in *Marshfield Clinic* or in any of other reported cases on MFNs, namely, a seller side MFN.  Plaintiffs allege that the Defendants compelled Internet Music retailers to execute an agreement that guaranteed each "seller" the best price negotiated by other sellers (i.e. a seller side MFN). ¶¶68, 73, 92, 96, 99.  Thus, if any of the Defendants negotiate a price increase then all the other Defendants receive the benefit of that increase, regardless of whether they have bargaining power to demand a higher price.  Given that the Defendants control approximately 80 percent of the market for Digital Music, this agreement effectively eliminates price competition among the Defendants in the sale of Internet Music.  Furthermore, the "price ceiling" argument assumes that the retailers of Internet Music have sufficient bargaining power to maintain or reduce the prices paid to all the Defendant sellers.  Since the Defendant sellers (as alleged in the Complaint) seek to impede the sale of Internet Music in order to protect CD sales, the retailers of Internet Music lack the bargaining power to discipline Defendants' pricing.  Second, whether an MFN is anti-competitive depends on the circumstances of each case.  Indeed, there are situations where even a "buyer side" MFN can have anticompetitive effects.  *See United States v. Delta Dental of Rhode Island*, 943 F. Supp. 172, 181 (D.R.I. 1996) (noting that in *Marshfield Clinic*, Judge Posner recognized that there may be circumstances where such an MFN is anticompetitive).  Moreover, Defendants cite no case law supporting the alleged practice of Defendants as sellers concertedly imposing MFNs on buyers as a condition of sale.

Defendants agreed to structure and did in fact structure the aforementioned joint ventures so as to fix prices instead of compete with one another[6] (¶89); (viii) Defendants agreed to maintain a price floor for Internet Music (¶¶98-99); (ix) Defendants acted against their individual self interests in order to fix prices (¶¶76, 78, 83, 102, 104); (x) Defendants are the subject of a pending investigation by the Office of the New York State Attorney General relating to wholesale pricing for Internet Music (¶106); and (xi) Defendants are being investigated by the U.S. Department of Justice for possible collusion and price fixing relating to Internet Music (¶107).[7]

Plaintiffs' complaint "has enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 127 S. Ct. at 1964. Setting the parallel conduct and the alleged conspiracy in the proper economic and legal context, plaintiffs have "crossed the line" of mere possibility to plausibility of entitlement to relief.

---

[6]     Defendants repeatedly state that the DOJ examined the joint venture and found no improper conduct. First, the DOJ analysis of the joint venture does not insulate it from subsequent scrutiny or challenge. *See generally Allied Signal v. B.F. Goodrich Co.*, 183 F. 3d 568, 575 (7th Cir. 1999) (noting that (in the context of a HSR review of a proposed merger that met with no objection from the FTC and DOJ), '[f]ederal regulators will not necessarily challenge every potentially troublesome merger, which is why Congress made private enforcement 'an integral' part of the congressional plan for protecting competition'). Second, this argument ignores that Plaintiffs' allegation that the Defendants concealed from the DOJ the seller side MFNs.  A secret arrangement that constrains the conduct of the venture participants can undermine the legitimacy of the venture.  *See*, *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F. 2d 263 (2nd Cir. 1979), *cert. denied*, 444 U.S. 1093 (1980). Thus, the DOJ's failure to object to the joint venture should have little or no weight, especially at the pleading stage.

[7]     Unlike *Twombly*, this is not a geographic market allocation case and the government never sanctioned a digital music monopoly or carved up the market for Internet music and CDs. In contrast, the federal government had sanctioned a monopoly for years with the old AT&T and later the Baby Bells.  The Supreme Court thought the "natural" explanation for the lack of competition among the Baby Bells was that these former government-sanctioned monopolists had never competed with one another. *Twombly*, 127 S. Ct. at 1972.

### A.   Plaintiffs Plead Economic Facts Supporting the Inference of Conspiracy

In recognizing that allegations of parallel conduct *and* "plus factors" state a §1 claim,[8] the Supreme Court relied on scholarly writings discussing antitrust plus factor jurisprudence: 6 Areeda & Hovenkamp, *Antitrust Law*, ¶1425 (2d ed. 2003) ("Areeda") and Blechman, *Conscious Parallelism, Signaling and Facilitating Devices: The Problem of Tacit Collusion Under the Antitrust Laws*, 24 N.Y.L. Sch. L. Rev. 881, 899 (1979) ("Blechman"). Blechman, for instance, lists the following "plus factors" that have been frequently recognized by courts as sufficient with parallel pricing to allow the inference of a conspiracy: (1) motive to conspire; (2) pervasiveness of the parallel conduct; (3) pricing contrary to economic factors; (4) the presence of extraordinarily high profits; and (5) Defendants' "past proclivity for antitrust violations." Blechman at 886. Plaintiffs allege that Defendants' have a strong motive to conspire (¶79); their conspiracy is pervasive (¶¶82, 86, 89); their prices bear little relation to economic factors (¶¶69, 91); Defendants – or entities controlled by the Defendants – have been engaged in nearly constant antitrust and consumer protection litigation for over a decade (¶¶106-112).

Similarly, Judge Posner, in his antitrust treatise, recognizes all of the factors discussed in Areeda and Blechman. Posner, *Antitrust Law*, at 69-93 (2d ed. 2001) ("Posner"). Among the factors Posner cites as "conditions propitious for the emergence of collusion" are (1) market concentration on the selling side; (2) lack of concentration on the buying side; (3) similar cost structures among defendants; (4) cooperative practices among defendants; and (5) defendants' "record of price fixing

---

[8]     *Twombly*, 127 S. Ct. at 1966 n.4. *Twombly* also recognized that a complaint alleging only parallel conduct could be sustained if the parallelism was sufficiently unusual (*e.g.*, "'complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason' would support a plausible inference of conspiracy"). *Id.* at 1966, 1972.

or related antitrust violations." *Id.* at 69-79.  Plaintiffs allege each of these factors here. *See* ¶39 (the industry is concentrated); ¶47 (there are thousands of class members); ¶¶70-71, 74 (cost allegations alleged against all the Defendants);  ¶¶72, 131 (cooperation through joint ventures and trade associations); ¶¶106-112 (antitrust record).   Particularly strong factors may make it "possible to demonstrate through economic evidence the existence of collusive pricing even though no overt acts of collusion are detected." Posner at 79-93.   These include competitors' exchange of price information and prices unjustified by changes in defendants' costs.[9] *Id.* at 80-88.

Economic factors probative of the existence of an illegal conspiracy identified in treatises and case law focusing on parallel conduct, together with plus factors warrant sustaining the Complaint as one in which Plaintiffs "nudged their claims across the line from conceivable to plausible." *Twombly*, 127 S. Ct. at 1974.

**Interfirm Communications and Opportunities to Conspire**.  Professor Areeda notes, "Ordinarily, however, it will be necessary to infer from the circumstances that parallel action depended upon advanced communication and understanding." Areeda, ¶1425a.  Areeda identifies several factors that support an inference of "advance communication and understanding" in a concentrated industry.  The first is "[v]erbal communication, direct and indirect."  *Id.* at ¶1430a. Courts have held that high levels of interfirm communication constitute a plus factor. *See, e.g., Apex Oil Co. v. Di Mauro*, 822 F.2d 246, 254 (2d Cir. 1987); *Petruzzi's IGA Supermarkets v. Darling-Delaware Co.*, 998 F.2d 1224, 1242 (3d Cir. 1993); *In re Plywood Antitrust Litig.*, 655 F.2d 627,

---

[9]     Plaintiffs' allegations must be taken as true and without "tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).  Thus, the Court should reject Defendants' efforts to analyze Plaintiffs' allegations on a piecemeal basis and quibbles over various factual allegations.

633-37 (5th Cir. 1981); *C-O-Two Fire Equip. Co. v. United States*, 197 F.2d 489, 493 (9th Cir. 1952).

Posner identifies the exchange of price information between competitors as especially strong circumstantial evidence of conspiracy. Posner at 86-87. In concentrated markets "the inference is stronger" that the information "is sought primarily to facilitate cartelization." Posner at 86-87. Plaintiffs allege that Defendants' common membership in the RIAA, pressplay and MusicNet allowed them to exchange pricing and licensing terms. ¶¶32-33, 80-81, 85-88. Defendants are certainly not small sellers without price power and plaintiffs have alleged that the market for Digital Music is highly concentrated. ¶6. As Judge Patel put it, "even a naïf must realize that in forming and operating a joint venture, plaintiffs' representatives must necessarily meet and discuss pricing and licensing, raising the specter of possible antitrust violations." *In re Napster, Inc. Copyright Litig.,* 191 F. Supp. 2d 1087, 1109 (N.D.Cal. 2002).

**Parallel Price Increases that Bear No Relationship to Costs**. Pricing behavior that is not explained by business costs, as Plaintiffs allege, is a well-recognized plus factor that together with price parallelism raises an inference of a conspiracy.[10] As Judge Posner explains: "Simultaneous price increases unexplained by any increases in cost may therefore be good evidence of the initiation of a price-fixing scheme." Posner at 88; *accord* Blechman at 886. Numerous courts have found pricing practices that bear little or no relationship to costs as probative evidence of conspiracy. *See In re NASDAQ Market-Makers Antitrust Litig.*, 894 F. Supp. 703, 714 (S.D.N.Y. 1995); *Monument Builders of Greater Kansas City, Inc. v. American Cemetery Ass'n of Kansas*, 891 F.2d 1473, 1482

---

[10]    Defendants attempt to reframe Plaintiffs' allegation regarding this plus factor as simply a reiteration of their parallel pricing and terms allegations and then recite *Twombly*'s holding that, in most cases, parallelism, taken alone, does not raise the necessary inference of conspiracy. Def. Mem. at 14-17. Defendants also launch a premature and impermissible attempt to argue the facts without, *inter alia*, an evidentiary record, developed factual discovery, and subsequent expert testimony.

(10th Cir. 1989); *C-O-Two Fire Equipment,* 197 F.2d at 497.[11]   Here, Plaintiffs plead that Defendants set prices at supracompetitive levels unjustified by cost and placed similar pricing and licensing restrictions on the sale of Internet Music, and that these price increases and consumer friendly restrictions were not explained by changes in Defendants' costs.  ¶¶70-79.

**Market Concentration**.  A large number of evenly matched firms is an impediment to collusion, especially "when their number exceeds 10 or 12."  Areeda, ¶1430f.  Here, four defendant music labels control well over 70% of the market for Digital Music.  ¶6.

**High Barriers to Market Entry**.  Price coordination is more difficult when substitute products are available or firms can enter the market with ease.  Areeda, ¶1430g.  Plaintiffs, however, allege that there are high barriers to market entry.  ¶¶55-57.

**Motive to Conspire**.  Plaintiffs also allege that defendants had a strong collective motive to fix prices and retard the emergence of the Internet Music sales, and in fact did so, in order to raise compact disk ("CD") prices to supracompetitive prices.  ¶¶2, 7, 77, 79, 95.  The Supreme Court has expressly and repeatedly ruled motive *is* a relevant consideration in Sherman Act cases.  In *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 225 (1939), the Court upheld an injunction based on "unanimity" of conduct and "the strong motive for such unanimity of action."  In *Poller v. CBS*, 368

---

[11]    This factor further distinguishes this case from *Twombly*, a market allocation case based on the Baby Bells' perceived lack of competition.  There, plaintiffs claimed conspiracy on the basis that none of the Baby Bells deviated from the **status quo** by challenging each others' geographic strongholds.  *Twombly*, 127 S. Ct. at 1972.  Here, plaintiffs do not claim that inferences should be made from a parallel **lack** of action, but from action, *i.e.*, parallel price restriction of Internet Music and parallel imposition of unfavorable terms (such as MFNs) and DRM) that are "unexplained by any increases in cost."  ¶¶2, 7, 63-65, 69-71, 77, 82-95.

Defendants incorrectly argue that parallel pricing does not support the inference for conspiracy.  Unlike in *Twombly*, Plaintiffs have alleged price fixing and parallel pricing through the use of MFNs.  Courts have long recognized price parallelism, in addition to product uniformity, exchange of price information and opportunity to meet to form anti-competitive policies as plus factors supporting an inference of a conspiracy.  *C-O-Two Fire Equip.*, 197 F.2d at 493.

U.S. 464 (1962), the Court reversed a grant of summary judgment because of plaintiff's evidence of CBS's motive to cancel its affiliation agreement with a local television station.  In *First Nat'l Bank v. Cities Serv. Co*., 391 U.S. 253, 287 (1968), the Court recognized the probative value of motive allegations, noting that the plaintiff had failed to allege a plausible motive for defendants to conspire. In *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, the Court found plaintiffs had failed to show that defendants had "any rational motive to conspire."  475 U.S. 574, 596-597 (1986); s*ee also* Posner at 71.

Lower courts have also found motive to conspire combined with parallel pricing sufficient to allow an inference of conspiracy.  In *Fuentes v. South Hills Cardiology*, the court noted that "[a]lthough [plaintiff] does not allege any meetings or phone calls at which this conspiracy was carried out, his allegations identifying the conspiracy's participants, purpose and motive are sufficient to survive a motion to dismiss." 946 F.2d 196, 202 (3d Cir. 1991).  Likewise, in *NASDAQ*, 894 F. Supp. at 713-14, the court, after reviewing the plaintiffs' allegations of several of the plus factors alleged here, including common motive to conspire, denied defendants' motion to dismiss. Summary judgment was denied in *In re Northwest Airlines Corp. Antitrust Litig*., when defendants' parallel practice of "labeling of hidden-city ticketing as fraud would tend to overcome any individual Airline's inclination to weigh the competitive advantages and disadvantages of allowing the practice, and would instead provide a common motive for all Airlines to take action against it."  208 F.R.D. 174, 200 (E.D. Mich. 2002).

**Defendants' Antitrust Record.**  Posner, Areeda, and Blechman all agree that a record of price fixing supports an inference of collusion.  Areeda,  ¶1421a ("But if there is other evidence of a present conspiracy, the defendants' sins elsewhere may cast doubt on the truthfulness of their innocent explanations."); Posner at 79; Blechman at 886.  Defendants' "sins" against free and

competitive markets are relevant, and taken together with the other evidence strongly support Plaintiffs' allegations.  Plaintiffs plead, and Defendants of course do not dispute, that Defendants are under investigation by the New York Attorney General and the United States Department of Justice; that the Defendants were found to have flagrantly violated payola laws and sought to cover up their illegal behavior; and that Defendants' were subject to a number of lawsuits and investigations regarding the pricing of CDs. ¶¶106-112.

Because Defendants' antitrust record is a recognized plus factor, pleading that record is appropriate.  Therefore, Defendants' motion to strike ¶¶109-112 should be denied.[12]  *See* Section VIII *infra.*

The "antitrust record" here also includes claims similar to those asserted in the *In re Napster, Inc. Copyright Litig*ation, which the United States District Court for the Northern District of

---

[12]     Motions to strike are disfavored and challenged matters in a pleading will not be stricken unless it is clear that it can have no possible bearing upon the subject matter of the litigation.  *See Eskofot A/S v. E.I. Du Pont De Nemours & Co.*, 872 F. Supp. 81, 93 (S.D.N.Y. 1995) (*citing Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976)). Defendants' reliance on *Lipsky* is misplaced. 551 F.2d at 893-94. ("ordinarily neither a district court nor an appellate court should decide to strike a portion of the complaint – on the grounds that the material could not possibly be relevant – on the sterile field of the pleadings alone").  Indeed, *Lipsky* confines itself to "the facts of this case," which differ greatly from those here. *Lipsky* arose from the attempted rescission of an agreement transferring stock, and the court struck references to only a single consent judgment while permitting the inclusion of references to the matters that lead to the consent judgment, including "the SEC's [related] opinion" that "may be relevant and may be admissible."  Defendants rely on three other cases to contend that reference to previous lawsuits and investigations are only relevant only if they reached a merits decision:  *In re Merrill Lynch & Co. Inc. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78-79 (S.D.N.Y. 2003) (securities action); *Shahzad v. H.J. Meyers & Co., Inc.*, No. 95 Civ. 6196 (DAB), 1997 WL 47817, at *14 (S.D.N.Y. Feb. 6, 1997) (securities action); *Ledford v. Rapid-Am. Corp.*,  No. 86 Civ. 9117 (JFK) 1988 WL 3428, at *1 (S.D.N.Y. Jan. 8, 1988) (age discrimination).  Like *Lipsky*, these cases are easily distinguished.  None are antitrust actions where previous investigations and litigation may be relevant, and courts in this district take a different approach. *Yankees Entm't & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657, 677 (S.D.N.Y. 2002) ("While the Court is skeptical that bald allegations of tying in another product/geographic market would have any relevance to the issues here . . . it is a question better left to more advanced stages of this lawsuit."); *see also* Section VIII *infra.*

California, by the Honorable Marilyn Hall Patel, has already ruled sufficient.  354 F. Supp. 2d 1113 (N.D. Cal. 2005).[13]

As a counterclaimant in *Napster*, HW alleged that "the major five record labels," engaged in "anticompetitive conduct in the market for the online distribution of recorded music."  HWC ¶21.  Specifically, like Plaintiffs, HW alleged that the labels made a "concerted effort to stop" online distribution of music altogether when Internet music first became a viable technology, and when the labels eventually were unable to "resist the technological tide[,] . . . embarked on a scheme to cartelize" online sales of music via the collusive joint ventures MusicNet and pressplay.  HWC ¶¶22-24.  HW further alleged, as plaintiffs do here, the purpose of the joint ventures was to "effect a price-fixing arrangement among horizontal competitors in the wholesale distribution of recorded music in digital form[.]"  HWC ¶25.

In granting Napster's request to seek discovery on its antitrust-related copyright misuse defense, Judge Patel found that: "The evidence [presented by Napster] also suggests that [the labels'] entry into the digital distribution market may run afoul of antitrust laws.  *See generally* Noll. Dec."  *In re Napster, Inc. Copyright Litig.*, 191 F. Supp. 2d 1087, 1102 (N.D. Cal. 2002).  ***The Noll declaration that Judge Patel referenced was later published and heavily quoted in Plaintiffs' complaint***.  ¶¶85-86.  Plaintiffs further quote Judge Patel's opinion in ¶87 of the complaint:

---

[13]     The counterclaims in the case, filed on August 13, 2004 by Hummer Winblad Venture Partners ("HW"), is attached as Ex. A to the Declaration of Imtiaz A. Siddiqui, dated September 13, 2007 ("Siddiqui Decl.") and is cited herein as "HWC."  HW was an investor in Napster and was sued by the record companies as Napster's alter-ego.  HW filed antitrust counterclaims.  Judge Patel recognized the similarity of Plaintiffs' and HW's antitrust cases against the record labels, ruling, over the labels' strenuous opposition, that the *Bulcao* action, No. C-06-01752 (N.D.Cal.), and latter several other actions now consolidated before the Court, were related to the *Napster* litigation, and that all such actions filed within the Northern District of California should be reassigned and litigated alongside the *Napster* litigation.  Related Case Order dated April 26, 2006 attached Ex. B to Siddiqui Decl.

> even a naïf must realize that in forming and operating a joint venture, [record label] representatives must necessarily meet and discuss pricing and licensing . . . [t]hese joint ventures bear the indicia of entities designed to allow [record labels] to use their copyrights and extensive market-power to dominate the market for digital music distribution.  Even on the undeveloped record before the court, these joint ventures look bad, sound bad and smell bad.

*In re Napster, Inc. Copyright Litig.*, 191 F. Supp. 2d at 1109.

Judge Patel thus found Napster's allegations of collusion by the record labels met the higher Rule 56(f) "burden to show what specific facts it hopes to discover that will raise an issue of material fact."  *Id.* at 1094.  Because Judge Patel's opinion recounts Defendants' "antitrust record," Defendants motion to strike ¶87 of the Complaint should be denied.

### B.    Defendants Improperly Propose a "Probability" Standard

Defendants misread *Twombly* to require factual specificity.  Under *Twombly,* Plaintiffs may allege circumstantial evidence if sufficient to infer an agreement to fix prices.  Plaintiffs' economic allegations here state a plausible case that Defendants agreed to restrain trade.  *Twombly* does not allow the court to weigh competing "plausible" inferences.  "Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 127 S. Ct. at 1965.[14]  As the Second Circuit has stated post-*Twombly*, a ruling on a motion to dismiss is not an occasion for the Court to weigh factual assertions, let alone make findings of fact

---

[14]     In support of their position, defendants curiously rely on three inapposite cases, two of which are from outside the Second Circuit.  In *Lum v. Bank of Am.*, 361 F.3d 217, 231 (3d Cir. 2004), the Third Circuit applied Rule 9(b) pleading standards to the antitrust allegations in what was in essence a RICO and fraud action.  *Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660 F.2d 1195, 1200 (7th Cir. 1981) was decided on summary judgment where the court found insufficient evidence that defendants fixed prices by use of a common formula.  Finally, in *Yellow Pages Solutions, Inc., v. Bell Atl. Yellow Pages Co.*, 00 Civ. 5663 (MBM), 2001 U.S. Dist. LEXIS 18831 (S.D.N.Y. Nov. 19, 2001), the plaintiffs did not even allege specific prices that the defendants fixed.

as, for example, Defendants ask the Court to do concerning the legitimacy of MusicNet and pressplay.  *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).

## II.    PLAINTIFFS' ANTITRUST CLAIMS HAVE NOT BEEN RELEASED

Defendants contend that the claims asserted against them through February 1, 2005 are barred by a release ("the *Ottinger* Release") given by a plaintiff settlement class ("the *Ottinger* Class") in connection with the coordinated settlement of indirect purchaser claims in *Ottinger, et. al v. EMI Music Distribution, et al*, Civil Action No. 24885-II (Tenn. Cir. Ct.). Def. Mem. at 17; Almeida Decl., Ex. E ("the *Ottinger* Stipulation").  Defendants greatly overstate both the ***breadth*** of the *Ottinger* Class and the ***scope*** of the *Ottinger* Release.  At most, the *Ottinger* settlement only releases claims relating to CDs purchased prior to September 29, 2003.

### A.    Defendants Overstate the Breadth of the *Ottinger* Class

*Ottinger* involved a multi-state class settlement of ***indirect*** purchasers of prerecorded CDs made in conjunction with and conditioned upon approval of a ***direct*** purchaser settlement in *In re Compact Disc Antitrust Litig.*, MDL Docket No. 1216 (C.D. Cal.). [15]  Defendants overstate the ***breadth*** of the *Ottinger* Release.  The *Ottinger* Release applies only to those then ***existing*** claims that "any Plaintiff or any Settlement Class member now has or has ever had based upon the matters alleged (or which could have been alleged) in the Complaints in the [*Ottinger*] Litigation or the Related State Actions."  *Ottinger* Stipulation, §1.16. The scope of such a purportedly broad class release (*e.g.*, of all class claims based on matters that "were or could have been alleged") is constrained by the "identical factual predicate" doctrine.  *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 106 (2d Cir. 2005).

---

[15]    The Ottinger Release would have no bearing on the claims by direct purchasers in this litigation since by its own definition, it applied to and released only the claims of indirect purchasers.

A class action settlement may be framed to "prevent class members from subsequently asserting claims relying on a legal theory different from that relied on in the class action complaint, but depending *on the very same set of facts*." *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 18 n.7 (2d Cir. 1981); *see also TBK Partners, Inc. v. Western Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982). Class action releases may include claims not presented *only if* the released claims arise out of the "*identical factual predicate*." *Wal-Mart*, 396 F.3d at 107; *TBK Partners*, 675 F.2d at 460. Class members' claims may be barred only "where there is a *realistic identity of issues* between the settled class action and the subsequent suit, and where the relationship between the suits is at the time of the class action *foreseeably obvious to notified class members*." *TBK Partners*, 675 F.2d at 461.

Defendants make no real effort to demonstrate that the claims alleged here and in *Ottinger* share the requisite "identical factual predicate." Comparison of the Complaint here and the Fifth Amended Complaint filed in *Ottinger* ("*Ottinger* 5AC") – the pleading which Defendants identify (Def. Mem. at 18) as indicative of the breadth of the *Ottinger* Release – readily confirms that there is no "realistic identity of issues" raised in the two pleadings.[16] Nowhere does the *Ottinger* 5AC

_____

[16]     As summarized above, the complaint *sub judice* is brought on behalf of persons who purchased Digital Music, either on-line ("Internet Music") or on CDs. ¶¶2, 43-45. Plaintiffs allege that Defendants conspired first to restrict the output of Internet Music, and then fix the prices of Internet Music. ¶¶3, 66. The conspiracy had several alleged aspects and stages: first, the establishment of certain joint ventures ("MusicNet" and "pressplay"), through which the Defendants allegedly came to agreements on restraints in the sale of Internet Music (¶¶67, 72, 75-87), including seller-side MFNs (¶¶68, 92-98, 119); the fixing of a 70 cent wholesale price floor; and other collusive terms of sale of Internet Music such as "Digital Rights Management" ("DRM") restrictions that the Defendants forced on Internet Music licensees. ¶¶69, 79-81, 100, 120. As a consequence of the alleged collusion regarding Internet Music, the prices of both Internet Music and CDs were inflated over what they would have been absent Defendants' actions with respect to Internet Music. ¶¶3, 66, 82-84. Defendants allegedly structured their on-line services "such that their economic incentives were to charge monopoly prices for Internet Music rather than compete with one another on price." ¶89. Plaintiffs also allege that the Defendants concealed their MFNs in so-called "White

mention Internet Music, MusicNet, pressplay, the use of MFNs, the use of DRM, White Papers, or

70 cent wholesale price floors.  Defendants' description of Plaintiffs' claims, slanted as it is,

acknowledges factual predicates completely alien to the *Ottinger* 5AC.  *See* Def. Mem. at 8-16; *see*

*e.g., id.*, at 1 (arguing that Plaintiffs' claims were prompted by newspaper articles first published in

late 2006).  In fact, Defendants argue that Plaintiffs here have ***not*** alleged an unlawful agreement to

fix the price of CD's as was alleged in *Ottinger*.  Def. Mem. at 20, 21(footnote omitted).

In short, this case is premised on conduct relating to the advent of the on-line sale of Internet

Music, a phenomenon nowhere mentioned or even hinted at in the *Ottinger* 5AC.  Because the

claims alleged here and in *Ottinger* do not arise from a shared set of operative facts – let alone an

"identical factual predicate" that was "foreseeably obvious to notified class members" at the time of

---

Papers" presented to the DOJ.  ¶¶91-93.  Defendants' actions spawned the opening of a DOJ
investigation regarding the sale of Internet Music in March 2006.  ¶¶107-110, 115.

In *Ottinger*, by contrast, the plaintiffs alleged that the Defendants employed certain collusive
schemes to maintain CD profit margins well above those for vinyl records or cassette tapes, even
though the cost of producing CDs had dropped steadily since the CD format was introduced in 1983.
*Ottinger* 5AC ¶1.  In particular, the *Ottinger* defendants were charged with agreeing to "tiered"
pricing for CDs from so-called "front-line" releases to budget CDs (*Ottinger* 5AC ¶1), using "price
signaling" through a number of public and private means (*e.g. Ottinger* 5AC C ¶47), such as
circulating price lists to retailers far in advance of price increases ("thereby allowing the co-
conspirators plenty of time to match the new price points") (*Ottinger* 5AC ¶48); statements in the
recording industry trade press (like that of EMI's president, whose public statement that "hits should
be selling for near $16.98" was followed within weeks by industry price-increases matching $16.98)
(*Ottinger* 5AC ¶¶48, 49); trade association meetings between 1992 and 1996 (*Ottinger* 5AC ¶50),
direct meetings among defendants' officers and chief executives, such as at the March 1993 National
Association of Recording Merchandisers meeting at which letters threatening various forms of
retailer punishment for selling used CDs were circulated to protect the market for new CDs; a 1992
or 1993 meeting at which rebates to retailers were discussed as an alleged "overt step in furtherance
of Defendants' conspiracy" (*Ottinger* 5AC ¶¶51-53); and meetings of credit managers to discuss
terms of credit extended to retailers (*Ottinger* 5AC ¶54).  The *Ottinger* plaintiffs further alleged that
defendants' price discrimination was reflected in cheap CD sales to record clubs, based on an alleged
"collusive agreement to restrict royalty payments to recording artists for sales to record clubs."
*Ottinger* 5AC ¶¶56-58.  The *Ottinger* plaintiffs also alleged that the defendants monitored
compliance with the conspiracy by sharing access to accurate unit sales and revenue data.  *Ottinger*
5AC ¶55.

the *Ottinger* settlement – the present claims are beyond the reach of the *Ottinger* Release.  *TBK Partners*, 675 F. 2d at 461.

     **B.**     **Defendants Overstate the Scope of the *Ottinger* Class**

The *Ottinger* Class was defined as follows:

> All indirect purchasers of new prerecorded music compact discs ("CDs") distributed by Defendants, which purchasers did not purchase such CDs for resale, in Alabama, Arizona, California, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, Wisconsin, and the District of Columbia ***at any time during the Class Period***, but excluding Defendants, their parents, subsidiaries, affiliates and employees, The Columbia House Company, BeMusic, Inc. (or its predecessors), and other CD clubs owned or operated by any of the Defendants, and persons who have purchased CDs exclusively from such CD clubs, The Columbia House Company, or BeMusic, Inc.

*Ottinger* Stipulation, §1.19.  The *Ottinger* Class Period is, in turn, defined as "the time period from June 1, 1991, to the date of execution of this Stipulation" – September 29, 2003.  *Id.*, §1.5; *see also,* Def. Mem., at 17-18 (acknowledging *Ottinger* Stipulation of Settlement dated Sept. 29, 2003).  In short, the *Ottinger* Class included only persons who purchased "new prerecorded music compact discs" between June 1, 1991 and September 29, 2003.

     Obviously, only members of the *Ottinger* Class are bound by the *Ottinger* Release. *Ottinger* Stipulation, §1.16 (release by its terms given only by members of the *Ottinger* Class).  For example, Defendants acknowledge that Nebraska residents, excluded from the *Ottinger* Class definition, are not bound by the *Ottinger* Release.  *See* Def. Mem. at 17-19; *Ottinger* Stipulation, §1.19.  Whatever its breadth (discussed *supra*), the *Ottinger* Release at most extends only to those putative class members who purchased "new prerecorded music compact discs" before September 29, 2003. Therefore, excluded from the *Ottinger* Class definition and unaffected by the *Ottinger* Release are

(1) persons who purchased CDs after September 29, 2003, and (2) persons who purchased on-line music at any time.[17]

Defendants' emphasis on the "Effective Date" of the *Ottinger* settlement is a red-herring. Def. Mem. at 17-20 & 19 n. 11.  The "Effective Date" by definition is the date on which all the conditions precedent to the *Ottinger* settlement were satisfied or excused.  *See Ottinger* Stipulation, §§1.8; 10.1.  The "Effective Date" has no bearing on the **scope** of the settlement Class, which is defined by the Class Period and without reference to the "Effective Date."  *Id.*, §§1.15 & 1.19.  Thus, the *Ottinger* Release could extend no further than purchases made before September 29, 2003 – not through February 1, 2005, as Defendants argue.[18]

### C.    Applying the Ottinger Release to the Instant Claims Would Violate Due Process

Construing the *Ottinger* Release to bar the claims alleged in this action would violate due process on a number of levels.  Defendants have failed to establish that members of the *Ottinger* Class were given notice that claims predicated upon the sale of Internet Music were somehow being released in the *Ottinger* settlement.  *See Nat'l Super Spuds*, 992 F.2d at 191 (no preclusive effect given where settlement agreement enlarged scope of claims to be released without notice to class members); *see also Consolidated Edison, Inc. v. Northeast Utilities*, 332 F. Supp. 2d 639, 652-53 (S.D.N.Y. 2004) (refusing to interpret release more broadly than indicated in class settlement notice).  Nor does the Class Notice suggest that the *Ottinger* settlement would preclude claims

---

[17]    Neither of the two cases cited by Defendants supports extending a class release to non-class members, or otherwise beyond its express terms.  *Krumme v. Westport Stevens, Inc*. 238 F.3d 133, 144 (2d Cir. 2000) (an unambiguous release must be enforced "according to its terms"); *Geron v. County of Nassau*, No. 95 Civ 3994 (LLM), 2004 WL 639615, at *8 (S.D.N.Y. Mar. 30, 2004) (enforcing individual release where releasor failed to present grounds to set aside release and in any event suffered no prejudice from its enforcement).

[18]    Even under Defendants' approach, purchases of Digital Music (whether on-line or by CD) made after February 1, 2005, are unaffected by the *Ottinger* Release.

arising out of anti-competitive conduct occurring **outside** the *Ottinger* Class Period; to the contrary, the Class Notice in *Ottinger* speaks solely in terms of **existing** claims the CD purchaser "now has or ever had. . . ."  Siddiqui Decl. Ex. C (*Ottinger* Notice of Proposed Class Settlement And Cash Rebate Settlement Hearing, filed Sept. 30, 2003) at 3.

Furthermore, Defendants present no evidence that the settlement and release of such future claims were considered separately from claims of current injury. *Stephenson v. Dow Chem. Co.*, 273 F.3d 249, 260-61 (2d Cir. 2001), *aff'd in part by an equally divided court and vacated in part*, 539 U.S. 111 (2003); *accord*, *Super Spuds*, 660 F. 2d at 19; *Consolidated Edison*, 332 F. Supp. 2d at 651-52.  Certainly the *Ottinger* settlement provides no consideration to the holders of such subsequent claims.  *In re Auction Houses Antitrust Litig.*, No. 00 Civ. 0648 (LAK), 2001 WL 170792, at *13 (S.D.N.Y. Feb. 22, 2001) ("[A]n expanded release requires the allocation of at least some of the settlement consideration to the holders of the claims prejudiced by the expansion unless the class action judgment would bar the released claims by application of principles of former adjudication."), *aff'd*, 42 Fed. Appx. 511, 517-19 (2d Cir. 2002).

## III. PLAINTIFFS STATE A CLAIM REGARDING END PURCHASER CD DAMAGES CLASS

Plaintiffs – including the End Purchaser CD Damages Class (here, "CD Purchasers") – allege a single, industry-wide conspiracy relating to Digital Music and two related (and substitutable) methods for delivering Digital Music to consumers. ¶¶3, 40-41, 66, 82-83, 105, 126, 128.  Plaintiffs further allege that a motive, purpose and intended effect of the conspiracy to inflate the price of Internet Music was to maintain and increase the price of Digital Music sold on CDs.  ¶¶3, 66, 82-83, 105, 126, 128.

Injuries to different groups of consumers of related products can be inflicted by a single antitrust conspiracy, and differently situated plaintiffs can pursue antitrust claims based on

allegations of a single conspiracy affecting varying products.[19]  CD purchases stand within that "area

of the economy . . . endangered by [that] breakdown of competitive conditions" resulting from the

Defendants' anticompetitive conduct targeting, *inter alia*, Internet Music.  *McReady*, 457 U.S. at

480-81.  That Defendants' anticompetitive conduct injured both Internet Music purchasers and CD

Purchasers  does  not  the  bar  the  claims  of  one  group  where  Defendants  intended  to  reap

supracompetitive prices from both.  Plaintiffs state viable antitrust claims related to CD Purchasers,

and dismissal of these claims would be improper.

> ### A.      Plaintiffs Allege that the CD Purchasers Suffered Antitrust Injury in the Form  of  Supracompetitive  Prices  for  CDs,  and,  Therefore  Have Antitrust Standing

The supracompetitive price that CD Purchasers pay for CDs "flows from" Defendants'

anticompetitive conduct.  *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489

---

[19]      *See, e.g.*, *Blue Shield of Virginia v. McReady*, 457 U.S. 465, 482-84 (1982) (class of group health plan subscribers allowed recovery for damages suffered by alleged conspiracy by health insurer and psychiatrists' organization targeted, not at subscribers, but at psychologists); *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 153-56 (3d Cir. 2002) (prices of corrugated containers and corrugated sheets affected by alleged price-fixing of linerboard, a related product); *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 483-84, 495 (7th Cir. 2002) (damages from defendants' alleged price-fixing of copper futures incurred in related markets for physical copper cathode and copper rod); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 989-91 (9th Cir. 2000) (milk sellers sufficiently alleged injury resulting from conspiracy motivated to depress fluid milk prices by fixing bulk cheese prices, which were used to determine cost of fluid milk); *Amarel v. Connell*, 102 F.3d 1494, 1512-13 (9th Cir. 1996) (paddy-rice farmers sufficiently direct victims of rice millers' antitrust conspiracy intended to have impact on both milled- and paddy-rice markets); *Sanner v. Board of Trade of Chicago*, 62 F.3d 918, 929 (7th Cir. 1995) (participants in the cash soybeans market sufficiently alleged injury due to anticompetitive acts committed in the related futures soybeans market, where the close relation of markets indicated that intent to harm futures market suggested intent to harm cash market); *Crimpers v. Home Box Office*, 724 F.2d 290, 294-95, 297 (2d Cir. 1983) (trade show promoter sufficiently alleged injury resulting from cable programmers' anticompetitive acts aimed at television producers and stations); *In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13, 17-19 (3d Cir. 1978) (effects of defendants' conspiracy to fix sugar prices felt by plaintiffs purchasing sugar-based hard candy from same defendants); *Ice Cream Liquidation, Inc. v. Land O' Lakes, Inc.*, 253 F. Supp. 2d at 272-279 (D. Conn. 2003) (defendants' alleged manipulation of butter prices on Chicago Mercantile Exchange for purpose of artificially inflating wholesale milk prices affected class of milk and cream purchasers).

(1977); ¶¶3, 66, 82-83, 105, 126, 128.  The Complaint alleges antitrust injury.[20]  *Id.* Courts have uniformly recognized that higher prices, when flowing from the offending restraint, constitute antitrust injury.[21]

### B.   The Other Factors Relevant to Antitrust Standing Are Satisfied

As Defendants concede, the thrust of the antitrust standing factors is to determine whether there are "other efficient antitrust enforcers 'whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement.'"  *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 444 (2d Cir. 2005) (quoting *Associated Gen. Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 542 (1983)).  Here, there is no suggestion anywhere of any set of purchasers with a greater incentive to challenge the subject collusion as it relates to CDs than the CD Purchasers themselves, the Defendants' obvious customers and necessarily the primary victims of the conspiracy.  The existence of a proposed class of Internet Music purchasers, *see* Def. Mem. at 22, does not preclude standing for the CD Purchasers, the Internet Music purchasers do not have

---

[20]    Defendants' argument that antitrust injury is somehow absent because "purchasers in one market lack standing to recover for competitive injury in another market," Def. Mem. at 22, fails because Plaintiffs allege that both CDs and Internet Music are part of a single Digital Music market, and allege facts that support a finding that they are in the same market.  ¶¶39-40.  Even if CDs and Internet Music were separate markets the argument would still fail because CD purchasers seek to recover for CD overpayments; and Internet Music purchasers for Internet Music overpayments.  It is telling that Defendants only cite Ninth Circuit authority for this point; their proffered argument does not appear to have support in any reported case in the Second Circuit.

[21]    *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("A consumer whose money has been diminished by reason of an antitrust violation has been injured 'in his . . . property' within the meaning of §4."); *A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc.*, 263 F.3d 239, 247 (3d Cir. 2001) (higher prices from output restriction are antitrust injury); *L.A.P.D., Inc. v. General Elec. Corp.*, 132 F.3d 402, 404 (7th Cir. 1997) (Easterbrook, J.) ("Antitrust law is designed to protect consumers from the higher prices . . .); *AD/SAT v. Associated Press*, 181 F.3d 216, 230 (2d Cir. 1999) (equating injury to competition with "'higher prices or reduced output or quality'") (quoting 3 Areeda, Antitrust Law ¶652)); *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 478 (S.D.N.Y. 2001) ("the prototypical example of antitrust injury is an allegation by consumers that they have had to pay higher prices . . . as a result of defendant's anticompetitive conduct").

incentive to recover losses suffered by CD purchasers (and *vice versa*).  Equally, their presence does not dilute CD Purchasers' interest in seeing their damages redressed by pursuing claims based on the Defendants' conduct that also relate to Internet Music.  As noted above, different injuries suffered by consumers of related products may be inflicted by a single antitrust conspiracy, and differently situated plaintiffs can pursue antitrust claims based on allegations of a single conspiracy having effects across varying product lines.

Defendants are also correct that the remaining factors focus principally on issues of causation and directness of injury resulting from the alleged wrongdoing.  But Defendants' claim that "Plaintiffs make no allegations setting forth the causal mechanism that links higher CD prices to an alleged conspiracy to raise Internet Music prices," Def. Mem. at 23, entirely ignores the allegations in the Complaint that allege that higher CD prices result from the anticompetitive conduct directed to Internet Music.  ¶¶3, 40-41, 66, 82-83, 105, 126, 128.[22]  The Complaint also alleges the requisite directness of injury: antitrust standing is appropriate because the CD Purchasers bought CDs, and their transactions with Defendants were an object of the Defendants' collusion.  ¶¶3, 45, 66, 82-83. The causal relation between Internet Music prices and CD prices was not so speculative that it slowed Defendants' efforts to inflate Internet Music prices for the purpose of maintaining or enhancing CD prices.  Elementary economics holds that increasing the price of a substitute also increases the demand, and therefore the price, of the product for which it can be substituted, and Plaintiffs allege that CDs and Internet Music are "viewed as substitutes by both record labels and consumers."  ¶40.

---

[22]    Even disregarding those particular portions of the Complaint, an examination of potentially complicated "causal mechanisms" is unwarranted at the motion to dismiss stage where Plaintiffs' allegations of such a causal link must be accepted as true.  *Ice Cream Liquidation, Inc.*, 253 F. Supp. 2d at 274.

Defendants' related contention that the determination of "whatever the causal mechanism might be" would "require considerable speculation" --- would impose on Plaintiffs a measure of proof that is not amenable to consideration on a motion to dismiss. *See Knevelbaard*, 232 F.3d at 991 (noting that defendants' arguments that effects of conspiracy were speculative failed because complaint alleged such harm and a court deciding a motion to dismiss deals only with the complaint's allegations); *Ice Cream Liquidation, Inc.*, 253 F. Supp. 3d at 274 (declining on a motion to dismiss to make findings on "causal connection" between prices of the price-fixed product and the products purchased by plaintiff noting that such connection had been alleged and could be revisited in discovery).

For the foregoing reasons, Plaintiffs adequately state a claim regarding the CD Purchaser Class.

## IV.   PLAINTIFFS STATUTORY STATE LAW CLAIMS SHOULD NOT BE DISMISSED ON STANDING GROUNDS

Defendants contend that the claims under the laws of certain states[23] should be dismissed on Article III standing grounds because the Complaint does not identify class representatives from those states.  Defendants misconstrue the applicable case law.

This District has twice ***refused*** to dismiss complaints for lack of standing where named plaintiffs in class action litigation have brought state law claims on behalf of plaintiffs in states other than those in which the named plaintiffs resided. *In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 377 (S.D.N.Y. 2002, Koetl, J.); *In re Grand Theft Auto Video Game Consumer Litig.*, No. 06 MD 1739, 2006 WL 3039993, at *2 (S.D.N.Y. 2006, Kram, J.).  Relying on *Ortiz v. Fibreboard*, 527 U.S. 815, 831 (1999), both decisions held that, in these circumstances, class certification issues

---

[23]   Arizona, the District of Columbia, Iowa, Kansas, Maine, Nebraska, Nevada, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia and Wisconsin.

should be resolved before standing issues. *Id.* Ignoring *Ortiz,* Defendants incorrectly contend these recent decisions "conflict directly" with prior Supreme Court precedent.

*Ortiz* held that class certification issues could be decided prior to consideration of Article III standing. The *Ortiz* Court addressed whether a mandatory settlement class could be certified under Rule 23(b)(1)(B) in an asbestos class action. Petitioners argued that the lawsuit was nonjusticiable under Article III because certain absent class members were "exposure only" and had not sustained injury-in-fact. The Court disagreed. It held that the standing of absent class members was properly considered as a class certification issue. *Ortiz*, 527 U.S. at 831 ("But the class certification issues are, as they were in *Amchem*, 'logically antecedent' to Article III concerns…")

Following *Ortiz*, Judge Koeltl in *Buspirone* deferred consideration of Article III standing until after class certification had been decided. *Buspirone*, 185 F. Supp. 2d at 377. In *Buspirone*, plaintiffs alleged the defendant unlawfully conspired to restrain trade. *Id*. at 365-66. Defendant argued plaintiffs lacked standing to assert state law claims on behalf of a nationwide class because plaintiffs only alleged to have purchased Buspirone in fifteen states. *Id*. at 377. Rejecting this argument, Judge Koetl held that the named plaintiffs had standing to bring at least some claims, and that the standing to bring claims on behalf of unnamed plaintiffs in other states would be subsumed by the analysis of commonality and typicality under Rule 23:

> [W]hen a class action raises common issues of conduct that would establish liability under a number of different States' laws, it is possible for those common issues to predominate and for class certification to be an appropriate mechanism for handling the dispute.

*Id*. In accordance with *Ortiz* and *Buspirone*, the court in *Grand Theft Auto* came to a similar conclusion on defendants' motion to dismiss. 2006 WL 3039993, at *3. There, Judge Kram held that the issue was not of standing, but whether the named plaintiffs could properly represent the class under Rule 23. *Id*. & n.3; *accord Payton v. County of Kane*, 308 F. 3d 673, 680, 682 (7th Cir. 2002);

*In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 268-69 n.7 (D. Mass. 2004); *Clark v. McDonald's Corp.*, 213 F.R.D. 198, 204-05 (D. N. J. 2003); s*ee also In re OSB Antitrust Litig.*, No. 06-826 (PSD) (E.D. Pa. Sept. 25, 2006) (copy submitted herewith as Ex. D to Siddiqui Decl.).[24]

By contrast, the only controlling cases Defendants cite stand for the unremarkable proposition that the named Plaintiffs allege injury-in-fact to have Article III standing to represent the class.[25]  In the present case, Plaintiffs allege actual injury, ¶ 6, and thus have Article III standing.

## V.   PLAINTIFFS STATE CLAIMS UNDER THE LAWS OF ALL TWENTY-ONE JURISDICTIONS SET FORTH IN COUNT II OF THE COMPLAINT

The Complaint asserts claims under the antitrust statutes and/or consumer protection statutes of twenty states and the District of Columbia.  ¶136.  As discussed above, Defendants' grounds for dismissal of these state law claims are baseless, and none of the statutory state law antitrust and consumer protection claims should be dismissed.

---

[24]    In *In re OSB*, the Court denied defendants' motion to dismiss indirect purchaser antitrust claims brought under the laws of several "unrepresented" states, stating:  "Plaintiffs have satisfied the elements of standing; they have alleged a concrete economic injury, traceable to Defendants' alleged conspiracy, that may be remedied by a judgment in Plaintiffs' favor.  The remaining issue is whether named Plaintiffs who do not reside in the challenged states, but who nonetheless were injured by Defendants' alleged conduct, may bring claims on behalf of residents of those states. This is a question of whether named Plaintiffs may properly represent the purported class, not whether they have standing to bring their claims in the first instance."  *Id.* at 3.

[25]    For example, defendants rely on *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.,* 433 F.3d 181 (2d. Cir. 2005), a class action brought under ERISA alleging defendant's breach of fiduciary duty.  *In Cent. States*, the named plaintiffs sought restitution and disgorgement, but had not alleged that they sustained either economic or medical injuries. *Id.* at 185.  Based on *Warth v. Seldin,* 422 U.S. 490, 498 (1975) and *O'Shea v. Littleton,* 414 U.S. 488 (1974), the Second Circuit emphasized that to satisfy Article III standing requirements, the named plaintiffs must have been personally injured by the defendants, *id.* at 199, and remanded the case for further consideration of this issue.  *Id.* at 200-04.

Defendants cite *Cent. States* for the proposition that "*on this motion, the named plaintiffs  are the only plaintiffs before the Court,"* Def. Mem. at 26 [emphasis in original].  Yet, the *Cent. States* opinion nowhere states this rule.  In addition, defendants cite *Blum v. Yaretsky,* 457 U.S. 991 (1982), again for the proposition that the class representatives must allege actual injury.  In that case, named class plaintiffs sufficiently established Article III standing as to certain conduct alleged against defendants, but other alleged injuries were too speculative to warrant standing.  *Id.* at 1000-01.

### A.   None of the State Claims Should Be Dismissed Due to Intrastate Limitations

Defendants assert that the District of Columbia, Michigan, New York, South Dakota, Tennessee, West Virginia and Wisconsin antitrust statutes and the North Carolina consumer protection statute require a "specific impact upon or nexus with *intrastate* commerce," and that those claims must be dismissed, because no such impact has been alleged. Def. Mem. at 28 (italics in original).

Defendants base their argument on the fact that the Complaint contains allegations of interstate conduct. Def. Mem. at 27-28. However, Defendants ignore those allegations that allege (directly or by reasonable inference) effects on *intrastate* commerce.[26] Similar allegations have been held sufficient to satisfy any intrastate impact requirements in at least two indirect purchaser antitrust cases. *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 350 F. Supp. 2d 160, 170-75 (D. Me. 2004) (discussing South Dakota, Tennessee and West Virginia antitrust claims with respect to intrastate impact issue); *In re Intel Corp. Microprocessor Antitrust Litig.*, No. MDL 05-1717, 2007 WL 2028113, at *6-*8 (D. Del. July 12, 2007) (noting as sufficient for intrastate impact allegations that putative class members were injured by Intel's alleged conduct throughout the United States); *see also Intel* at *8 ("it is reasonable to infer from Class Plaintiffs' allegations of indirect purchaser

---

[26]    *See*, *e.g.*, ¶39 ("Defendants . . . produced, licensed, distributed and/or sold Digital Music in a continuous and uninterrupted flow of *intrastate* commerce . . .throughout the United States."); ¶40 ("[Defendants] control in excess of 80% of the market for all sales of Digital Music in the United States."); ¶56 ("Defendants produce, license and distribute Digital Music, including Internet Music and CDs, to retailers for sale throughout the United States"); ¶57 (same); ¶127 ("Defendants distribute Digital Music throughout the United States"); ¶3 ("Plaintiffs and members of the Classes have paid more for Internet Music and CDs than they would have in a Digital Music market free from Defendants' illegal restraints of trade"); ¶121 ("Plaintiffs . . . were . . . induced to pay supracompetitive prices for Digital Music"); ¶133 ("plaintiffs and other members of the Classes paid more for Internet Music and CDs than they would have in the absence of the illegal combination, conspiracy and common course of conduct").

injury throughout the United States that Class Plaintiffs' allegations of anticompetitive conduct by Intel include the sale of the x86 microprocessor in Nevada markets").

None of the state statutes cited by Defendants impose any intrastate requirement that would support a conclusion different from the one reached on this issue by the courts in *New Motor Vehicles* and *Intel*.  Indeed, *Intel* specifically found that allegations of nationwide sales and injury were sufficient to allege impact on consumers within the District of Columbia.  *See Intel.* at *7; s*ee also GTE New Media Servs., Inc. v. Ameritech Corp.*, 21 F. Supp. 2d 27, 45 (D.D.C. 1998) (noting that the D.C. statute requires only a "connection within the jurisdiction.").[27]

The Michigan Antitrust Reform Act ("MARA") has **no** language stating or implying any intrastate limitation.  That statute provides that, "[a] contract, combination or conspiracy between 2 or more persons in restraint of, or to monopolize, trade or commerce in a relevant market is unlawful."  M.C.L.A. 445.772.[28]  Because, contrary to Defendants' assertions, Plaintiffs do not assert a claim under the New York antitrust law (the Donnelly Act), Defendants' argument concerning intrastate limitations in that statute are irrelevant.[29]  There is no authority supporting intrastate limitations under the South Dakota and West Virginia antitrust statutes (and in the case of

---

[27]     *Sun Dun, Inc. of Washington v. Coca Cola Co.*, 740 F. Supp. 381 (D. Md. 1990) and 770 F. Supp. 285 (D. Md. 1991), cited by Defendants, do not support a narrower interpretation of the D.C. statute, and to the extent that it does, it is inconsistent with *Intel* and *GTE*, and does not represent the current state of the law.

[28]     *Aurora Cable, Inc. v. Jones Intercable, Inc.*, 720 F. Supp. 600 (W.D. Mich. 1989), cited by Defendants, does not suggest such a limitation.  The cited portion of that case merely provides that since the statute provides that courts should construe MARA as federal courts construe the federal antitrust laws, the *Noerr-Pennington* doctrine applies to MARA.  720 F. Supp. at 603.

[29]     Plaintiffs bring a claim under § 349 of New York's General Business Law ("NYGBL") not under the Donnelly Act, §§ 340-347 of NYGBL.

South Dakota, Defendants cite no such authority). In two cases where dismissal of South Dakota and West Virginia claims was sought on this basis, the motions were denied.[30]

The Tennessee statute is not limited to conduct which solely or predominantly affects intrastate commerce, but rather "applies to illegal conduct that substantially affects commerce within this state." *Sherwood v. Microsoft Corp.*, No. M2000-01850-COA-89-CV, 2003 WL 21780975, at *17-*21 (Tenn. Ct. App. 2003); *accord New Motor Vehicles*, 350 F. Supp. at 173-74 (adopting *Sherwood*).[31] The Wisconsin antitrust statute covers conduct that has substantial effects in the state, even if such conduct occurred predominantly or exclusively outside the state. *Meyers v. Bayer AG*, No. 2003AP2840, 2007 WL 2011483, at *13-*14 (Wis. July 13, 2007).[32] Finally, the North Carolina statute does not require that the illegal conduct take place within the state but only that the

---

[30]    In *New Motor Vehicles*, the Court found that it is ambiguous as to whether it is part of the conspiracy or part of the trade or commerce that must be "within this state" under these statutes. 350 F. Supp. 2d at 172 (South Dakota), 175 (West Virginia). With respect to the South Dakota statute, the Court then observed that "it is logical to assume that the state intended its antitrust coverage to be as broad as possible" and "conclude[d] that the plaintiffs need only allege that a part of the trade or commerce occurred within South Dakota." *Id.* at 172. The Court in *Intel* cited and adopted the reasoning of the *New Motor Vehicles* Court on this point, and found that any intrastate impact requirement was satisfied because "Plaintiffs have, at least by reasonable inference, alleged the sale of computers containing Intel x86 microprocessors in South Dakota." The Court made the same finding and used the same language as to the West Virginia statute. *Id.* at *8. *Anziulewicz v. Bluefield Community Hosp., Inc.*, does not dictate a different result. 531 F. Supp. 49 (S.D. W.Va. 1981). *Anziulewicz* granted a motion to remand by a plaintiff asserting a claim under the West Virginia antitrust law, holding that no federal question existed under the "well-pleaded complaint" rule. 531 F. Supp. at 53. *State ex rel. Palumbo v. Graley's Body Shop, Inc.*, 425 S.E.2d 177 (W.Va. 1992), merely cited the above-referenced portion of the *Anziulewicz* opinion.

[31]    In adopting the *Sherwood* approach, the Court in *New Motor Vehicles* specifically rejected earlier federal court interpretations of Tennessee law on this issue, including *FTC v. Mylan Labs., Inc.*, 62 F. Supp. 2d 25 (D.D.C. 1999), cited by Defendants. *In re Cardizem CD Antitrust Litig.*, cited by Defendants, does not support dismissal of the Tennessee claim. In that case, the Court actually denied defendant's motion to dismiss the claim arguing for an intrastate requirement.

[32]    *Olstad v. Microsoft Corp.*, 700 N.W. 2d 139 (Wis. 2005), cited by Defendants, is not to the contrary: conduct is actionable under the statute if it "substantially affects the people of Wisconsin and has impacts in this state, even if the illegal activity resulting in those impacts occurred predominantly or exclusively outside the state." *Id.* at 158.

conduct have a substantial effect in North Carolina. *See Merck & Co. v. Lyon*, 941 F. Supp. 1443, 1463 (M.D.N.C. 1996) (citing *The InPorters, S.A. v. Hanes Printables, Inc*. 663 F. Supp. 494, 501-502 (M.D.N.C. 1987)).

**B.     None of the State Claims Should Be Dismissed Due to a Presumed Constitutional Limitation to Intrastate Activity**

Defendants also contend that the antitrust statutes of Arizona, Iowa, Minnesota, North Carolina, North Dakota and Vermont must be interpreted as being limited to intrastate commerce because to do otherwise would violate the Commerce Clause.  Defendants do not cite any authority that has ever held that the Commerce Clause so limits state antitrust statutes.  In *Knevelbaard Dairies*, the Ninth Circuit held that the Commerce Clause does not limit state antitrust statutes to intrastate activity, and that such statutes can also apply whenever residents of a state purchase goods, the price of which is affected by anticompetitive conduct committed in other states. 232 F.3d at 993-94; s*ee also Meyers v. Bayer*, 735 N.W.2d  448, 457-58 (Wis. 2007) (*quoting Olstad*, 700 N.W. 2d 139); *People of State of N.Y. by Abrams v. Trans World Airlines, Inc*., 728 F. Supp. 162, 182 (S.D.N.Y. 1989) (GBL §350 action did not violate commerce clause because statute protects New York consumers from unfair or deceptive practices and  any resulting impact on interstate commerce is incidental to the regulation's primary goal).

Defendants' citations to *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429 (1978) and *Flood v. Kuhn* 407 U.S. 258 (1972) are also unavailing.  In *Raymond Motor*, the Supreme Court addressed a Wisconsin statute that prohibited certain tractor trailers from passing through the state of Wisconsin.  In *National Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104 (2d Cir. 2001) ("*NEMA*"), the court distinguished *Raymond Motor* on grounds that also apply here.  *NEMA* held that a Vermont statute requiring labels on lamps did not violate the Commerce Clause because, unlike the regulation

in *Raymond Motor*, it was not a direct restriction on interstate transportation and did not have a "distinct interstate" burden.  272 F. 3d at 111-12.

Second Circuit cases interpreting the Commerce Clause since *NEMA* have consistently held that interpreting a state statute to include interstate commerce does not violate the Commerce Clause unless it imposes a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce.  *E.g.*, *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt.*, 438 F.3d 150, 156 (2d Cir. 2006); *Grand River Enter. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 170 (2d Cir. 2005); *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 216 (2d Cir. 2004).[33]

## C.    No State Claims Should Be Dismissed Based on a Limitation to Deceptive Conduct

Defendants contend that Plaintiffs' claims under the consumer protection laws of Kansas, New Mexico, New York, and North Carolina must fail because those statutes require deceptive conduct, which they contend is not alleged in the Complaint.  Def. Mem. at 30-31.  This misinterprets relevant law (as well as the allegations of the Complaint), as those statutes do not require any allegations beyond what is already alleged in the Complaint.

The New Mexico Unfair Practices Act prohibits not only "***unfair*** or deceptive trade practices" but also "***unconscionable trade practices*** in the conduct of any trade or commerce." N.M. Stat. Ann. §57-12-3.  Price fixing and monopolization are unconscionable conduct under the statute.[34]  Here, Plaintiffs allege a conspiracy that resulted in significant artificial increases in the

---

[33]    *Flood v. Kuhn*, also cited by Defendants, was based on the federal antitrust exemption for Major League Baseball, which obviously has no application here.  *See American Academic Suppliers, Inc. v. Beckley-Cardy, Inc.*, 699 F. Supp. 152, 155-56 (N.D. Ill. 1988) (distinguishing *Flood* and denying motion to dismiss claims under Illinois antitrust and consumer statutes).

[34]    *See New Motor Vehicles*, 350 F. Supp. 2d at 196; *Intel*, 2007 WL 2028113, at *12.

price of Digital Music, conduct that, "results in a gross disparity between the value received by a person and the price paid." *See* N.M. Rev. Stat. §57-12-2(E)(2).

Plaintiffs bring their claim under the Kansas Unfair Trade and Consumer Protection Act is brought under K.S.A. §50-101, *et seq.* ("Restraint of Trade") and not K.S.A. §50-623, *et seq.* ("Consumer Protection"). ¶136(f). In any event, the Kansas Consumer Protection Act prohibits "unconscionable," as well as "deceptive," acts or practices. K.S.A. §50-627.[35] The Kansas statute can be analyzed in much the same way as the New Mexico statute. *See, e.g., Intel*, at *12.

New York's statute (GBL §349) does require that the defendant engage in "an act or practice that is deceptive or misleading in a material way. . . ." *Goshen v. Mutual Life Ins. Co. of N.Y.,* 774 N.E.2d 1190, 1195 (2002). However, New York courts look to the Federal Trade Commission's broad definitions of deceptive practices[36] and recognize that antitrust allegations sufficiently implicate deceptive conduct in order to state a claim under the statute.[37]

The North Carolina statute under which Plaintiffs are assert their claim contains antitrust provisions which prohibit precisely the type of conduct alleged in the Complaint. *See* N.C.G.S.A. §75-1.[38] In addition, the consumer protection provisions of the North Carolina statute prohibit "unfair methods of competition," as well as "*unfair* or deceptive acts or practices." N.C.G.S.A. §75-1.1

---

[35]    *See Gonzalez v. Assoc. Fin. Serv. Co. of Kansas, Inc.*, 967 P.2d 312, 328 (Kan. 1998), cited by Defendants (noting that KCPA prohibits unconscionable and deceptive conduct).

[36]    *See, e.g., Genesco Entertainment v. Koch*, 593 F. Supp. 743, 751-52 (S.D.N.Y. 1984).

[37]    *See Excellus Health Plan, Inc. v. Tran*, 287 F. Supp. 2d 167, 179-80 (W.D.N.Y. 2003); *New York v. Feldman*, 210 F. Supp. 2d 294, 302 (S.D.N.Y. 2002); *Cox v. Microsoft Corp.,* 778 N.Y.S.2d 147, 148 (1st Dept. 2004); *see also In re Intel*, 2007 WL 2028113, at *12.

[38]    The private right of action for such antitrust misconduct (in N.C.G.S.A. §75-16) is applicable to indirect purchasers. *Hyde v. Abbott Labs*, 123 N.C. App. 572, 584 (N.C. Ct. App. 1996).

Assuming *arguendo* that any of the above statutes require allegations of deceptive conduct, such conduct is sufficiently alleged in the Complaint.[39]

### D.   Plaintiffs Are Not Seeking Damages Under the California Unfair Competition Law

Defendants' argument that Plaintiffs cannot recover damages under the California Unfair Competition Law, §17200 (the "UCL"), is irrelevant because Plaintiffs are seeking restitution, not "damages," on this claim (Complaint, Prayer for Relief, ¶D).  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003).   Indirect purchasers may seek restitution for antitrust misconduct under the UCL.  *In re Ditropan XL Antitrust Litig.*, No. M:06-CV-01761-JSW, 2007 WL 1411617, at *5 (N.D. Cal. May 11, 2007).

### E.   Plaintiffs Have Properly Asserted a Claim Under N.Y. GBL §349

Plaintiffs have not asserted a claim under the Donnelly Act, New York's antitrust statute (*see* fn 29 *supra*), despite Defendants' continued insistence that such a claim has been asserted.  *See* Def. Mem. at 32 ("plaintiffs' New York Donnelly Act claim must fail.").    To the extent Defendants assert that Plaintiffs' express waiver of treble damages, special damages and penalties under New York's GBL §349 cannot be effective, they are wrong.  Courts interpreting §349 have consistently

---

[39]     For example, the Complaint alleges that Defendants: (1) "conspired to mask their anticompetitive conduct by pretextually establishing rules to prevent antitrust violations, ignoring them, and then using these sham rules to convince the [DOJ] to drop the investigation it launched in 2001" (¶90); (2) hid most favored nations clauses in their contracts (¶¶93-96); (3) had secret agreements to share competitive information (¶98); and (4) affirmatively and fraudulently concealed their unlawful conduct through various means (¶¶118-123).  Moreover, courts have recognized that price-fixing conspiracies, like the one alleged here, necessarily have a deceptive conduct component. *See, e.g., United States v. Rubin*, 999 F. 2d 194, 198 (7th Cir. 1993), quoting *Texas v. Allan Constr. Co.*, 851 F. 2d 1526, 1530 (5th Cir. 1988) ("[i]t is true of any price-fixing conspiracy that 'it must remain concealed to be successful.'  Because price-fixing is illegal, public knowledge of the activity usually ends the agreement.").

held that parties may waive the potential for multiple damages and thus pursue class actions under that statute.[40]

## VI.     PLAINTIFFS STATE A VALID CLAIM FOR UNJUST ENRICHMENT

Plaintiffs bring a claim for unjust enrichment under the laws of Arizona, California, District of Columbia, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Mexico, New York, South Dakota, Tennessee, Vermont, West Virginia and Wisconsin.  There is no basis for dismissing these unjust enrichment claims as a matter of law.

### A.     Plaintiffs May Plead Unjust Enrichment Claims in the Alternative

Plaintiffs have alleged statutory claims under state antitrust and consumer protection acts. Federal Rule of Civil Procedure 8(e)(2) explicitly allows a party the ability to plead alternative theories of relief.  Defendants argue that equitable claims of unjust enrichment may not be granted when "an adequate remedy at law exists" Def. Mem. at 34-35.  Defendants wrongly imply that this bars a plaintiff from jointly asserting claims at both law and equity.  Whether or not an adequate remedy at law exists is simply not a matter to be considered at the pleading stage.

At the pleading stage, a plaintiff may plead alternative theories of relief because it is unclear which remedy will be supported by the evidence.  A party must elect between inconsistent forms of relief only when both forms of relief become ripe.  The axiomatic rule that equitable relief may not be granted when adequate legal relief exists *does not affect the viability of either type of claim at the pleading stage*.  *See The Pantry, Inc. v. Stop-N-Go Foods, Inc.*, 777 F. Supp. 713, 718 (S.D. Ind.

---

[40]     *E.g.*, *Leider v. Ralfe*, No. 01 Civ. 3137 (HB)(FM), 2004 WL 1773330, at *8-*9 (S.D.N.Y. July 30, 2004); *Cox*, 778 N.Y.S. 2d at 148 ; *Ridge Meadows Homeowners Assoc., Inc. v. Tara Development Company, Inc.*, 665 N.Y.S. 2d 361 (N.Y. App. Div. 4th Dept. 1997); *Noble v. 93 University Place Corporation*, 224 F.R.D. 330, 341 (S.D.N.Y. 2004); *In re Ditropan*, No. M: 06-CV-01761-JJW, 2007 WL 1411617, at *8.

1991), *modified on other grounds by The Pantry, Inc. v. Stop-N-Go Foods, Inc.*, 796 F. Supp. 1164 (S.D. Ind. 1992).[41]

In the face of this tenet, Defendants cite inapposite authority which essentially holds that certain statutory remedies trump or otherwise preempt common law claims.[42]

### B.      Unjust Enrichment Is a Claim Not a Remedy

Defendants further seek to minimize Count III by arguing that it is merely a remedy for the causes of action asserted in Count II and as such, should be dismissed.  *See, e.g.,* Def. Mem., at 35 & n.31.  Defendants rely primarily on *FTC v. Mylan Labs*, 62 F. Supp. 2d 25 (D.D.C. 1999).  *Mylan Labs* is inapposite, as are Defendants' other cases.[43]  There, 32 states sought ***disgorgement*** and

---

[41]      *See also Northwestern Pub. Serv. v. Union Carbide Corp.*, 115 F. Supp. 2d 1164, 1172 (D.S.D. 2000); *George v. Morton*, No. 06-1112 , 2007 WL 680787, at *7 (D. Nev. Mar. 1, 2007); *Bates v. Northwestern Human Servs. Inc.*, 466 F. Supp. 2d 69, 102 (D.D.C. 2006); *In re Neurontin Mktg., Sales Practices, and Prods Liab. Litig.*, 433 F. Supp. 2d 172, 186 (D. Mass. 2006); *IM Partners v. Debit Direct LTD*, 394 F. Supp. 2d 503, 519 (D. Conn. 2005); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004).

[42]      *See Goadby v. Philadelphia Elec. Co.*, 639 F.2d 117, 122 (3d Cir. 1981) (injunction against construction of power line unavailable where claimant had right to challenge the scope of the taking and to receive compensation in a condemnation proceeding); *Reingold v. Swiftships Inc.*, 210 F.3d 320, 321 (5th Cir. 2000) (Louisiana civil code section pertaining to unjust enrichment did not modify or displace the statutory remedies expressly provided for by the Louisiana Uniform Trade Secrets Act).  Likewise irrelevant is *Wrench LLC v. Taco Bell Corp.*, 36 F. Supp. 2d 787-88, 790 (W.D. Mich. 1998), in which the court granted a motion to strike from an amended complaint allegations that were inconsistent with its earlier ruling that plaintiffs' unjust enrichment claim was preempted by the federal Copyright Act.  Defendants do not contend that the Sherman Act preempts Plaintiffs' common law unjust enrichment claims, nor could they after the explicit holding in *California v. ARC Am. Corp.*, 490 U.S. 93, 102 (1989), that federal antitrust laws ***do not*** preempt state law.
         Defendants also seek to recast the restitution remedy inherent in unjust enrichment claims as one for damages.  Def. Mem. at 35 n.31.  In support, they cite, *inter alia*, *Mylan Labs*.  Yet *Mylan Labs* simply held that the FTC, under 15 U.S.C. §53(b), has the ability to seek monetary relief which can take the form of restitution, disgorgement, or asset freeze.  Defendants' citations to two *Microsoft* decisions is equally baffling, as the opinions did not discuss any dichotomy between law and equity or between damages and disgorgement.

[43]      Those cases deal with the scope of ***new*** causes of action created by statute, ***not*** with common law unjust enrichment.  *See Fascione v. CNA Ins. Cos.*, 754 N.E. 2d 662, 666 (Mass. 2001) (interest unavailable under Mass. G.L. c. 90, §34M); *Lubner v. City of Los Angeles*, 53 Cal. Rtpr. 2d 24, 28

*restitution* in connection with those statutory counts under various state antitrust laws.  The states

did not assert *any* common law claims for unjust enrichment.  *Id.* at 34-35.  The Court held that such

remedies were not available to the states under state antitrust statutes *unless* those *statutes* expressly

so provided (as many of the state statutes did).  *Id.* at 43-54.[44]  Common law unjust enrichment is an

established, independent cause of action, which cannot be dismissed out of hand as merely

"duplicative" of Plaintiffs' state statutory claims or a mere remedy to statutory claims.  *State ex rel.*

*Palmer v. Unisys Corp.,* 637 N.W.2d 142, 150 (Iowa 2001).  The unjust enrichment claim must be

evaluated independently of the statutory claims.  *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d

618, 669-70 (E.D. Mich. 2001), *aff'd*, 332 F.3d 896 (6th Cir., 2003), *cert. denied sub nom, Andrx*

*Pharm., Inc. v. Kroger Co.*, 543 U.S. 939 (2004).  Many courts have sustained unjust enrichment

claims for allegedly anti-competitive conduct.[45]  *Mylan Labs* and the other cases string-cited by

---

(Cal. Ct. App. 1997) (damages unavailable under Cal. Art Preservation Act, Cal. Civ. Code §987); *Trade 'N Post, LLC v. World Free Duty Ams.*, 628 N.W. 2d 707, 713 (N.D. 2001) (no private right of action under N.D.C.C. chs. 51-09 or 51-10); *Wyman v. Terry Schulte Chevrolet, Inc.*, 584 N.W.2d 103, 107 (S.D. 1998) (no right to punitive damages under SDCL 37-24-31); *Monroe Beverage Co. v. Stroh Brewery Co.*, 559 N.W. 2d 297, 298-99 (Mich. 1997) (statutory cause of action under M.C.L. §436.30b applied only to beer wholesalers).

[44]     Indeed, the court in *Mylan Labs* confirmed the availability of restitution and/or disgorgement for indirect purchasers under the respective state statutes in Michigan, New Mexico and New York. *See Mylan Labs.*, 62 F. Supp. 2d at 57 (chart).  Notably, the defendants in *Mylan Labs* did not even attempt to dismiss state statutory disgorgement and restitution claims brought on behalf of indirect purchasers in four jurisdictions for whom Plaintiffs assert such claims here in Count III: District of Columbia, New Mexico, South Dakota and Wisconsin.  *Id.* at 44.  Nor did *Mylan Labs* address the propriety of such claims in several jurisdictions included in this action: Arizona, Kansas, Massachusetts, Nebraska and Nevada.

[45]     *See, e.g.*, *Cox*, 778 N.Y.S.2d at 149; *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d at 618, 668-71 (noting that courts often award equitable remedies under common law claims for unjust enrichment where claims based upon contract or other state law violations prove unsuccessful); *In re Lorazepam & Clorazepate Antitrust Litig.*, 295 F. Supp. 2d 30, 51 (D.D.C. 2003); *see also* D. Karon "Undoing the Otherwise Perfect Crime – Applying Unjust Enrichment to Consumer Price-Fixing Claims," 108 W. Va. L. Rev. 395, 405 (2005) (drawing distinction between statutory claims and common law claim of unjust enrichment) (collecting cases).

Defendants address only the remedies available for a particular statutory cause of action and do not limit a Plaintiffs' ability to bring common law claims for unjust enrichment.

### C.    A Massachusetts Claim Is Properly Pled

In a footnote, Defendants argue that since Massachusetts has not passed *Illinois Brick* repealer legislation, such indirect purchaser suits cannot be brought on behalf of its residents.  Def. Mem. at n.32.  This argument was specifically rejected by the Massachusetts Supreme Judicial Court in *Ciardi v. Hoffmann-LaRoche, Ltd.*, 436 Mass. 53, 61 n.15, 762 N.E.2d 303, 310 n.15 (2002). Moreover, the *Ciardi* Court also held that indirect purchasers had standing to sue for anticompetitive conduct under the Massachusetts consumer protection statute even though they had no standing to bring such claims under the Massachusetts Antitrust Act.  Thus, case law permits indirect purchaser suits in Massachusetts despite *Illinois Brick*.[46]

### D.    Privity or Direct Benefit Is Not a Prerequisite to a Valid Claim for Unjust Enrichment

Defendants attack Plaintiffs' unjust enrichment claim by contending Plaintiffs lacked the requisite directness or privity with Defendants as indirect purchasers of Digital Music.  Def. Mem. at 36-37.  All states at issue in this Complaint agree that privity is not required in a claim for unjust enrichment.[47]

---

[46]      *Accord In Re Hypodermic*, No. 05-CV-1602, 2007 WL 1959225, at *3, *16; *In re Relafen Antitrust Litig.*, 221 F.R.D. at 288; *Lorazepam & Clorazepate*, 295 F. Supp. 2d at 51.

[47]      *See D.R. Ward Const. Co. v. Rohm and Haas Co.*, 470 F. Supp. 2d 485 (E.D. Pa. 2006) (Arizona and Vermont law does not require either a direct causal connection between the enrichment and the impoverishment, or the transference of a direct enrichment from the plaintiff to the defendant.); *John A. Artukovich & Sons, Inc. v. Reliance Truck Co.*,126 Ariz. 246 (Az. 1980); *Muehlbauer v. General Motors Corp.*, 431 F. Supp. 2d 847 (N.D. Ill. 2006) (California and Maine); *Jordan Keys & Jessamy, LLP v. St. Paul Fire and Marine Ins. Co.*, 870 A.2d 58, 61-65 (D.C. 2005); *In re Lorazepam & Clorazepate Antitrust Litig.*, 295 F. Supp. 2d 30 (D.D.C. 2003); *Iconco v. Jensen Constr. Co.*, 622 F.2d 1291 (8th Cir. 1980) (Iowa); *Security Ben. Life Ins. Corp. v. Fleming Cos, Inc.* 21 Kan. App. 2d 833, 842-43 (1995); *Aladdin Elec. Assocs. v. Town of Old Orchard Beach*, 645

Indeed, some of Defendants' own citations support plaintiffs' unjust enrichment claims.  *See*

Def. Mem. at 37 (citing *Freeman*, *supra*; *Paschall's, Inc. v. J.P. Dozier*, 407 S.W.2d 150, 154 (Tenn.

1966)) ("It is well established that want of privity between parties is no obstacle to recovery under

quasi contract."); *Haz-Mat Response, Inc. v. Certified Waste Serv. Ltd.*, 910 P.2d 839, 847 (Kan.

1996) ("[R]ecovery under quasi-contract or unjust enrichment is not prohibited simply because the

subcontractor and the owner of the property are not in privity."). The remaining cases cited by

Defendants are readily distinguishable as cases discussing incidental as opposed to indirect benefit.[48]

---

A.2d 1142, 1144 (Me. 1994); *Rabinowitz v. People's Nat'l Bank*, 126 N.E. 289, 290 (Mass. 1920); *Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, No. 207538, No. 207538, 2000 Mich. App. LEXIS 2469, at *16 n.6 (Mar. 21, 2000); *Olson v. Synergistic Techs. Bus. Sys., Inc.*, 628 N.W.2d 142, 150 n.4 (Minn. 2001); *Siebler Heating & Air Conditioning, Inc. v. Jenson*, 326 N.W.2d 182, 184 (Neb. 1982); *Smith v. Hamilton*, 265 P.2d 214, 216 (Nev. 1953); *Ontiveros Insulation Co. v. Sanchez*, 3 P.3d 695, 698-99 (N.M. 2000); *Manufacturers Hanover Trust Co. v. Chemical Bank,* 160 A.D.2d 113, 117 (N.Y. App. Div. 1990); *Anderson v. Dunn*, 4 N.W.2d 810, 812 (S.D. 1942); *Freeman Indus. v. Eastman Chem. Co.,* 172 S.W.3d 512, 525 (Tenn. 1966); *Beauregard v. Orleans Trust Co.*, 182 A. 182, 183-84 (Vt. 1936); *Dunlap v. Hinkle*, 317 S.E.2d 508, 512 n.2 (W.V. 1984); *Puttkammer v. Minth*, 266 N.W.2d 361, 366 (Wis. 1978); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517 (D.N.J. 2004) (analysis for 50 states plus territories); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 670-71 (E.D. Mich. 2001) (California, District of Columbia, Michigan, Minnesota, New York, North Carolina, Tennessee and Wisconsin).

[48]    For example, some involved the ***incidental*** benefit when hospitals provided benefits to nonpaying patients suffering for tobacco related injury under the theory that the hospitals discharged the tobacco companies' legal duties by saving them from bearing costs caused by their fraudulent and wrongful conduct.  *City and County of San Francisco v. Phillip Morris, Inc.*, 957 F. Supp. 1130, 1144-45 (N.D. Cal. 1997); *Allegheny General Hosp. v. Phillip Morris, Inc.*, 228 F.3d 429, 447 (3d Cir. 2000).  The courts in *Allegheny* and *San Francisco* dismissed these claims reasoning that since the tobacco companies had no legal obligation to pay the medical expenses of the hospital patients, the hospitals' provision of medical services did not provide a benefit to Defendants.  *Id.*  Thus, the provision of a benefit was at most ***incidental*** to the hospitals' performance of their "independent obligation to provide health care to nonpaying patients."  *Id.*; *see also San Francisco*, 957 F. Supp. at 1144-45.

The issue in *In re Motel 6 Securities Litig.*, No. 93-2183 (JFK), 93-2866 (JFK), 1997 WL 154011, at *7 (S.D.N.Y. Apr. 2, 1997) was similarly that of an *incidental* benefit in a contemporaneous trading scenario. In finding that defendants' actions did not sufficiently impact plaintiffs' decisions to sell their shares and their losses, the *Motel 6* Court held there had to be some connection between defendants' actions and plaintiffs' losses in order to make out a claim for unjust enrichment.  *Motel 6*, 1997 WL 154011, at *7.  As stated above, however, New York specifically

The benefits Plaintiffs conferred here are not incidental to Plaintiffs' relationship with Defendants. By restricting the output and fixing prices and terms under which their internet music would be sold, Defendants realized a clear financial benefit that flowed directly and indirectly from Plaintiffs' purchases of Internet Music: there is a clear connection between Defendants providing Internet Music for sale and Plaintiffs' purchase of this music. Any overcharges resulting from Defendants' actions would be reflected in Plaintiffs' purchases.

In any event, some Plaintiffs purchased ***directly*** from Defendants. ¶¶44-45.

### E.  Defendants Were Unjustly Enriched at Plaintiffs' Expense

Overcharges paid by Plaintiffs as a result of Defendants' anti-competitive behavior have been held to satisfy unjust enrichment claims in numerous courts.[49]

Defendants' attempt to cloud the issue by arguing that they could not be unjustly enriched because Plaintiffs received "***some*** benefit from the transaction."[50] Def. Mem. at 37. Defendants' argument is misguided because the economic benefit gained by ***Defendants*** from Plaintiffs through Defendants' price-fixing and anticompetitive conduct is precisely the issue here. The proper focus is

---

permits an indirect benefit in an unjust enrichment claim. *See Manufacturers Hanover Trust*, 160 A.D.2d at 117. In short, *Motel 6* sought to fashion a limit between an indirect and incidental benefit. The remaining cases cited by Defendants in support of their privity argument involve either a complete lack of benefit conferred (*Kaye v. Grossman*, 202 F.3d 611, 615-16 (2d Cir. 2000)) or a contractual provision nullifying the claim for monies (*Parker v. W. Dakota Insurers*, 605 N.W. 2d 181 (S.D. 2000)).

[49]    *See, e.g., Lorazepam & Clorazepate*, 295 F. Supp. 2d at 51 (where plaintiffs' overpayments for drugs significantly increased the revenue and net earnings of the drug manufacturers, plaintiffs adequately pled they conferred a benefit upon Defendants); *Cardizem*, 105 F. Supp. 2d at 671 (plaintiffs' alleged overpayments for a drug manufactured by defendants qualify as a sufficient benefit to defendants for a claim for unjust enrichment); *Cox*, 8 A.D.3d at 40, ("plaintiffs' allegations that Microsoft's deceptive practices caused them to pay artificially inflated prices for its products state a cause of action for unjust enrichment").

[50]    Defendants further state that to allege a successful unjust enrichment claim, plaintiffs must show that "defendants received a benefit while plaintiffs received ***nothing*** in return." Def. Mem. at 37 (emphasis added).

on the amounts by which Defendants were enriched. Defendants ignore the law as applied to overcharge cases and instead cite a few inapposite cases where, anecdotally, there was no benefit conferred and unjust enrichment not found.[51]

## VII.   THE JOINT VENTURES DO NOT SHIELD DEFENDANTS FROM THE ANTITRUST LAWS

Defendants invoke *Texaco, Inc. v. Dagher*, 547 U.S. 1 (2006) for the overbroad proposition that "joint ventures are free to set the terms and requirements under which the joint venture will operate" without violating antitrust laws.[52] Def. Mem. at 11. As set forth below, *Dagher* is easily distinguishable from the facts here.[53]

----

[51]     *See, e g., Heller v. Fortis Benefits Ins. Co.*, 142 F.3d 487, 495 (D.C. Cir. 1998) (insurer not entitled to benefit accidentally received under the plan and owed restitution). Similarly, Defendants attempt to use *Paschall's* and *Tooltrend v. CMT Utensili SRL*, 198 F.3d 802, 806 (11th Cir. 1999), for the proposition that recovery for unjust enrichment is barred if defendants have "given any consideration to any person." *Paschall's*, 407 S.W.2d at 155. In *Paschall's*, the plaintiff was hired by the defendant's daughter and grandson to construct a bathroom addition to the defendant's house. However, the plaintiff was unable to collect from the daughter and grandson (contracted) and brought suit against defendant (third party beneficiary) for unjust enrichment. *Id.* at 151-52. In allowing the plaintiff to bring a claim for unjust enrichment, the court while unequivocally reiterating the lack of a privity requirement, simply sought to set a limit for these types of third-party beneficiary cases. Specifically, the court sought to limit the risk of double payment and (in albeit poorly worded dicta) stated that "if the landowner has given any consideration to any person for the improvements, it would not be unjust for him to retain the benefit without paying the furnisher." *Id.* at 155. Thus, "any consideration" in *Paschall's* did not mean a mere scintilla of consideration or the proverbial peppercorn. As such, whether Plaintiffs received the "consideration" of Internet Music and CDs from Defendants does not absolve Defendants of liability if Defendants economic benefit includes overcharges.

Equally*, nothing in *Tooltrend* supports such an argument. In *Tooltrend*, the issue was whether the marketing provided an indirect benefit or was gratuitously conferred. After trial, the court found that the marketing efforts were not an indirect benefit to Utensili but an incidental or gratuitous one, that Tooltrend reaped significant benefits from the marketing program, and that for Utensili to keep the benefits, under these circumstances, was not unjust ***as a matter of law***. *Id.* at 807-08. At this stage, Plaintiffs have sufficiently pled a claim for unjust enrichment and legal determinations cannot be made.

[52]     Although Defendants imply that joint ventures enjoy a protected status, the Supreme Court has a long history of applying the antitrust laws to joint ventures. *Timken Roller Bearing Co. v.*

First, in *Dagher*, the entity accused of price fixing was solely the joint venture itself.  The price fixing allegations here are not limited to price fixing by the joint ventures.  *See* ¶¶73, 99, 100; *Compare* ¶67 *with* ¶68 and ¶72 *with* ¶73.  In *Dagher*, the court stated that the market participants jointly participated in the market through the joint venture, rather than independently.  *Dagher*, 547 U.S. at 6.  Here, the Defendants independently participated in the market.

Second, in *Dagher*, the court noted that the joint venture was a lawful enterprise and that there were no allegations that the venture was a sham.  *Id.*. at 6 n. 1.  The Complaint here alleges that the MusicNet and pressplay joint ventures were created to serve as vehicles to restrain the output of Internet Music.  *See* ¶¶72-78.

Third, the *Dagher* joint venture involved full economic integration and was formed to function as a single entity, *Dagher*, 547 U.S. at 6, whereas Defendants claim that the MusicNet and pressplay associations were formed for the limited purpose "to provide an alternative to widespread unauthorized downloading of music from the Internet." Def. Mem.at 9.  Defendants make no claim that their associations involved full economic integration and functioned as a single entity. In any

---

*United States*, 341 U.S. 593 (1951); *United States v. Sealy, Inc.*, 388 U.S. 350 (1967); *Citizen Publishing Co. v. United* States, 394 U.S. 131 (1969); *United States v. Topco Associates, Inc.*, 405 U.S. 596 (1972); *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1 (1979); *Arizona v. Maricopa County Medical Society*, 457 U.S. 332 (1982); *NCAA v. Board of Regents of Oklahoma*, 468 U.S. 85 (1984); and *FTC v. Indiana Fed. of Dentists*, 476 U.S. 447 (1986).

[53]    Not only is *Dagher* not controlling, it has no application here because it dealt with fundamentally different facts. Directly on point and controlling instead is *Citizen Publishing Co.*, 394 U.S. 131 (1969), a decision defendants avoid altogether, which affirmed summary judgment for the Government in a Section 1 challenge to a joint venture of newspapers in Tucson, Arizona. The newspapers' joint venture in that case neither fully combined the operations of its owners nor eliminated competition between them in the relevant market. Rather, the newspapers had retained their separate news and editorial departments, and, in setting their advertising and subscription rates, the newspapers were not setting the price for a jointly produced product (but were agreeing on prices for their separate products as to which they remained in competition). There, as in this case, the *per se* illegality of defendants' price fixing is "plain beyond peradventure." *Id.* at 135.

event, this inquiry is fact-specific, *see Freeman v. San Diego Association of Realtors*, 322 F.3d 1133, 1148 (9th Cir. 2003), and so, cannot be resolved on a motion to dismiss.

Finally, *Dagher* dealt with pricing of a jointly owned product as to which competition validly had ended, *Dagher*, 547 U.S. at 6, whereas the Complaint here alleges that defendants remained in competition in connection with Digital Music sold directly to retailers they did not control, and otherwise engaged in anticompetitive conduct in licensing and selling Digital Music. *See e.g.*, ¶¶ 69, 85.

## VIII.   DEFENDANTS' MOTION TO STRIKE SHOULD BE DENIED

Defendants have moved to strike various matters in the Complaint.  Plaintiffs respond to Defendants' arguments to strike ¶87 and ¶¶109-112 *supra* at pp. 10-12.

Defendants also ask the Court to strike the last sentence of paragraph 38 because "it states neither the grounds for jurisdiction nor the basis of a claim."  Def. Mem. at 39. Defendants' effort to strike this sentence should be denied because: (1) the last sentence of paragraph 38 states a ground for jurisdiction, and (2) the allegation raises a question of law not properly considered on a motion to strike.  Federal Rule of Civil Procedure 8(a)'s requirement for "a short and plain statement of the grounds for the court's jurisdiction" has long been interpreted to mean that an allegation regarding jurisdiction should include a "reference to a federal statute."  *Atkins v. School Bd.*, 379 F. Supp. 1060, 1061 (D. Va. 1974) *aff'd*, *Atkins v. School Bd.*, 511 F.2d 1398 (4th Cir. 1975).  In paragraph 38, Plaintiffs assert jurisdiction under 28 U.S.C. §1407 and a Supreme Court decision interpreting that statute.  Thus, the last sentence of paragraph 38 properly alleges the parameters of this Court's jurisdiction. The sentence should not be stricken because Defendants' motion raises substantial dispute over a question of law.  The Motion to Strike raises the issue of whether, under 28 U.S.C. §1407, the filing of a new complaint binds transferee plaintiffs to the transferor court beyond pretrial proceedings.  Defendants cite two cases that have opined on the issue, but neither case is binding on

this Court and both stand in stark contrast to the clear statutory text of 28 U.S.C. §1407.[54]  Indeed,

the statute states that actions are transferred "to any district for coordinated or consolidated ***pretrial***

proceedings," and, thus, venue in this Court is proper only for pretrial proceedings.  28 U.S.C.

§1407.[55]  When a substantial dispute over a question of law is raised on a motion to strike, it is more

appropriate to postpone its determination until after discovery and a complete hearing on the merits.

*Sample v. Gotham Football Club, Inc.*, 59 F.R.D. 160, 169 (S.D.N.Y. 1973).  Consequently, the

Motion to Strike should be denied in its entirety.

---

[54]    Defendants cite *dicta* from *In re African-American Slave Descendents Litig.*, 471 F. 3d 754, 756 (7th Cir. 2006), and  *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 211 n.32 (D. Me. 2003), to support their contention that "plaintiffs have incorrectly stated the law" and that Plaintiffs "did, in fact, waive any right to return to the [transferor] districts."  Def. Mem. at 41.  Defendants fail to direct the Court to contrary opinions such as *In re Propulsid Prods. Liab. Litig.*, 208 F.R.D. 133, 141-42 (E.D.La. 2002) (court refused to "circumvent the remand requirement of 28 U.S.C. §1407 by substituting itself for all individual actions filed in the MDL and thereby frustrate the intended effect of that statute as recognized in the Supreme Court's decision in *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, (1998)") or *In re General Instrument Corp. Sec. Litig.*, No. 96C11129, 1999 WL 515485 at *4 (N.D. Ill. 1999) (plaintiffs did not waive their right to remand by amending their complaints consistent with the Panel's transfer order).

[55]    Defendants also assert that, despite making no mention of 28 U.S.C. §1407 in the filing of the First Consolidated Amend Complaint, Plaintiffs effected a waiver of their rights.  The Second Circuit has held that waiver is reserved for a litigant's intentional relinquishment of a known right. *Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 61 (2d Cir. 1999).  Plaintiffs do not concede that an intentional relinquishment of a known right has occurred.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss and to strike portions of the complaint should be denied in their entirety.

Respectfully submitted,

/s/ Imtiaz A. Siddiqui

Christopher Lovell (CL-2595)
Craig Essenmacher
Imtiaz A. Siddiqui (IS-4090)
LOVELL STEWART HALEBIAN LLP
500 Fifth Avenue, Floor 58
New York, New York, 10110
(212) 608-1900

John Stoia
Christopher Burke
COUGHLIN STOIA GELLER RUDMAN &
ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

***Interim Co-Lead Counsel***

BERGER & MONTAGUE, P.C.
Charles Goodwin
1622 Locust Street
Philadelphia, PA 19103:
(215) 875-3000

FINKELSTEIN THOMPSON LLP
Douglas G. Thompson, Jr.
Tracy D. Rezvani
1050 30th Street, N.W.
Washington, DC 20007
(202) 337-8000

HULETT HARPER STEWART LLP
Dennis Stewart
Sarah Weber
50 West C Street, Suite 1600
San Diego, CA 92101
(619) 338-1133)

45

PEARSON SIMON SOTER WARSHAW PENNY
LLP
Bruce L. Simon
44 Montgomery Street, Suite 1200
San Francisco, CA 94104
(415) 433-9000

WHATLEY DRAKE & KALLAS, LLC
Joe R. Whatley, Jr
2001 Park Place North, Suite 1000
Birmingham, AL 35203
( 205) 328-9576

***Plaintiffs' Steering Committee***