UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
IN RE DIGITAL MUSIC          :
ANTITRUST LITIGATION         :       No. 06 MD 1780 (LAP)
                             :
THIS DOCUMENT RELATES TO:    :       Opinion & Order
ALL ACTIONS                  :
------------------------------x

LORETTA A. PRESKA, Chief United States District Judge:

Before the Court is a joint motion to dismiss a class-action complaint alleging federal and state antitrust violations by major record labels in the distribution of music over the Internet.  Defendants include Bertelsmann, Inc.; Sony BMG Music Entertainment; Sony Corporation of America; Capitol Records, Inc. d/b/a EMI Music North America; EMI Group North America, Inc.; Capitol-EMI Music, Inc.; Virgin Records America, Inc.; Time Warner Inc.; UMG Recordings, Inc.; and Warner Music Group Corp.[1]  Several individual plaintiffs seek to represent a putative nationwide class of digital music purchasers.  The operative complaint before the Court is the Third Consolidated Amended Complaint ("TCAC"), filed June 2, 2010.  The Court's previous judgment dismissing the Second Consolidated Amended

---

[1] Because Bertelsmann, Inc., Sony Corporation of America, and Time Warner, Inc., are parent companies of other named defendants, the analysis proceeds somewhat differently for these three defendants.  Therefore, the Court will refer to the named entities other than the three parent companies as "Defendants," and the parent company defendants will be called the "Parent Companies" with their arguments analyzed separately.

Complaint was vacated, and the case returned on remand from the
Court of Appeals.  Starr v. Sony BMG Music Entm't, 592 F.3d 314,
327 (2d Cir. 2010), cert. denied, 131 S. Ct. 901 (2011).

I. BACKGROUND

Because the allegations in the TCAC are, with certain
exceptions, the same as those previously considered in published
opinions both here and in the Court of Appeals,[2] the Court
assumes familiarity with the factual allegations in the TCAC.
Starr, 592 F.3d at 317-22; In re Digital Music Antitrust Litig.,
592 F. Supp. 2d 435, 437-39 (S.D.N.Y. 2008).  To situate this
discussion, a summary of the alleged facts follows.  The Court
assumes that all nonconclusory facts alleged are true for
present purposes.  Starr, 592 F.3d at 317 & n.1.

Defendants produce, license, and distribute music sold
online ("Internet Music") and on compact discs ("CDs").  They
control eighty percent of the market for digital music in the
United States.  Defendants Bertlesmann, Inc., Warner Music Group
Corp., and EMI launched an online service called MusicNet, a

---

[2] There are two salient exceptions.  The first is an amendment to
paragraph 99, which was proposed but denied as futile in the
now-vacated order dismissing the complaint.  The TCAC contains
the amended language, which was considered by the Court of
Appeals in its analysis, Starr, 592 F.3d at 323 n.3, and is
considered here.  The second exception is that the TCAC contains
paragraphs 146-153, which were not included in the Second
Consolidated Amended Complaint.  Those paragraphs allege
violations of the Illinois and New York state antitrust laws,
and they are discussed in this opinion.

joint venture entity owned and controlled by various Defendants. (TCAC ¶ 67.)  Defendants UMG and Sony Corporation of America launched a similar online music service called Duet, later renamed pressplay.  (TCAC ¶ 67.)  It too was a joint venture. All Defendants signed distribution agreements with MusicNet and pressplay.  (TCAC ¶ 67.)  These joint ventures, along with the Recording Industry Association of America, provided a forum for Defendants to exchange pricing information, terms of sale, and use restrictions.  (TCAC ¶¶ 34, 67-68, 87-88.)

Plaintiffs allege that Defendants conspired to fix the price, terms of sale, and restrictions on the use of Internet Music through these joint ventures.  (TCAC ¶¶ 72, 98.) Defendants used these joint ventures as a forum to discuss their desire to engage in the alleged conduct, to share licensing terms and pricing information, and to police the alleged agreements, among other things.  (TCAC ¶¶ 67-68, 98.)  Through the use of Most Favored Nation ("MFN") clauses in Defendants' licensing agreements, a licensor would receive at least equivalent licensing terms as another licensor.  (TCAC ¶¶ 92, 99.)  The alleged effect of the MFN agreements was to set a wholesale price floor for Internet Music of seventy cents per song.  (TCAC ¶¶ 99-100.)  Plaintiffs allege that despite the fact that the price of distributing Internet Music fell to essentially zero, the wholesale price of Internet Music

increased uniformly.  (TCAC ¶¶ 99-100.)  This was due in material part to Defendants' enforcement of the MFN clauses, which Defendants attempted to hide.  (TCAC ¶¶ 93, 99-100.)  In addition, Defendants included digital rights management ("DRM"), which restricted transfer of songs to portable players, among other things.  (TCAC ¶ 76.)  Plaintiffs allege that but for the conspiracy, a defendant may have removed DRM to gain market share.  (TCAC ¶ 76.)  Allegedly, both the wholesale price and DRM included with Defendants' music was fixed among Defendants because of Defendants' collusion, even when they sold to unaffiliated retailers.  (TCAC ¶ 69.)

The core allegation is that Defendants' behavior sustained high prices for Internet Music, which made it less attractive to consumers and hampered the growth of Internet Music services generally.  (TCAC ¶¶ 81-82.)  Plaintiffs point to eMusic, an independent competitor in the online music business, as an example of competitive pricing.  It is the second-largest online retailer and charges – at retail – less than half of Defendants' wholesale price, and Defendants refuse to do business with it.  (TCAC ¶¶ 103-104.)  Plaintiffs allege that Defendants' motive to conspire was to support their ability to charge supracompetitive prices for CDs; they could do so because Internet Music was priced, through the alleged conspiracy, so as

to be an unattractive or economically uncompetitive substitute.
(TCAC ¶ 83.)

The procedural history of this case is also well-described in the earlier opinions in this case.  E.g., Starr, 592 F.3d at 320-21.  The Court of Appeals remanded for further proceedings consistent with its opinion, and Defendants have again moved to dismiss the action, relying mainly on arguments made but not addressed in their original motion to dismiss.

II. DISCUSSION

In evaluating this motion, the Court first will discuss the Sherman Act claims, beginning with a brief discussion of the Twombly analysis by the Court of Appeals. Then the Court will turn to the arguments made regarding the Sherman Act claims but not addressed in the original motion to dismiss and renewed in the motion to dismiss sub judice.  Next, the Court will analyze Defendants' arguments relating to the state claims, aside from the Twombly-related argument, made in the original motion to dismiss but not addressed previously. The Court will also discuss new arguments raised in relation to newly added claims under the Illinois and New York antitrust laws.  Following the state-law discussion, the Court will analyze Defendants' motion to dismiss claims against the Parent Companies.  Finally, the Court will discuss the associated

motion to strike portions of the TCAC.  Before delving into
these matters, the Court sets out the applicable legal standard.

## A. Legal Standard for Motions to Dismiss

In assessing a motion to dismiss, the Court must
accept all non-conclusory factual allegations as true and draw
all reasonable inferences in the plaintiff's favor.  Goldstein
v. Pataki, 516 F.3d 50, 56 (2d Cir. 2008) (internal quotation
marks omitted).  To survive such a motion, "a complaint must
contain sufficient factual matter, accepted as true, to 'state a
claim to relief that is plausible on its face.'"  Ashcroft v.
Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v.
Twombly, 550 U.S. 544, 570 (2007)).  A complaint that offers
"labels and conclusions" or "a formulaic recitation of the
elements of a cause of action will not do."  Twombly, 550 U.S.
at 555.  The complaint must allege "enough facts to state a
claim to relief that is plausible on its face."  Id.  "Where a
complaint pleads facts that are 'merely consistent with' a
defendant's liability, it 'stops short of the line between
possibility and plausibility of entitlement to relief.'"  Iqbal,
129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 557) (internal
quotation marks omitted).  In other words, "where the well-
pleaded facts do not permit the court to infer more than the
mere possibility of misconduct," dismissal is appropriate.  Id.
at 1950.  "Factual allegations must be enough to raise a right

to relief above the speculative level, on the assumption that
all the allegations in the complaint are true (even if doubtful
in fact)." Twombly, 550 U.S. at 555 (citations omitted).

In analyzing a motion to dismiss a claim under section
1 of the Sherman Act, the Court is mindful that a plaintiff
needs to allege only "enough factual matter . . . to suggest
that an agreement was made," id. at 556, but he need not, unlike
in the summary judgment context, "rule out the possibility that
the defendants were acting independently," id. at 554.  "Asking
for plausible grounds to infer an agreement does not impose a
probability requirement at the pleading stage; it simply calls
for enough fact to raise a reasonable expectation that discovery
will reveal evidence of an illegal agreement." Id. at 556.
"Thus, an allegation of parallel conduct coupled with only a
bare assertion of conspiracy is not sufficient to state a
Section 1 claim." Starr, 592 F.3d at 322.  "Instead,
allegations of parallel conduct 'must be placed in a context
that raises a suggestion of a preceding agreement, not merely
parallel conduct that could just as well be independent
action.'"  Id. (quoting Twombly, 550 U.S. at 557).

B. Pleading of Sherman Act Claims

In its opinion vacating the judgment entered in this
case, the Court of Appeals concluded that the Second
Consolidated Amended Complaint "alleges specific facts

7

sufficient to plausibly suggest that the parallel conduct alleged was the result of an agreement among the defendants." Id. at 323.  The TCAC being the same in material part, Defendants do not argue their motion to dismiss on Twombly grounds.  In light of the Court of Appeals clarification of the importance of context in claims under section 1 of the Sherman Act and its conclusion that the allegations above suffice, Plaintiffs' section 1 claims may proceed because the TCAC meets Twombly's pleading standards.  Id. at 323-24.

C. Other Sherman Act Arguments

In their original motion to dismiss, Defendants made two arguments with respect to the federal claims that were not addressed.  First, Defendants argue that Plaintiffs' claims through February 1, 2005, were settled and released because of a state class action settlement in Ottinger v. EMI Music Distrib., Civ. Action No. 24885-II (Tenn. Cir. Ct.).  (Declaration of Helena Almeida in Support of Defendants' Motion to Dismiss dated July 30, 2007 ("Almeida Decl."), Ex. E.)  Second, Defendants argue that Plaintiffs' claims involving CDs cannot survive because the TCAC does not state a claim of anticompetitive conduct involving CDs, which deprives Plaintiffs of antitrust standing for CD purchases.  The Court considers these arguments in this section.

1. <u>Settlement and Release</u>

Defendants argue that the <u>Ottinger</u> case involved an alleged conspiracy that Defendants conspired to elevate the price of CDs despite cost reductions.  Because the <u>Ottinger</u> settlement released all claims that the settlement class "alleged or could have alleged" (Defendants' October 2007 Reply Brief ("Def. 2007 Reply Br.") at 11) based on the allegations in that case, the argument is that the instant claims, which Defendants argue could have been alleged, were released.

Defendants correctly note that "[a] court may release not only those claims alleged in the complaint and before the court, but also claims which could have been alleged . . . in connection with any matter or fact set forth or referred to in the complaint."  <u>Wal-Mart Stores, Inc. v. Visa</u>, 396 F.3d 96, 107 n.13 (2d Cir. 2005) (quoting <u>In re Corrugated Container Antitrust Litig.</u>, 643 F.2d 195, 221 (5th Cir. 1981)) (internal quotation marks omitted).  However, they fail to appreciate that a release applies only "as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct."  <u>Id.</u> at 107.  In other words, a settlement may be framed to prevent future suits "depending on the very same set of facts," <u>Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.</u>, 660 F.2d 9, 18 n.7 (2d Cir. 1981), but future claims are barred only "where there is a realistic identity of issues" between the

former and future cases and "where the relationship between the
suits is at the time of the class action foreseeably obvious to
notified class members."  TBK Partners, Ltd. v. W. Union Corp.,
675 F.2d 456, 461 (2d Cir. 1982).

        Here, the claims do not arise out of the "identical
factual predicate" as the Ottinger claims.  Ottinger involved
allegations that record-company defendants used various schemes
to maintain higher CD profit margins than they could achieve for
vinyl records and cassette tapes, despite cost reductions in the
price of CD production.  (Almeida Decl. Ex. G ¶ 1.)  The alleged
schemes had to do with the ways CDs were priced at wholesale and
marketed to retailers, and the schemes involved allegations of
direct price agreements and price signaling for CDs.  (Id. ¶ 2.)
The allegations simply have nothing to do with Internet Music,
the interplay between the online music market and the CD market,
or the related allegations here.  This complaint involves
allegations that the market for online music downloads was
priced at set, artificially high levels.  It involves a
different factual predicate from the Ottinger complaint.  That
this complaint, like the complaint in Ottinger, also alleges
anticompetitive effects in the CD market or a motive to maintain
higher CD prices is insufficient; a release bars future suits
that depend on "the very same set of facts."  Nat'l Super Spuds,
660 F.2d at 18 n.7; see Wal-Mart Stores, 396 F.3d at 107.  The

source of the alleged antitrust conspiracy here is wholly
different from the source of the alleged antitrust conspiracy in
Ottinger.  Thus, the Ottinger release does not bar these claims.[3]

### 2. Standing to Assert CD-Purchaser Claims

Defendants next argue that the TCAC does not allege
antitrust injury to purchasers of CDs but, rather, only to
Internet Music purchasers.  This is an argument about antitrust
standing.  Defendants say that the TCAC is insufficient to
confer standing on a CD purchaser class because it does not
allege that any CD purchaser would have bought Internet Music
instead of CDs absent the alleged conspiracy.  They also argue
that the complaint does not specify how restricting Internet
Music affected the price of CDs.  In sum, Defendants' argument
is that the CD-purchaser plaintiffs may not recover for an
antitrust injury in a separate market.

In addition to Article III standing, "an antitrust
plaintiff must also establish antitrust standing."  In re DDAVP
Direct Purchaser Antitrust Litig., 585 F.3d 677, 688 (2d Cir.
2009).  Antitrust standing is analyzed using two metrics.
First, a plaintiff must demonstrate "antitrust injury, which is

---

[3] Even if the Ottinger release were to bar these claims, it would
be effective only for claims through September 29, 2003.  The
release by its terms only applies to members of the Ottinger
class, which includes claims arising from CD purchases from June
1, 1991 to September 23, 2003.  (Almeida Decl. Ex. E, §§ 1.5,
1.16, 1.19.)

'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'"  Id. (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)).  Second, a plaintiff must show that he is a proper plaintiff in light of the factors discussed in Associated General Contractors v. California State Council of Carpenters, 459 U.S. 519, 540-45 (1983).  These include:

> (1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.

In re DDAVP, 585 F.3d at 688.  In addition, the existence of an improper motive is a relevant consideration, but it "is not a panacea that will enable any complaint to withstand a motion to dismiss."  Associated Gen., 459 U.S. at 537; Balaklaw v. Lovell, 14 F.3d 793, 797 n.9 (2d Cir. 1994).

        Ultimately, antitrust standing is about the question of "which persons have sustained injuries too remote [from an antitrust violation] to give them standing to sue."  Blue Shield of Va. v. McCready, 457 U.S. 465, 476 (1982) (alteration and emphasis in original).  "Just as in common-law tort and contract litigation, concepts such as 'foreseeability and proximate cause, directness of injury, certainty of damages, and privity

of contract' circumscribe a party's right to recovery, so in antitrust actions 'the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them,' can limit the right to sue." <u>Daniel v. Am. Bd. of Emergency Med.</u>, 428 F.3d 408, 437 (2d Cir. 2005) (quoting <u>Associated Gen.</u>, 459 U.S. at 532-33, 535-36); <u>Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC</u>, 317 F. Supp. 2d 301, 316 n.8 (S.D.N.Y. 2003) ("In considering the question of antitrust standing, the Supreme Court has likened the analysis to that of proximate cause.").

 As to the first part of the analysis, there is little doubt that the CD-purchaser plaintiffs' alleged injury is an antitrust injury.  The CD-purchaser plaintiffs allege that they bought Defendants' CDs but were "forced to pay supra-competitive prices as a result of the defendants' anticompetitive conduct. Such an injury plainly is 'of the type the antitrust laws were intended to prevent.'"  <u>In re DDAVP</u>, 585 F.3d at 688 (quoting <u>Brunswick</u>, 429 U.S. at 489).

 The second part of the analysis is less straightforward, however.  Defendants argue that there are several infirmities in the CD-purchaser plaintiffs' antitrust standing: (1) the allegedly unlawful <u>conduct</u> has only to do with Internet Music; (2) no plaintiff alleges he would have bought Internet Music instead of CDs but for the allegedly unlawful conduct; and (3) there is no alleged connection between the

allegedly unlawful conduct and its effect on the CD market.
Plaintiffs counter that "injuries to different groups of
consumers of related products can be inflicted by a single
antitrust conspiracy." (Plaintiffs' September 2007 Opposition
Memorandum ("Pl. 2007 Opp.") at 21.) Neither side cites a case
directly on point.

> The Court begins by laying out the allegations
relevant to the CD market in the TCAC. It states:

- "Internet Music and CDs are viewed as substitutes by
  both record labels and consumers as evidenced by the
  inverse relationship between sales of CDs and Internet
  Music." (TCAC ¶ 41.)

- "Defendants' collusion in setting high prices for
  Internet Music . . . made Internet Music less
  attractive to consumers, allowing Defendants to sell
  CDs at supracompetitive prices." (TCAC ¶ 82.)

- "Acting alone, no defendant could sustain the
  supracompetitive prices prevailing in the CD market.
  This inability to charge high CD prices, as market
  factors made consumer demand for CDs more elastic over
  time at the prices charged by Defendants during the
  conspiracy, gave Defendants motive to conspire."
  (TCAC ¶ 83.)

- "In consequence, Defendants' conspiracy to restrain the availability and distribution of Internet Music, and to fix and maintain the price of Internet Music, has protected the sale of CDs and enables Defendants to maintain CD prices at supracompetitive levels."

(TCAC ¶ 126.)

Otherwise, the TCAC has substantially similar allegations in a few other paragraphs, but no allegations that add materially to these.

The allegations in the TCAC do not suffice to establish the antitrust standing of CD purchasers.  Although Plaintiffs argue that the "supracompetitive price that CD purchasers pay for CDs 'flows from' Defendants' anticompetitive conduct" (id. at 22), this argument is nothing more than ipse dixit.  The allegations either (1) are insufficient to allege antitrust standing because they do not demonstrate an adequate connection between the alleged misconduct and an effect on the CD market or (2) do not allege cognizable antitrust standing because the alleged injury is too attenuated from the source of the alleged misconduct.

As to the first point, all of the allegations of misconduct in the TCAC involve fixing prices of Internet Music. Without saying more than that CDs and Internet Music are "substitutes," the TCAC goes on to assert that Defendants'

conduct in the Internet Music market "allow[ed] Defendants to sell CDs at supracompetitive prices." (TCAC ¶¶ 41, 82.) The TCAC contains no nonconclusory allegations about how the pricing of Internet Music affected CD pricing, how the CD market operated generally, what considerations affected CD pricing, or any kind of tie – contractual, historical, or correlative, for example – between CD pricing and Internet Music pricing. Absent a "physical and economic nexus between the alleged violation and the harm to the plaintiff," antitrust standing is difficult to come by. See Blue Cross, 457 U.S. at 478; see also Associated Gen., 459 U.S. at 545-46.

Allegations of this type of linkage are important. The cases Plaintiffs rely upon have a much closer link between the allegedly unlawful conduct and the antitrust standing of the plaintiff. For example, in Loeb Industries, Inc. v. Sumitomo Corp., defendants allegedly fixed prices on the copper futures market, but claims by purchasers of physical copper proceeded because "the price of physical copper . . . is directly linked to the . . . price for copper futures." 306 F.3d 469, 476 (7th Cir. 2002). In part, that was due to the fact that "dealers in all forms of physical copper quote prices based on rigid formulas related to [copper futures]." Id. Here, there is no alleged "direct link" between Internet Music pricing and CD

pricing.[4]  Likewise, In re Linerboard Antitrust Litigation
involved a situation where vertically integrated producers
restricted production of linerboard, which was a component of
the end product, corrugated packaging.  305 F.3d 145, 159 (3d
Cir. 2002).  Plaintiffs, buyers of corrugated materials, had
antitrust standing because restricting linerboard output
necessarily increased the price of the corrugated packaging, as
it was a required component.  See id. at 148-49, 159-60.  In
this case, there is no necessary link alleged between the price
of Internet Music, the market where the alleged misconduct
occurred, and the price of CDs, which could be affected by
totally distinct market forces or costs of production.
Moreover, the TCAC does not explain any alleged link.
Similarly, in Blue Cross of Virginia v. McCready, patients of
psychologists who were allegedly damaged by conspiracy between
psychiatrists and health insurers had standing because the
patients' injury was "inextricably intertwined" with the
psychologists' injury.  457 U.S. at 479, 482-84.  This case
created a limited exception to the rule that an antitrust claim

---

[4] Other futures-market cases Plaintiffs rely upon are similarly
distinguishable; in all of those cases, allegations of
contractual or highly correlated price movements were at issue.
E.g., Sanner v. Bd. of Trade of Chi., 62 F.3d 918, 929 (7th Cir.
1995); Ice Cream Liquidation, Inc. v. Land O' Lakes, Inc., 253
F. Supp. 2d 262, 274 (D. Conn. 2003) ("Defendants concede that
plaintiff has alleged a causal link between the CME butter price
and the wholesale price of milk, cream, and butter.").

must be asserted by a market participant; it applies when
injuries are "inextricably intertwined" with a market
participant's.  Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Ca., 190
F.3d 1051, 1057 n.5 (9th Cir. 1999).  Blue Cross is inapposite
because here, both CD purchasers and Internet Music purchasers
allegedly were harmed by higher prices of CDs and Internet
Music, respectively, and CD purchasers' alleged injury is thus
distinct from and not intertwined with Internet Music
purchasers' injury.  Finally, Plaintiffs allude to Crimpers
Promotions Inc. v. Home Box Office, Inc., 724 F.2d 290 (2d Cir.
1983), as supporting authority.  That case involved an alleged
conspiracy to boycott a trade show that allowed television
producers to sell programming directly to cable television
systems, rather than having producers go through middlemen who
packaged programming together and sold it to the cable systems.
Id. at 294.  Crimpers involved conduct directly affecting the
group defendants allegedly conspired to harm.  724 F.2d at 294.
Here, the conduct was directed at an entirely separate group of
plaintiffs, and any effect on CD purchasers was at best
indirect.

        Although in Crimpers and in this case, the complaints
alleged a motive of the conspiracy to harm the plaintiffs,
intent alone is insufficient.  Associated Gen., 459 U.S. at 537;
see Blue Cross, 457 U.S. at 479 (stating that antitrust

liability "is not a question of the specific intent of the
conspirators").  Yet Plaintiffs appear to rely on only the
"motive, purpose and intended effect of the conspiracy" (Pl.
2007 Opp. at 21) to support their CD-related claims.  The thrust
of the TCAC is that Defendants were motivated to engage in this
conspiracy in order to continue selling CDs at higher prices,
but the TCAC goes no further.  (<u>E.g.</u>, TCAC ¶¶ 3, 41, 126.)  At
best, it could be read to say that Defendants' motivation
supported some unstated, preexisting, and parallel conspiracy to
keep CD prices high.  (TCAC ¶ 126 (stating that object of
conspiracy was to "<u>maintain</u> CD prices at supracompetitive
levels" (emphasis added)).)  But such an allegation does not
exist in the TCAC, and there is nothing in the TCAC to show how
any conduct was directed at the CD market or how other conduct
affected the CD market beyond conclusory allegations that
Defendants could continue selling CDs at higher prices.  The CD-
purchaser plaintiffs do not have antitrust standing.  <u>Associated
Gen.</u>, 459 U.S. at 540, 545.

        Were the above not enough, the TCAC also alleges an
injury that is too attenuated from the source of the alleged
misconduct.  The TCAC alleges that Defendants' price-fixing in
the Internet Music market caused prices of Internet Music to be
supracompetitive.  (TCAC ¶¶ 98-99, 103, 105, 126.)  This
allegation is sufficient.  As a side-effect, and with no conduct

directed at the CD market, the TCAC asserts that the Internet
Music price-fixing scheme allowed Defendants to continue selling
CDs at supracompetitive prices.  (TCAC ¶ 126.)  This allegation
is not sufficient.  Not only is there no nonconclusory
connection alleged between the Internet Music and CD markets,
but the CD market could have been affected by supply and demand,
cost of production, or other economic factors wholly unrelated
to Internet Music.  (See, e.g., TCAC ¶ 71 (discussing factors
involved in CD pricing that are absent in Internet Music
distribution).)  Absent allegations of some conduct directed at
the CD market or a direct linkage between the two markets, an
allegation of wrongdoing in the Internet Music market bears
little connection to the CD market.  Cf. Associated Gen., 459
U.S. at 542-43 (listing independent factors that could have been
at play).  This alleged injury is simply too attenuated from the
source of the alleged malfeasance.  See id.; see also Am. Ad
Mgmt., 190 F.3d at 1057 ("Antitrust injury requires the
plaintiff to have suffered its injury in the market where
competition is being restrained."); Automated Salvage Transp.,
Inc. v. Wheelabrator Envtl. Sys., Inc., 155 F.3d 59, 79 (2d Cir.
1998) (similar).

       Indeed, looking to the antitrust standing factors, the
CD-purchaser plaintiffs' standing fails in several regards.  See
In re DDAVP, 585 F.3d at 688.  First, the cause of any injury to

CD purchasers is from an indirect source; the direct cause of any injury is from machinations in the Internet Music market. Associated Gen., 459 U.S. at 540. Second, there is a class of persons – those who purchased Internet Music directly – whose self-interest would motivate them to vindicate the public interest. Id. at 542. Third, allowing CD purchasers to bring an antitrust suit involves more speculative injuries than those alleged to Internet Music purchasers, especially in light of the dearth of allegations about the linkage between the CD market and the Internet Music market, as explained above. Id. at 542-43. Because the CD market is separate, as the Court explains infra, "the alleged effects on the [CD market] may have been produced by independent factors." Id. at 542. And fourth, there is strong potential for duplicative recoveries here because the CD purchasers' claims are hard to disentangle from the Internet Music purchasers' claims, and the injury they seek to remedy arises from the same alleged misconduct. Id. at 544-45. Given these additional factors, the CD-purchaser plaintiffs are not the proper plaintiffs to bring this action. The most they allege is malfeasance in the Internet Music market with no hard link to the CD market.[5]

---

[5] It is illustrative that the Court of Appeals hardly mentioned CDs in its opinion vacating this Court's earlier judgment dismissing the case. Its explanation for why the complaint (cont'd . . .)

Plaintiffs appear to argue that no distinction between the CD market and the Internet Music market is warranted. (Pl. 2007 Opp. at 21-22.) Although Plaintiffs have structured their complaint to define the relevant market as the market for music generally, their allegations involve only conduct related to the Internet Music market and not the CD market. Moreover, Plaintiffs themselves divide the market by referring to two separate classes of purchasers: Internet Music purchasers and CD purchasers. (TCAC ¶¶ 44-45.) The TCAC itself explains how Internet Music differs from CDs. For example, Internet Music is "well below CD-quality" and "further hampered by DRM." (TCAC ¶ 74.) In addition, CD pricing includes costs for many features that distinguish the product: it includes costs for producing the discs, cases, packaging, antishoplifting mechanisms, shipping, distribution, and so forth. (TCAC ¶ 71.) Most tellingly, the TCAC alleges that while Internet Music "has the potential to transform the market" by increasing selection (TCAC ¶ 70), Defendants' conduct hampered its development and "forestalled the time by which Internet Music would emerge as a reasonable consumer substitute for CDs." (TCAC ¶ 79.) Thus,

---

survives focused instead on the Internet Music-related allegations. Only once did the Court of Appeals mention CDs in that discussion, and that mention referenced the lack of any reduction in the price for Internet Music "as compared to CDs." Starr, 592 F.3d at 323.

the TCAC acknowledges that Internet Music is not the same as or a substitute for CDs.  Even Plaintiffs' memorandum implicitly understands that CDs and Internet Music are different; it calls them "related products."  (Pl. 2007 Opp. at 21.)  Finally, it takes no special training to understand that a CD is a physical product, while Internet Music is not.  These attributes could be meaningful to one set of consumers over another.

To summarize: the TCAC does not allege a sufficient linkage between the CD market and the Internet Music market to make its allegations regarding the CD market cognizable for antitrust purposes.  In addition, the TCAC alleges an injury that is too attenuated from the source of the alleged malfeasance to confer antitrust standing on the CD-purchaser plaintiffs.  The TCAC merely pairs an allegation of a motive with an allegation of consequential harm to assert antitrust standing.  The Supreme Court held specifically that this approach, combined with the other factors present here, is insufficient to confer antitrust standing.  Associated Gen., 459 U.S. at 545 ("We conclude, therefore, that [plaintiff]'s allegations of consequential harm resulting from a violation of the antitrust laws, although buttressed by an allegation of intent to harm [plaintiff], are insufficient as a matter of law.").  This being the third amended complaint involving

factual allegations that do not involve the CD-purchaser
plaintiffs, these claims are DISMISSED with prejudice.

> D. State-Law Claims

Defendants reassert three state-law-based arguments
that were made but not addressed previously: they argue that (1)
Plaintiffs lack standing to assert claims on behalf of residents
of states not included in this action; (2) Plaintiffs claims
fail under state-law pleading requirements; and (3) Plaintiffs'
unjust enrichment claims are barred under the Illinois Brick
doctrine.  Defendants also argue that Plaintiffs' newly added
claims under Illinois and New York antitrust statutes are
barred.  The Court addresses these arguments in turn.

In considering substantive state-law claims, the Court
"follow[s] a decision of the highest state court 'unless there
are very persuasive grounds for believing that the state's
highest court no longer would adhere to it.'"  In re New Motor
Vehicles Can. Exp. Antitrust Litig. (In re NMV), 350 F. Supp. 2d
160, 169 (D. Me. 2004) (quoting 19 Charles Alan Wright, Arthur
R. Miller & Edward H. Cooper, Federal Practice & Procedure
§ 4507).  "In the absence of a ruling by the state's highest
court, [the Court] consider[s] and may follow intermediate court
rulings unless [it is] convinced that the state's highest court
would decide otherwise."  Id.  However, the standing argument,
which the Court addresses first, is a matter of federal law.

1. Standing on Behalf of Other State
   Residents

The named Plaintiffs are residents of California,
Florida, Hawaii, Massachusetts, Michigan, Minnesota, New Mexico,
New York, and Oregon; they assert state-law claims under those
states' laws.  (TCAC ¶¶ 5-19, 44.)  The TCAC also asserts state-
law claims under the laws of fourteen other states and the
District of Columbia, where no named plaintiffs reside.[6]  (TCAC
¶ 44.)  Because the TCAC does not identify class representatives
from those fourteen other states and the District of Columbia,
Defendants argue that Plaintiffs have no Article III standing to
assert these claims.  Plaintiffs disagree, saying that, in this
case, class certification issues are "logically antecedent" to
standing issues.  See Ortiz v. Fibreboard Corp., 527 U.S. 815,
831 (1999).

Although an Article III court must ordinarily assure
itself that it has jurisdiction before proceeding, there is an
exception to that rule when class certification issues are
"logically antecedent to Article III concerns."  Id. (internal
quotation marks omitted).  The "logically antecedent" exception
is not exactly defined.  See Blessing v. Sirius XM Radio Inc.,

---

[6] The TCAC amends its allegations to include violations of
Illinois state law.  (TCAC ¶¶ 146-149.)  Illinois is a state
from which no named plaintiff hails, making the total fourteen
states, a one-state increase from the thirteen states identified
in the parties' papers.  (Pl. 2007 Opp. at 25 n.23.)

756 F. Supp. 2d 445, 451 (S.D.N.Y. 2010).  The cases indicate that where "class certification is the source of the potential standing problems," class certification should precede the standing inquiry.  In re Grand Theft Auto Video Game Litig., No. 06 MD 1739, 2006 WL 3039993, at *2 (S.D.N.Y. Oct. 25, 2006) (emphasis added); accord Blessing, 756 F. Supp. 2d at 451; see In re Buspirone Patent Litig., 185 F. Supp. 2d 363, 377 (S.D.N.Y. 2002) (deferring standing inquiry until after class certification decision because "these alleged problems of standing will not arise unless class certification is granted"). This is particularly true where, as here, Article III concerns "pertain to statutory standing." Salsitz v. Peltz, 210 F.R.D. 95, 97 (S.D.N.Y. 2002) (quoting Ortiz, 527 U.S. at 831).  Cases holding otherwise have been situations where the standing of the named plaintiffs is in question or where the standing of each plaintiff involves nuances in the conduct affecting each plaintiff.  E.g., Gunther v. Capital One, N.A., 703 F. Supp. 2d 264, 274 (E.D.N.Y. 2010) (named plaintiff had no standing); In re Flonase Antitrust Litig., 692 F. Supp. 2d 524, 533-34 (E.D. Pa. 2010) (similar, declining to defer standing inquiry where defendant "attack[ed] the standing only of the named plaintiffs"); Marshall v. Milberg, LLP, No. 07 Civ. 6950, 2009 WL 5177975, at *8 (S.D.N.Y. Dec. 23, 2009) (nuanced conduct determines standing of each plaintiff); see Clark v. McDonald's

Corp., 213 F.R.D. 198, 204 (D.N.J. 2003) ("Stated differently, the Ortiz exception . . . does not apply if the standing issue would exist regardless of whether the named plaintiff filed his claim alone or as part of a class."). Generally, this occurs in securities cases where "plaintiffs brought claims related to securities they did not purchase on the theory that proposed class members had purchased them and would establish standing once joined." Blessing, 756 F. Supp. 2d at 451 n.1.

The Court concludes that this case is one where class certification issues are the source of any standing problems, making it appropriate to defer consideration of standing until the class certification stage. Defendants do not dispute that the named Plaintiffs have standing to bring class actions in the states where they reside and purchased Internet Music. See, e.g., In re Flonase, 692 F. Supp. 2d at 533-34. Thus, there is no risk that the named Plaintiffs are attempting to "to piggy-back on the injuries of the unnamed class members." In re Grand Theft Auto, 2006 WL 3039993, at *3 (quoting Payton v. Cnty. of Kane, 308 F.3d 673, 680 (7th Cir. 2002)). Plaintiffs claim that they, along with a class of many more individuals, were all injured in similar ways by the same conduct of the Defendants: price-fixing of Internet Music. This conduct is alleged to be the same no matter where any plaintiff resides. This is not a case where nuances in the facts of each alleged injury suggest

27

that standing must be determined first.  "The relevant question, therefore, is not whether the Named Plaintiffs have standing to sue Defendants – they most certainly do – but whether their injuries are sufficiently similar to those of the purported Class to justify the prosecution of a [larger] class action." Id.; accord Blessing, 756 F. Supp. 2d at 452; Sheet Metal Workers Nat'l Health Fund v. Amgen Inc., No. 07 Civ. 5295, 2008 WL 3833577, at *9 (D.N.J. Aug. 13, 2008).

Therefore, class certification issues are the source of any standing problems identified by Defendants at this stage of the litigation.  Here, moreover, statutory standing is generally at issue with respect to the state claims.  Salsitz, 210 F.R.D. at 97.  Class certification is logically antecedent to standing in this case, and the Court will consider standing after class certification has been resolved.  See Blessing, 756 F. Supp. 2d at 452; In re Buspirone, 185 F. Supp. 2d at 377.

## 2. State-Law Statutory Claims

Defendants make two basic arguments as to the pleading of state-law claims.  First, they claim that the TCAC contains insufficient allegations of intrastate conduct in states requiring such allegations and that in states without such a requirement, a lack of an intrastate connection fails under the dormant Commerce Clause.  Second, they say that Plaintiffs do not properly allege state-law consumer protection claims.

a. Intrastate Conduct

Defendants argue that the TCAC insufficiently alleges state claims under the antitrust laws of the District of Columbia, Michigan, South Dakota, Tennessee, West Virginia, and Wisconsin, as well as the consumer protection laws of North Carolina.  Defendants focus on a single common denominator: they say that because each of those states' statutes require an allegation of conduct or substantial effects within the state, the absence of such an allegation is fatal.[7]  In large part, Plaintiffs accept the proposition that these states require allegations of intrastate conduct or substantial effects within the states, but they say that the TCAC sufficiently pleads intrastate activity.[8]

---

[7] In supplemental briefing, Defendants state that the state statutes "apply exclusively to intrastate – not interstate – conduct."  (Def. Response to Pl. Supp. Auth. Dated June 10, 2010, at 5.)  If this argument is that relief under these statutes is exclusive of any applicable federal relief for interstate activity, the Court rejects it.  "[T]he Court does not interpret the statutes to be inapplicable where the anticompetitive conduct may have both interstate effects and, as concerns the particular state in question, intrastate impact."  Sheet Metal Workers, 2008 WL 3833577, at *12 (collecting cases).

[8] Plaintiffs dispute that Michigan, West Virginia, and South Dakota require intrastate allegations.  The Michigan statute explicitly requires the unlawful restraint of trade to be in "a relevant market," Mich. Comp. Laws Ann. § 445.771, which it defines as an area of competition, "all or any part of which is within the state," Id. § 445.772.  Thus, the Court assumes that an allegation of intrastate conduct is required in Michigan.  West Virginia and South Dakota have statutes that courts have (cont'd . . . .)

Drawing all inferences in favor of Plaintiffs, as the Court must, the TCAC's allegations are sufficient to satisfy state statutes requiring either allegations of intrastate conduct or substantial effects within the state.  The TCAC alleges that Defendants "produced, licensed, distributed and/or sold" Internet Music in all of the listed states.  (TCAC ¶¶ 39, 44, 57-59, 127, 136.)  The TCAC alleges that Defendants' conduct was "in a continuous and uninterrupted flow of intrastate and interstate commerce throughout the United States."  (TCAC ¶ 39.)  Pleadings involving similar allegations of intrastate conduct along with conduct throughout the United States in nationwide class actions have survived motions to dismiss in the face of this very argument.  E.g., In re Chocolate Confectionary Antitrust Litig., 602 F. Supp. 2d 538, 581 (M.D. Pa. 2009) (similar pleading sufficient to allege intrastate conduct in

---

held to be ambiguous as to whether the conspiracy or the conduct must be alleged to have been within the state.  S.D. Codified Laws § 37-1-3.1 ("[A] conspiracy . . . in restraint of trade or commerce any part of which is within this state is unlawful."); W. Va. Code § 47-18-3 (similar); see, e.g., In re NMV, 350 F. Supp. 2d at 172, 175 (holding statutes ambiguous).  In light of this potential ambiguity, courts have held that the states intended to cover as broad a range of activities as possible and that the statutes require allegations of some conduct within the state.  In re Intel Corp. Microprocessor Antitrust Litig., 496 F. Supp. 2d 404, 414 (D. Del. 2007); In re NMV, 350 F. Supp. 2d at 172, 175.  Accordingly, Plaintiffs' objections to having to allege intrastate conduct or effects as to South Dakota and West Virginia are meritless, and the Court assumes that those states require an allegation of intrastate conduct.

Wisconsin); In re Intel Corp. Microprocessor Antitrust Litig.,
496 F. Supp. 2d 404, 411-14 (D. Del. 2007) (District of
Columbia); In re NMV, 350 F. Supp. 2d at 171-75 (South Dakota,
Tennessee & West Virginia).  The Court cautions that "[t]he
allegations of the [TCAC] certainly could have been more fulsome
on this subject."[9]  In re NMV, 350 F. Supp. 2d at 171.
Nevertheless, the Court must construe the pleadings in a light
favorable to Plaintiffs and thus considers allegations of
nationwide sales and distribution on essentially the same terms
in both intrastate and interstate commerce to be sufficient.
See id.  Defendants cite California v. Infineon Technologies AG,
which they argue holds that similar language is insufficient to
plead interstate activity.  531 F. Supp. 2d 1124, 1156 (N.D.
Cal. 2007).  That case, unlike this one and others similar to
it, does not contain specific allegations of "intrastate"
conduct along with allegations of conduct "throughout the United
States" and therefore is not persuasive.  See In re Chocolate,
602 F. Supp. 2d at 581 n.53 (coming to the same conclusion).

       Defendants also argue that the antitrust laws of
Arizona, Iowa, Minnesota, North Carolina, North Dakota, and

---

[9] "It would have been helpful if the plaintiffs had added
allegations of state-directed activity."  In re NMV, 350 F.
Supp. 2d at 169 n.2.  For example, simply adding an allegation
of conduct throughout the United States "and in each listed
state" would be superior pleading.

Vermont have not been determined to require an intrastate connection and that allegations that lack such a connection would violate the prohibition on state regulation that unduly burdens interstate commerce.  See, e.g., Am. Trucking Ass'ns, Inc. v. Mich. Pub. Serv. Comm'n, 545 U.S. 429, 433 (2005).  The Court need not tarry here because, as discussed above, reading the TCAC in a light most favorable to Plaintiffs, it contains sufficient allegations of intrastate conduct or effects to pass Constitutional muster without having to construe the limitations on those state laws, if any.  Moreover, without getting to the details of the jurisprudence, it suffices to say that states may not regulate wholly interstate activity, but they are not limited to regulating wholly intrastate activity.  See id.; Grand River Enters. Six Nations, Ltd. v. Pryor, 425 F.3d 158, 169-72 (2d Cir. 2005).  The Court rejects Defendants' argument as to pleading under the laws of these six states.  The motion as to the state-law antitrust claims is DENIED.

### b. Consumer Protection Laws

Defendants argue that the TCAC insufficiently pleads violations of the consumer protection laws of California, the District of Columbia, Florida, Kansas, Maine, Massachusetts, Nebraska, New Mexico, New York, and North Carolina because the TCAC does not plead the requisite deceptive or fraudulent

conduct under those statutes.[10]  As a general matter, whether the
TCAC contains allegations of deception or fraud affects the
analysis of allegations under each state's consumer protection
laws.  Thus, the Court first addresses this issue.

        The TCAC does not contain allegations of fraudulent or
deceptive conduct.  First of all, the TCAC does not purport to
comply with Federal Rule of Civil Procedure 9(b) and plead any
allegation of fraud with particularity (and, in fairness,
Defendants do not make this argument).  The Court cannot find in
the TCAC any cognizable allegations of fraud.  Secondly, there
is no deception alleged about the nature of the product
Plaintiffs purchased or the terms and conditions under which it
was sold.  This is not a case like In re Intel, where the
product was secretly altered to underperform when joined with
complementary technology offered by a competitor and where the
defendant threatened and retaliated against customers who dealt
with its competitor.  496 F. Supp. 2d at 418.  Instead,
Plaintiffs rely only on allegations that Defendants concealed a
price fixing conspiracy in attempting to parry Defendants'
argument.  (Pl. 2007 Opp. at 34 n.39.)  However, if "failure to

---

[10] Defendants offer no developed argument or legal authority for
their claim that the TCAC is insufficient under the District of
Columbia, Florida, Maine, Massachusetts, or Nebraska consumer
protection laws.  Absent Defendants' invocation of some legal
basis to dismiss these claims, the Court will not do so.  The
claims under these states' laws may proceed.

disclose participation in a purported antitrust conspiracy were sufficient to state a consumer-protection claim, then any Section 1 antitrust case would automatically become a consumer-protection case. That is not the law." In re NMV, 350 F. Supp. 2d at 177 n.22; accord Leider v. Ralfe, 387 F. Supp. 2d 283, 295-96 (S.D.N.Y. 2005). Finally, although Plaintiffs assert that two other nationwide antitrust cases determined that allegations of price fixing or monopolization alone are enough to allege deceptive or unconscionable conduct, that is not true. In both of those cases, the courts undertook a detailed, fact-intensive analysis of the allegations to determine whether the complaints alleged such conduct. In re NMV, 350 F. Supp. 2d at 176-77, 196; see In re Intel, 496 F. Supp. 2d at 418. Without such allegations here, the Court can do no more and disagrees with Plaintiffs' characterization of the law.

These preliminary matters determined, the Court proceeds to discuss state consumer protection law claims about which Defendants make arguments. It has been observed that different state consumer protection statutes contain "not only nuances, but differing standards of proof, procedure, substance, and remedies." Tylka v. Gerber Prods. Co., 178 F.R.D. 493, 499 (N.D. Ill. 1998). The Court thus discusses Defendants' arguments with respect to each state because there is no unifying theme.

i. California

Plaintiffs agree with Defendants that they do not bring a claim under California Unfair Competition Law for damages because such a claim is not allowed.  Korea Supply Co. v. Lockheed Martin Corp., 63 P.3d 937, 943 (Cal. 2003). Instead, Plaintiffs seek restitution, which is a permissible claim.  Id.  This statute "prohibits unfair competition, including unlawful, unfair, and fraudulent business acts.  The [California law] covers a wide range of conduct."  Id. Defendants make no other argument about why this claim should be dismissed.  Their motion is DENIED.

ii. Kansas

The parties agree that Plaintiffs do not assert a claim under the Kansas Consumer Protection Act, Kan. Stat. Ann. § 50-623 et seq., but, rather, under the "Restraint of Trade" statute, id. § 50-101 et seq.  Defendants' motion is therefore DENIED as moot on this point.

iii. New Mexico

Defendants argue that the TCAC insufficiently alleges "unconscionable trade practices."  N.M. Stat. Ann. § 57-12-2(E)(2).  "Federal courts have generally permitted claims under the New Mexico Unfair Practices Act in price fixing cases if the plaintiff alleges a gross disparity between the price paid for the product and the value received."  In re Aftermarket Filters

Antitrust Litig., No. 08 Civ. 4883, 2009 WL 3754041, at *9 (N.D.
Ill. Nov. 5, 2009).  Here, as in Aftermarket Filters, the TCAC's
allegation that Plaintiffs paid supracompetitive prices for the
music they purchased "is sufficient to allege gross disparity."
Id.  Defendants' motion is DENIED as to the New Mexico Unfair
Practices Act.

                              iv.  New York

          Defendants argue that Plaintiffs' New York General
Business Law § 349(a) claim is deficient because the TCAC does
not allege any deceptive conduct.  The New York statute requires
"a showing that defendant is engaging in an act or practice that
is deceptive or misleading in a material way and that plaintiff
has been injured by reason thereof."  Goshen v. Mut. Life Ins.
Co. of N.Y., 774 N.E.2d 1190, 1195 (N.Y. 2002).  "The deceptive
practice, whether a representation or an omission, must be
likely to mislead a reasonable consumer acting reasonably under
the circumstances.  Morrissey v. Nextel Partners, Inc., 895
N.Y.S.2d 580, 585 (N.Y. App. Div. 2010).  Although the New York
statute is based upon section 5 of the Federal Trade Commission
Act ("FTCA"), "New York has chosen not to include 'unfair
competition' or 'unfair' practices in its consumer protection
statute, language that bespeaks a significantly broader reach."
Leider, 387 F. Supp. 2d at 296.  Accordingly, "anticompetitive
conduct that is not premised on consumer deception is not within

the ambit of the statute," id. at 295, because "[t]he statute
seeks to secure an honest market place where trust, and not
deception, prevails," Goshen, 774 N.E.2d at 1195 (internal
quotation marks omitted).  See also In re NMV, 350 F. Supp. 2d
at 197 ("An antitrust violation may violate section 349, but
only if it is deceptive.").

        The TCAC does not contain antitrust allegations that
"were imbued with a degree of subterfuge," Leider, 387 F. Supp.
2d at 295, as has been the case when courts uphold section 349
claims based on anticompetitive conduct.  As the Court found,
the TCAC does not allege deception.  Plaintiffs' reliance on
cases like In re TFT-LCD (Flat Panel) Antitrust Litigation (In
re TFT I), 586 F. Supp. 2d 1109, 1127-28 (N.D. Cal. 2008), is
unpersuasive in this case because those cases deal with an
argument about whether defendants made misrepresentations to
plaintiffs.  Therefore, Defendants' motion to dismiss the
section 349 claim is GRANTED.

                                    v. North Carolina

        Defendants argue that the North Carolina consumer
protection statute prohibits "unfair or deceptive" commercial
conduct, of which they argue the TCAC lacks allegations.  Dalton
v. Camp, 548 S.E.2d 704, 711 (N.C. 2001).  Plaintiffs argue that
the TCAC contains sufficient allegations of at least unfair
conduct.  Having already determined that there are no

allegations of deceptive conduct in the TCAC, the Court goes on
to consider whether the TCAC contains allegations of unfair
conduct.

The most persuasive authority arising under North
Carolina law holds that price fixing is an unfair practice under
that state's law.  See Marshall v. Miller, 276 S.E.2d 397, 403
(N.C. 1981) ("A practice is unfair when it offends established
public policy as well as when the practice is immoral,
unethical, oppressive, unscrupulous, or substantially injurious
to consumers."); see also McDaniel v. Greensboro News Co., No.
81 Civ. 132, 1983 WL 1943, at *3 (M.D.N.C. Dec. 19, 1983)
(holding that price-fixing efforts in combination with other
dishonest conduct suffices under the North Carolina law).
Moreover, like the New York statute, the North Carolina law is
based upon section 5 of the FTCA.  ITCO Corp. v. Michelin Tire
Corp., 722 F.2d 42, 48 (4th Cir. 1983).  However, unlike the New
York statute, the North Carolina law contains a provision
prohibiting "unfair" practices and thus fully mirrors the FTCA.
Id.; Leider, 387 F. Supp. 2d at 295.  Because of that
similarity, decisions construing the FTCA are appropriate
guidance here.  ITCO, 722 F.2d at 48.  "[I]t is an accepted
tenet of basic antitrust law that § 5 of the [FTCA] sweeps
within its prohibitory scope conduct also condemned by § 1 of
the Sherman Act."  Id.  Because the parties point to no reason

to conclude that North Carolina courts would rule otherwise, the
Court finds that the TCAC suffices to state a claim under the
North Carolina law for the same reasons it states a federal
antitrust claim.  Defendants' motion as to the North Carolina
consumer protection law is DENIED.

### 3. State-Law Unjust Enrichment Claims

Plaintiffs assert claims for restitution based on
unjust enrichment under various state laws, stating that
"Defendants' financial benefits resulting from their unlawful
and inequitable conduct are traceable to overpayments for
Internet Music and CDs stemming from Defendants' combination and
conspiracy to restrain trade in Internet Music."  (TCAC ¶ 139.)
Defendants argue that these claims are nothing more than claims
for damages for the alleged antitrust violations, which are
barred because they seek duplicative recovery and because state
antitrust laws should be the exclusive remedy for such
violations.  Plaintiffs argue first that they are entitled to
plead alternative theories of relief and second that unjust
enrichment claims are independent of antitrust claims and
proceed on their own merits.

Although the requirements to plead unjust enrichment
vary by state, "almost all states at minimum require plaintiffs
to allege that they conferred a benefit or enrichment upon
defendant and that it would be inequitable or unjust for

defendant to accept and retain the benefit."[11]  In re Flonase,
692 F. Supp. 2d at 541; see also Golden Pac. Bancorp v. FDIC,
273 F.2d 509, 519 (2d Cir. 2001).  "In contemporary United
States common law, restitution based upon unjust enrichment
takes at least two forms"; it may be "autonomous" or
"parasitic."  In re NMV, 350 F. Supp. 2d at 207-08.  Parasitic
claims are "[w]here the unjust enrichment is based upon a
predicate wrong, such as a tort, breach of contract or other
wrongful conduct such as an antitrust violation."  In re
Flonase, 692 F. Supp. 2d at 542 n.13.  "Conversely, unjust
enrichment may provide an independent ground for restitution,
and this is known as 'autonomous' restitution."  Id.  Autonomous
claims in an area "regulated by an independent body of law" are
more problematic than parasitic claims because the "premise for
such a claim must be that, even if the defendants' conduct is
blameless under the substantive requirements of federal and
state antitrust statutes and state consumer protection statutes,

---

[11] The Court rejects Defendants' first argument: that unjust
enrichment is disallowed where an adequate remedy at law exists.
This argument is premature because Plaintiffs may plead in the
alternative.  In re K-Dur Antitrust Litig., 338 F. Supp. 2d 517,
544 (D.N.J. 2004).  Likewise, Defendants' argument that
Plaintiffs' lack of privity with at least some defendants is
groundless because, as Plaintiffs argue (without Defendants'
refutation), no state at issue here has a privity requirement to
plead unjust enrichment.  Id.; see Pl. 2007 Mem. at 38 & n.47
(citing cases).  Defendants' reliance on cases discussing
incidental benefits is misplaced; this case may involve certain
indirect benefits, but it does not involve incidental benefits.

the plaintiffs nevertheless can still obtain restitution."  In
re NMV, 350 F. Supp. 2d at 209.  Plaintiffs do not clearly
differentiate the type of restitution they seek.  See id. at 209
n.86.

        For purposes of this motion, the Court assumes that
the TCAC alleges that Plaintiffs conferred a benefit (payment
for music) on Defendants and that, at minimum, Defendants'
conduct violated the federal antitrust laws.

        The Court begins with the autonomous claims.  On its
own, "unjust enrichment ordinarily does not furnish a basis for
liability where parties voluntarily have negotiated, entered
into and fully performed their bargain . . . ."  In re NMV, 350
F. Supp. 2d at 210.  Here, Plaintiffs "paid their purchase
prices and obtained their" products.  Id.  Plaintiffs do not
seek rescission of the sales, and they do not "assert that
purchasers failed to receive the benefit for which they
bargained."  Id.  They only allege that they overpaid for the
product for which they bargained.  Although authority exists for
the proposition that providing only "fair," not "any,"
consideration for a benefit defeats an autonomous unjust
enrichment claim, see In re K-Dur Antitrust Litig., 338 F. Supp.
2d 517, 545-46 (D.N.J. 2004), this case does not involve a
situation, as in In re K-Dur, where the plaintiffs alleged that
"they failed to receive the benefit of their bargain."  In re

Intel, 496 F. Supp. 2d at 421 (rejecting unjust enrichment claims in an overpayment case).  Indeed, Plaintiffs received the music they purchased.  Because autonomous restitution only exists in the absence of a violation of law, the Court will not inquire into the terms of the sale where, as here, a relatively comprehensive state and federal statutory and common-law scheme exists to proscribe the conduct of which Plaintiffs complain. See id.; see also U.S. East Telecomms., Inc. v. U.S. West Commc'ns Servs., Inc., 38 F.3d 1289, 1299 (2d Cir. 1994); Ferguson v. Lion Holdings, Inc., 312 F. Supp. 2d 484, 495 (S.D.N.Y. 2004).  To do so would undermine that legal regime. In re NMV, 350 F. Supp. 2d at 209 (citing Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 936-37 (3d Cir. 1999)).  Therefore, Plaintiffs "cannot prevail on a claim of restitution based upon [autonomous] unjust enrichment."  Id. at 210; see In re Flonase, 692 F. Supp. 2d at 542 n.13.

       Before proceeding to the "parasitic" claims, it must be noted that there are two types of plaintiffs here: direct purchasers and indirect purchasers.  Direct purchasers are those who bought music directly from MusicNet or pressplay.  (TCAC ¶ 44.)  Indirect purchasers are those who bought music owned by Defendants from another source that is unrelated to Defendants.

(Id.)  Moreover, there are two categories of violations at issue: federal and state law.

As to parasitic claims premised on a violation of federal law, it is beyond peradventure that indirect purchasers may not employ unjust enrichment to skirt the limitation on recovery imposed by Illinois Brick Co. v. Illinois, 431 U.S. 720, 735 (1977).  In re NMV, 350 F. Supp. 2d at 211.  Moreover, there is no clearly established federal common law of restitution for a federal antitrust violation, and Plaintiffs do not suggest that the Court create one.  Id. at 211 n.90. Therefore, absent a basis for restitution in federal law both direct and indirect purchasers may not bring unjust enrichment claims premised solely on a violation of federal law. Plaintiffs' claim for parasitic unjust enrichment is dismissed to the extent it is premised on a violation of federal law.

As to parasitic claims premised on a violation of state law, these claims boil down to an election of remedies, which the Court does "not have unlimited compass . . . to determine" because "the statute creating liability can override otherwise relevant common law restitution principles by permitting such relief, by prohibiting such relief or by limiting or enlarging the scope of restitutionary relief."  Id. at 210.  Plaintiffs have not sought an unjust enrichment remedy under Florida, Montana, North Carolina, or North Dakota law.

The Court has dismissed the New York state claims, so they cannot be the basis for a parasitic claim.  Without further direction from the parties about which other states disallow restitutionary relief, the Court will allow all direct purchaser parasitic unjust enrichment claims to proceed in states not named because they merely provide a different form of remedy.

Indirect purchaser Plaintiffs, however, face a further limitation: they may not recover restitution in states that follow the rule of Illinois Brick.  See In re Flonase, 692 F. Supp. 2d at 544-45 (Illinois follows Illinois Brick for individual indirect purchasers); In re TFT-LCD (Flat Panel) Antitrust Litig. (In re TFT II), 599 F. Supp. 2d 1179, 1185-87 (N.D. Cal. 2009) (Virginia, Montana, and Puerto Rico); In re Microsoft Corp. Antitrust Litig., 241 F. Supp. 2d 563, 565-66 (D. Md. 2003) (Kentucky, Maryland, and Oklahoma); see also 740 Ill. Comp. Stat. 10/7(2) (stating that only the Illinois state attorney general may bring a class action on behalf of indirect purchasers under Illinois law).  Many states have not expressly adopted or rejected Illinois Brick, but they have antitrust laws that are harmonized with federal law or "overwhelmingly" look to federal law for guidance.  In re Digital Music, 592 F. Supp. 2d at 448 & nn.20-21.  Therefore, any state that has not expressly passed Illinois Brick repealer legislation or interpreted its law in such a way as to override the rule of Illinois Brick is

presumed to have decided to follow federal law, including the
Illinois Brick limitation on indirect purchaser claims.  See,
e.g., In re TFT II, 599 F. Supp. 2d at 1185-87; FTC v. Mylan
Labs., Inc., 62 F. Supp. 2d 25, 43 (D.D.C. 1999).  In addition
to claims (if any) brought under the laws of Florida, Illinois,
Montana, New York, North Carolina, and North Dakota, all
parasitic claims premised on the state laws of states that
follow Illinois Brick are DISMISSED.[12]

---

[12] Of the other states in which plaintiffs purportedly reside as
pleaded in this action, Arizona, California, the District of
Columbia, Kansas, Maine, Michigan, Minnesota, Nevada, New
Mexico, South Dakota, Tennessee, Vermont, West Virginia, and
Wisconsin have passed Illinois Brick repealer laws or their
courts have held that state law permits indirect purchaser suits
by individuals.  The Court relies on the following authority
from each state in holding that these states do not follow
Illinois Brick: Cal. Bus. & Prof. Code § 16750(a); D.C. Code
§ 28-4509(a); Kan. Stat. Ann. § 50-161; Me. Rev. Stat. tit. 10,
§ 1104(1); Mich. Comp. Laws § 445.778(2); Minn. Stat.
§ 325D.57; Nev. Rev. Stat § 598A.210(2); N.M. Stat. Ann.  § 57-
1-3(A); S.D. Codified Laws § 37-1-33; Vt. Stat. Ann. tit. 9,
§ 2465; W. Va. Code R. 142-9-2; Wis. Stat. § 133.18(1)(a);
Bunker's Glass Co. v. Pilkington PLC, 75 P.3d 99, 102 (Ariz.
2003); Comes v. Microsoft Corp., 646 N.W.2d 440, 441 (Iowa
2002); Sherwood v. Microsoft Corp., No. M2000-01850, 2003 WL
21780975, at *29 (Tenn. Ct. App. July 31, 2003).  Massachusetts
is somewhat different in that only direct purchasers may
maintain a cause of action under the state antitrust act, but
both direct and indirect purchasers may maintain a cause of
action under the state consumer protection act.  Ciardi v.
Hoffmann-LaRoche, Ltd., 762 N.E.2d 303, 308-09, 312 (Mass.
2002).  Plaintiffs do not assert a cause of action under the
Massachusetts antitrust act, Mass. Gen. Laws ch. 93, § 1 et
seq., relying instead only on the consumer protection law, id.
ch. 93A, § 1 et seq.  Because the parties have not briefed
whether the TCAC is sufficient to state a cause of action under
the Massachusetts consumer protection law, the Court will allow
(cont'd . . .)

To summarize: Plaintiffs' autonomous unjust enrichment claims are dismissed, but their parasitic claims under the laws of many, but not all, states pleaded in the TCAC may proceed.

### 4. Newly Added State Law Claims

The TCAC adds state-law claims under Illinois and New York law.  Plaintiffs argue that the Supreme Court's decision in Shady Grove Orthopedic Assocs. v. Allstate Ins. Co., 130 S. Ct. 1431 (2010) allows them to assert these claims.  The Court addresses these newly added claims, beginning with claims under Illinois law.

### i. Illinois

Defendants argue that Plaintiffs' claim under Illinois antitrust law on behalf of all Illinois-resident indirect purchasers fails because the law expressly precludes private parties from asserting class actions on behalf of indirect purchasers.  They acknowledge that the Illinois law does not "deny any person who is an indirect purchaser the right to sue for damages," but they say that only the state attorney general may assert a class action under this law.  740 Ill. Comp. Stat. 10/7(2).  They therefore argue that Plaintiffs lack standing under the Illinois statute or that Shady Grove does not permit them to assert a claim.  The Court begins with Shady Grove

---

a parasitic unjust enrichment claim to proceed for Massachusetts plaintiffs, if any.

because that analysis determines whether Plaintiffs have standing.

Shady Grove is a decision about the contours of the Erie doctrine, but it did not result in unanimity on all points. The Court considered whether a New York law prohibiting class actions in any suit seeking penalties or statutory minimum damages precluded a federal court from exercising diversity jurisdiction over a class action.  130 S. Ct. at 1436 (majority op.).  The question for the Court was whether a suit for statutory damages could proceed in federal court as a class action notwithstanding the state statute's limitation.  Id. at 1437.  The same question exists here because the Illinois law clearly provides for an individual remedy for indirect purchasers, yet it limits those who may maintain a class action for the same alleged violation to only the state attorney general.  740 Ill. Comp. Stat. 10/7(2) ("No provision of this Act shall deny any person who is an indirect purchaser the right to sue for damages.").

Setting out the legal framework, the Court proceeded to analyze two questions: first, whether the applicable federal rule applies, and second, whether that rule "exceeds statutory authorization or Congress's rulemaking power."  130 S. Ct. at 1437 (majority op.).  A majority of the Court concluded that Rule 23 conflicted with the state statute because Rule 23

47

"creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action." Id. at 1437-38. The same analysis applies in this case: a diversity plaintiff in federal court may maintain a class action if he wishes; this rule conflicts with the Illinois statute, which places limits on who may maintain a class action in antitrust suits. Unless Rule 23 exceeds statutory authority or Congress's rulemaking power, then, it – and not the state rule – applies. Id. at 1437.

The Supreme Court differed as to the proper analysis of this second question, even though the Justices agree that a federal rule may not "abridge, enlarge, or modify a substantive right." Id. at 1442 (plurality op.); id. at 1452 (Stevens, J., concurring in part and concurring in the judgment). Justice Scalia's plurality opinion contained a simple approach: "the validity of a Federal Rule depends entirely upon whether it regulates procedure." Id. at 1444 (plurality op.). Justice Scalia thought that a "class action . . . merely enables a federal court to adjudicate claims of multiple parties at once" but doing so leaves "the parties' legal rights and duties intact and the rules of decision unchanged." Id. at 1443. This view garnered the support of only four Justices. Justice Stevens wrote separately. He explained a more nuanced view of a similar concept: "there are some state procedural rules that federal

courts must apply in diversity cases because they function as a part of the State's definition of substantive rights and remedies." Id. at 1448 (Stevens, J., concurring in part and concurring in the judgment). "A state procedural rule, though undeniably 'procedural' in the ordinary sense of the term, may exist to influence substantive outcomes and may in some instances become so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy." Id. at 1450 (internal quotation marks and citation omitted). "When a federal rule appears to abridge, enlarge, or modify a substantive right, federal courts must consider whether the rule can reasonably be interpreted to avoid that impermissible result." Id. at 1452. Nevertheless, finding that a federal rule of procedure exceeds Congress's authority is a "high" bar. Id. at 1457. In Shady Grove, "Justice Stevens concluded that § 901(b) was not intertwined with New York's definition of substantive rights because the rule is in New York's procedural code, it is applicable to class actions brought under any source of law, and the legislative history was ambiguous." In re Wellbutrin XL Antitrust Litig., 756 F. Supp. 2d 670, 674 (E.D. Pa. 2010).

"'When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that

position taken by those Members who concurred in the judgments
on the narrowest grounds.'" United States v. Alcan Aluminum
Corp., 315 F.3d 179, 189 (2d Cir. 2003) (quoting Marks v. United
States, 430 U.S. 188, 193 (1977)) (internal quotation marks
omitted).  This rule is not a carte blanche; it only applies "in
instances where one opinion can meaningfully be regarded as
'narrower' than another . . . that is to say, only when that
narrow opinion is the common denominator representing the
position approved by at least five justices."  Id. (internal
quotation marks and citation omitted).  "Justice Stevens'
approach does, however, form the 'narrowest grounds' in Shady
Grove . . . ."  In re Wellbutrin, 756 F. Supp. 2d at 675.
"[T]he five justices in the concurrence and the dissent
concluded that the validity of Federal Rules of Civil Procedure
turns, in part, on the rights afforded by the state rule that
the Federal Rule displaces."  Id.; see also In re Packaged Ice
Antitrust Litig., No. 08 MD 1952, 2011 WL 891169, at *15 (E.D.
Mich. Mar. 11, 2011) ("Courts interpreting the Shady Grove
decision . . . have concluded that Justice Stevens' concurrence
is the controlling opinion by which interpreting courts are
bound.").

        The Illinois law, under Justice Stevens's controlling
analysis, is "substantive" and therefore provides the rule of
decision here.  It states, in relevant part:

>           Any person who has been injured in his
>     business or property, or is threatened with such
>     injury, by a violation of [the Illinois antitrust
>     statute] may maintain an action in the Circuit Court
>     for damages, or for an injunction, or both, against
>     any person who has committed such violation. . . .
>     . . . .
>           No provision of this Act shall deny any
>     person who is an indirect purchaser the right to sue
>     for damages. . . .  Provided further that no person
>     shall be authorized to maintain a class action in any
>     court of this State for indirect purchasers asserting
>     claims under this Act, with the sole exception of this
>     State's Attorney General, who may maintain an action
>     parens patriae as provided in this subsection.

740 Ill. Comp. Stat. 10/7(2).  This statute provides a procedure

that is "so bound up with the state-created right or remedy that

it defines the scope of that substantive right or remedy."

Shady Grove, 130 S. Ct. at 1450 (Stevens, J., concurring in part

and concurring in the judgment).  Therefore, applying the

federal rule to override this process would be "an application

of a federal rule that effectively abridges, enlarges, or

modifies a state-created right or remedy" and is disallowed.

Id. at 1451.  Unlike the New York law at issue in Shady Grove,

its limitation is not contained in a generally applicable

procedural rule but, rather, in the same paragraph of the same

statute that creates the underlying substantive right.  In re

Wellbutrin, 756 F. Supp. 2d at 677.  It applies only to that

statute.  Id.  "Furthermore, courts have observed that the

Illinois statute represents a policy judgment as to the

feasibility of managing duplicative recovery, which the

legislature has entrusted to the Attorney General but not to individual indirect purchasers." Id.  That policy judgment is substantive.  Indeed, the statute expressly cautions courts to take care to follow the Illinois Brick rule and avoid duplicate recoveries.  "Because the indirect purchaser restrictions of the [Illinois law] IAA are 'intertwined' with the underlying substantive right, application of Rule 23 would 'abridge, enlarge or modify' Illinois' substantive rights, and therefore Illinois' restrictions on indirect purchaser actions must be applied in federal court."[13]  Id.

Plaintiffs' claim on behalf of indirect purchasers under Illinois law is DISMISSED.

ii. New York

Plaintiffs have added a claim under New York's Donnelly Act, which is a New York antitrust statute.  Defendants contend that, even though Shady Grove allows private class actions for statutory claims in federal court under New York law, Plaintiffs' claim fails because "federal antitrust laws preempt the Donnelly Act where the alleged conduct principally affects interstate commerce."  Conergy AG v. MEMC Elec. Materials, Inc., 651 F. Supp. 2d 51, 61 n.83 (S.D.N.Y. 2009) (collecting cases).  Plaintiffs argue that federal antitrust

---

[13] This holding indicates that Plaintiffs have no standing to bring suit under the Illinois law.

preemption obtains only when there is "little or no impact on local or intrastate commerce." Two Queens, Inc. v. Scoza, 745 N.Y.S.2d 517, 519 (N.Y. App. Div. 2002).

Although the authorities quoted by the parties contain broad, categorical language, the state authorities suggest that New York requires an impact on intrastate commerce so as to avoid a dormant Commerce Clause issue. Compare id. ("The question is whether the burden on interstate commerce outweighs the States' interests." (internal quotation marks omitted)), with, e.g., Nat'l Elec. Mfrs. Ass'n v. Sorrell, 272 F.3d 104, 108 (2d Cir. 2001) ("A statute may violate the well-established 'dormant' aspect of the Commerce Clause . . . if it imposes a burden on interstate commerce incommensurate with the local benefits secured." (internal citations omitted)). As Plaintiffs point out, the cases on which Defendants rely involve situations where the defendants had only tangential connections to New York. And as the Court already determined, supra Part II.D.2.a., the TCAC alleges a sufficient intrastate connection to survive this type of argument. The TCAC alleges a "significant impact on intrastate commerce" in New York, Conergy AG, 651 F. Supp. 2d at 61, because the end purchasers presumably purchased Internet Music from New York and consumed the product in New York. Moreover, many of the Defendants are headquartered in New York City and/or incorporated in New York, and they

clearly conduct significant business in New York.  Federal
antitrust law does not preempt the Donnelly Act in this case.

Defendants' motion to dismiss the newly added New York
claim is DENIED.

E. Parent Company Motions to Dismiss

Three named defendants, Sony Corporation of America
("SCA"), Bertelsmann, Inc. ("Bertelsmann"), and Time Warner,
Inc. ("Time Warner" and, collectively, the "Parent Companies"),
move to dismiss the complaint against them because they are
parent companies to the relevant actors named in the complaint.
These defendants argue that absent allegations allowing the
Court to pierce the corporate veil, their separate corporate
form entitles them to dismissal.  The Court agrees.  The Parent
Companies could be liable directly or as alter egos of entities
they own or control.  The complaint is insufficient under either
theory.

Beginning with the straightforward, the complaint
alleges no conduct by the Parent Companies that violates the
law.  The complaint alleges that each Parent Company is a parent
of a subsidiary that owns the rights to musical copyrights,
royalties, and licensing agreements and that runs the related
music operations. (TCAC ¶¶ 21-23, 26.)  The Parent Companies
have no direct involvement in or ownership of the relevant music
licenses.  (See TCAC ¶¶ 21-23, 26.)  The complaint alleges that

the Parent Companies had ownership interests in MusicNet and
pressplay, which sold music to customers, and that SCA sold
music directly through its website.  (TCAC ¶¶ 58-60, 67, 72.)
None of this is actionable conduct; an antitrust conspiracy
complaint must assert enough "factual matter" to suggest
plausibly a preceding agreement.  Twombly, 550 U.S. at 555-57;
see DM Research, Inc. v. Coll. of Am. Pathologists, 170 F.3d 53,
55 (1st Cir. 1999).  Although Plaintiffs argue that they alleged
that the Parent Companies were directly involved in the alleged
conspiracy (Pl. Mem. of Supp. Auth. Dated June 2, 2010, at 1), a
reading of the complaint indicates otherwise.  The complaint
alleges direct involvement of the Parent Companies by way of
generic references to "defendants."  (Id. at 1-5.)  This
approach is insufficient.  See, e.g., Monsanto Co. v. Spray-Rite
Serv. Corp., 465 U.S. 752, 764 (1984); In re Elevator Antitrust
Litig., 502 F.3d 47, 50-51 (2d Cir. 2007); Heart Disease Res.
Found. v. Gen. Motors Corp., 463 F.3d 98, 101 (2d Cir. 1972);
Invamed, Inc. v. Barr Labs., Inc., 22 F. Supp. 2d 210, 221
(S.D.N.Y. 1998); see also De Jesus v. Sears, Roebuck & Co., 87
F.3d 65, 70 (2d Cir. 1996) (reiterating that related
corporations are presumed to be separate).

        Direct involvement aside, the thrust of the complaint
is to impute the actions of the Parent Companies' subsidiaries
or joint ventures (MusicNet and pressplay) to the Parent

Companies.  But the complaint does not allege a basis to
disregard the separate corporate forms of these entities and
impose liability on the Parent Companies.  "It is a general
principle of corporate law deeply ingrained in our economic and
legal systems that a parent corporation . . . is not liable for
the acts of its subsidiaries."  United States v. Bestfoods, 524
U.S. 51, 61 (1998) (internal quotation marks omitted); see,
e.g., Greene v. Long Island R.R. Co., 280 F.3d 224, 235-36 (2d
Cir. 2002).  "But there is an equally fundamental principle of
corporate law, applicable to the parent-subsidiary relationship
as well as generally, that the corporate veil may be pierced and
the shareholder held liable for the corporation's conduct when,
inter alia, the corporate form would otherwise be misused to
accomplish certain wrongful purposes . . . ."  Bestfoods, 524
U.S. at 62.

         "Under New York choice-of-law principles, the issue of
whether the corporate veil may be pierced is determined under
the law of the state of incorporation."  Spagnola v. Chubb
Corp., 264 F.R.D. 76, 85 n.10 (S.D.N.Y. 2010) (citing Fletcher
v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).  Here, Time
Warner and Bertelsmann are Delaware corporations,[14] and SCA is a

---

[14] Although the place of Time Warner's incorporation is not
stated in the complaint, the Court takes judicial notice that
Time Warner is a Delaware corporation.  Time Warner, Inc.,
(cont'd . . .)

New York corporation.  (TCAC ¶¶ 22-23.)  In Delaware, "a court can pierce the corporate veil of an entity where there is fraud or where a subsidiary is in fact a mere instrumentality or alter ego of its owner." Geyer v. Ingersoll Publ'ns Co., 621 A.2d 784, 793 (Del. Ch. 1992).  Likewise, in New York, "piercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." Morris v. N.Y. State Dep't of Taxation & Fin., 623 N.E.2d 1157, 1160 (N.Y. 1993).  In determining whether to pierce the corporate veil in either state, courts consider allegations of disregarding corporate formalities, siphoning or intermingling of funds, inadequate capitalization, or that the corporation is a mere sham acting for the shareholder, among others. MicroStrategy Inc. v. Acacia Research Corp., Civ. A. No. 5735, 2010 WL 5550455, at *11 (Del. Ch. Dec. 30, 2010); Fantazia Int'l Corp. v. CPL Furs N.Y., Inc., 889 N.Y.S.2d 28, 29 (N.Y. App. Div. 2009).

     In neither state may liability be imposed merely based on a parent's ownership of a controlling interest in the subsidiary. Mabon, Nugent & Co. v. Tx. Am. Energy Corp., Civ.

---

Quarterly Report (Form 10-Q) (May 4, 2011); see Citadel Equity Fund Ltd. v. Aquila, Inc., 168 F. App'x 474, 476 (2d Cir. 2006).

A. No. 8578, 1990 WL 44267, at *5 (Del. Ch. Apr. 12, 1990)
("[T]he separate corporate existences of parent and subsidiary
will not be set aside merely on a showing of common management
of the two entities, nor on a showing that the parent owned all
the stock of the subsidiary."); Sheridan Broad. Corp. v. Small,
798 N.Y.S.2d 45, 46 (N.Y. App. Div. 2005).  Indeed, a showing
that a fraud would be "perpetrated through misuse of the
corporate form" generally is required in both states.  Medi-Tec
of Egypt Corp. v. Bausch & Lomb Surgical, No. Civ. A. 19760,
2004 WL 415251, at *7 (Del. Ch. Mar. 4, 2004); see Morris, 623
N.E.2d at 1161.  Finally, in both states, the corporation's
separate identity is generally respected, and the proponent of
disregarding a corporation's separate identity bears a heavy
burden.  TNS Holdings, Inc. v. MKI Sec. Corp., 703 N.E.2d 749,
751 (N.Y. 1998); see MicroStrategy Inc., 2010 WL 5550455, at
*11.

          The TCAC fails to allege circumstances that would
allow the Court to pierce the Parent Companies' corporate veils.
The complaint contains no allegations that the Parent Companies
misused the corporate form, disregarded corporate formalities,
commingled funds, or otherwise misused the separate identities
of the entities.  See, e.g., De Jesus, 87 F.3d at 70; Miller v.
Citicorp, No. 95 Civ. 9728, 1997 WL 96569, at *9 (S.D.N.Y. Mar.
4, 1997) (quoting New York law that subsidiary has to be the

"mere dummy" of parent for veil to be pierced); <u>MicroStrategy Inc.</u>, 2010 WL 5550455, at *11; <u>Fantazia Int'l Corp.</u>, 889 N.Y.S.2d at 29.   There is no allegation that the Parent Companies used the separate corporate form of the subsidiaries to perpetrate a fraud.   The most the complaint alleges is that the Parent Companies own their respective subsidiaries and have ownership interests in the joint ventures.[15]   (TCAC ¶¶ 21-23, 25-28, 57-58, 72.)   But a mere ownership stake in a joint venture is not grounds for a presumption of wrongdoing or fraud <u>on the part of its owners</u>.   See, e.g., <u>Broad. Music, Inc. v. CBS, Inc.</u>, 441 U.S. 1, 23 (1979) ("Joint ventures and other cooperative arrangements are also not usually unlawful . . . where the agreement on price is necessary to market the product at all."); <u>see also</u> <u>Texaco, Inc. v. Dagher</u>, 541 U.S. 1, 5-6 (2006); <u>Addamax Corp. v. Open Software Found., Inc.</u>, 152 F.3d 48, 52 (1st Cir. 1998) (declining to adopt per se section 1 liability for joint venture unless it is a "complete sham").   The joint ventures

---

[15] With respect to Bertlesmann, the TCAC states that Bertlesmann AG, not Bertlesmann, Inc., has an ownership in Sony BMG (TCAC ¶ 21), but Plaintiffs state in their memorandum of law that Bertlesmann, Inc., is the owner.   Moreover, the TCAC alleges that Bertlesmann (and SCA) transferred their "musical copyrights, licensing agreements and royalty rights" to Sony BMG, a separate entity that "produces, licenses and distributes" the music involved in this lawsuit.   (<u>Id.</u>)   Whether Bertlesmann or Bertlesmann AG owns an interest in Sony BMG is thus not material for the purpose of this motion; in either case, there is no basis to pierce either entity's corporate veil.

here are separate legal entities and enjoy a presumption of
separateness.  See De Jesus, 87 F.3d at 70.  It is clear that
simply owning, even wholly owning, a subsidiary is insufficient
to pierce the corporate veil.  See Mabon, Nugent & Co., 1990 WL
44267, at *5; Sheridan Broad. Corp., 798 N.Y.S.2d at 46.  And
even though Plaintiffs challenge aspects of the joint ventures,
see Starr, 592 F.3d at 326, there are no allegations about any
involvement of the Parent Companies.

      There are no allegations that any Parent Company did
anything actionable in the alleged antitrust conspiracy.
Whether the joint ventures or subsidiaries did anything
actionable is not relevant with respect to the liability of the
Parent Companies absent a basis to pierce the corporate veil,
and none is alleged.  Moreover, there is no allegation that the
Parent Companies directed the subsidiaries to engage in an
antitrust conspiracy.  As stated in a case involving more
significant allegations of "dominion and control" over
subsidiaries, "[t]he unadorned invocation of dominion and
control is simply not enough."  In re Currency Conversion Fee
Antitrust Litig., 265 F. Supp. 2d 385, 426 (S.D.N.Y. 2003).
Here, allegations of less pervasive control over the subsidiary
entities, combined with the complete absence of any basis to
infer the use of the subsidiary entities as a means to
perpetrate a fraud, are likewise not enough.  There being no

basis in the complaint to impute liability to the Parent
Companies, dismissal of the actions against them is appropriate.

F. Motion to Strike Portions of the TCAC

Defendants move to strike paragraphs 87, 106-112, and
the last sentence of paragraph 38 of the TCAC.  Defendant's
motion is GRANTED except as to paragraph 38 because paragraphs
87 and 106-112 contain information that is only inflammatory and
is based on investigations or litigation that is unconcluded,
concluded with no resolution against Defendants, or concluded
but wholly irrelevant to digital music.

III. CONCLUSION

For the reasons stated above, Defendants' motion to
dismiss [dkt. no. 132] is GRANTED in part and DENIED in part.
The result is as follows: Plaintiffs' Sherman Act claims may
proceed.  The CD-purchaser class does not have antitrust
standing, and its claims are DISMISSED with prejudice.  The
Court will conduct a standing inquiry on claims asserted in
states in which no named plaintiff resides at the class
certification stage.  Defendants' motion to dismiss claims for
violations of state consumer protection statutes is DENIED
except as to New York, in which case it is GRANTED.  Defendants'
motion to dismiss the unjust enrichment claims is GRANTED in
part and DENIED in part.  Autonomous unjust enrichment claims
are DISMISSED.  Parasitic unjust enrichment claims are DISMISSED

as to Illinois, Florida, Montana, New York, North Carolina, and
North Dakota based claims, if any, but may proceed as to other
states.  Defendants' motion to dismiss the newly added Illinois
and New York state antitrust claims is DENIED in part and
GRANTED in part.  The New York claim only may proceed.
Defendants' motion to dismiss claims against the Parent
Companies is GRANTED.  Defendants' motion to strike portions of
the TCAC is GRANTED in part and DENIED in part; paragraphs 87
and 106-112 are stricken.

The parties shall confer and inform the Court no later
than August 1, 2011, how they propose to proceed.

SO ORDERED.

Dated:    New York, New York
          July 18, 2011


*Loretta A. Preska*

LORETTA A. PRESKA
Chief U.S. District Judge