UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x

In re DIGITAL MUSIC ANTITRUST          :     MDL Docket No. 1780
LITIGATION                             :
                                       :
——————————————————————— x

Assigned to: Judge Loretta A. Preska

CONFORMED THIRD CONSOLIDATED
AMENDED COMPLAINT

RECEIVED
2011 AUG 31  P  ⊦ 11
U S DISTRICT COURT SDNY

## INTRODUCTION

1.      Plaintiffs Benham, Clark, Edenbaum, Hall, Horton, Kelly, Landry, Michaud, Owens, Paschkett, Putnam, Seley, Starr and Thornton, on behalf of themselves and the classes defined herein (the "Classes"), based on information, belief and investigation of counsel, except for information based on their personal knowledge, allege as follows:

2.      This action is brought by plaintiffs on behalf of all persons and entities who have paid inflated prices for music sold as digital files ("Digital Music"). The two primary means of delivery of Digital Music are: (1) online via the Internet ("Internet Music"); and (2) compact discs ("CDs").

3.      Recognizing that Internet Music is a substitute for CDs and that competition in the sale of Internet Music would result in lower sales and prices for CDs, Defendants conspired to restrict the output of and fix both the prices and the terms under which Internet Music would be sold. As a result of Defendants' conspiratorial and anticompetitive conduct, plaintiffs and members of the Classes have paid more for Internet Music and CDs than they would have in a Digital Music market free from Defendants' illegal restraints of trade.

4.      Defendants' conduct violates, *inter alia*, the Sherman Act, state antitrust, unfair competition and consumer protection statutes, and the common law. Plaintiffs seek an order enjoining Defendants' anticompetitive conduct, damages, restitution and other monetary relief for themselves and the Classes as a result of Defendants' unlawful conduct.

## PARTIES

5.      Plaintiff Richard Benham ("Benham") is a resident of the State of Minnesota, Hennepin County. Plaintiff Benham has purchased numerous CDs, as well as Internet Music, produced, licensed, distributed and/or sold by one or more of the Defendants, during the Class

Period (defined herein). As a result of Defendants' unlawful conduct alleged herein, plaintiff Benham has suffered injury in fact and paid artificially inflated prices for CDs and Internet Music.

6.     Plaintiff Sheri Clark ("Clark") is a resident of the State of California, San Diego County. Plaintiff Clark has purchased numerous CDs, as well as Internet Music, produced, licensed, distributed and/or sold by one or more of the Defendants, during the Class Period. As a result of Defendants' unlawful conduct alleged herein, plaintiff Clark has suffered injury in fact and paid artificially inflated prices for CDs and Internet Music.

7.     Plaintiff Andrew Edenbaum ("Edenbaum") is a resident of the State of Florida, Broward County. Plaintiff Edenbaum has purchased numerous CDs, as well as Internet Music, produced, licensed, distributed and/or sold by one or more of the Defendants, during the Class Period. As a result of Defendants' unlawful conduct alleged herein, plaintiff Edenbaum has suffered injury in fact and paid artificially inflated prices for CDs and Internet Music.

8.     Plaintiff Rachael Hall ("Hall") is a resident of the State of Florida, Leon County. Plaintiff Hall has purchased numerous CDs, as well as Internet Music, produced, licensed, distributed and/or sold by one or more of the Defendants, during the Class Period. As a result of Defendants' unlawful conduct alleged herein, plaintiff Hall has suffered injury in fact and paid artificially inflated prices for CDs and Internet Music.

9.     Plaintiff Mitchell Horton ("Horton") is a resident of the State of New Mexico, Curry County. Plaintiff Horton has purchased numerous CDs, as well as Internet Music, produced, licensed, distributed and/or sold by one or more of the Defendants, during the Class Period. As a result of Defendants' unlawful conduct alleged herein, plaintiff Horton has suffered injury in fact and paid artificially inflated prices for CDs and Internet Music.

10.     Plaintiff Keaton Landry ("Landry") is a resident of the State of California, San Diego County. Plaintiff Landry has purchased numerous CDs, as well as Internet Music, produced, licensed, distributed and/or sold by one or more of the Defendants, during the Class Period. As a result of Defendants' unlawful conduct alleged herein, plaintiff Landry has suffered injury in fact and paid artificially inflated prices for CDs and Internet Music.

11.     Plaintiff Kathryn Elizabeth Kelly ("Kelly") is a resident of the District of Columbia. Plaintiff Kelly has purchased numerous CDs, as well as Internet Music, produced, licensed, distributed and/or sold by one or more of the Defendants, during the Class Period. As a result of Defendants' unlawful conduct alleged herein, plaintiff Kelly has suffered injury in fact and paid artificially inflated prices for CDs and Internet Music.

12.     Plaintiff Christopher Michaud ("Michaud") is a resident of the State of New York, Kings County. Plaintiff Michaud has purchased numerous CDs, as well as Internet Music, produced, licensed, distributed and/or sold by one or more of the Defendants, during the Class Period. As a result of Defendants' unlawful conduct alleged herein, plaintiff Michaud has suffered injury in fact and paid artificially inflated prices for CDs and Internet Music.

13.     Plaintiff Lisa Owens ("Owens") is a resident of the State of California, Orange County. Plaintiff Owens has purchased numerous CDs, as well as Internet Music, produced, licensed, distributed and/or sold by one or more of the Defendants, during the Class Period. As a result of Defendants' unlawful conduct alleged herein, plaintiff Owens has suffered injury in fact and paid artificially inflated prices for CDs and Internet Music.

14.     Plaintiff David Paschkett ("Paschkett") is a resident of the State of Michigan, Genesee County. Plaintiff Paschkett has purchased numerous CDs, as well as Internet Music, produced, licensed, distributed and/or sold by one or more of the Defendants, during the Class

Period. As a result of Defendants' unlawful conduct alleged herein, plaintiff Paschkett has suffered injury in fact and paid artificially inflated prices for CDs and Internet Music.

15.      Plaintiff Matthew Putnam ("Putnam") is a resident of the State of California, San Diego County. Plaintiff Putnam has purchased numerous CDs, as well as Internet Music, produced, licensed, distributed and/or sold by one or more of the Defendants, during the Class Period. As a result of Defendants' unlawful conduct alleged herein, plaintiff Putnam has suffered injury in fact and paid artificially inflated prices for CDs and Internet Music.

16.      Plaintiff Cynthia Seley ("Seley") is a resident of the State of California, Monterey County. Plaintiff Seley has purchased numerous CDs, as well as Internet Music, produced, licensed, distributed and/or sold by one or more of the Defendants, during the Class Period. As a result of Defendants' unlawful conduct alleged herein, plaintiff Seley has suffered injury in fact and paid artificially inflated prices for CDs and Internet Music.

17.      Plaintiff Kevin Starr ("Starr") is a resident of the State of Oregon, Multnomah County. Plaintiff Starr has purchased numerous CDs, as well as Internet Music, produced, licensed, distributed and/or sold by one or more of the Defendants, during the Class Period. As a result of Defendants' unlawful conduct alleged herein, plaintiff Starr has suffered injury in fact and paid artificially inflated prices for CDs and Internet Music.

18.      Plaintiff Cato Thornton ("Thornton") is a resident of the State of California, Alameda County. Plaintiff Thornton has purchased numerous CDs, as well as Internet Music, produced, licensed, distributed and/or sold by one or more of the Defendants, during the Class Period. As a result of Defendants' unlawful conduct alleged herein, plaintiff Thornton has suffered injury in fact and paid artificially inflated prices for CDs and Internet Music.

19.     Plaintiffs Benham, Clark, Edenbaum, Hall, Horton, Kelly, Landry, Michaud, Owens, Paschkett, Putnam, Seley, Starr and Thornton are collectively referred to as ("plaintiffs").

20.     Defendant Sony BMG Music Entertainment ("Sony BMG"), is a Delaware general partnership, with its principal place of business in New York and a major corporate office in Santa Monica, California. Defendant Sony BMG was formed as a joint venture of Sony Corporation and Bertelsmann AG to operate their merged music operations. In or about August 2004, Sony and Bertelsmann merged their United States music operations and purportedly transferred their respective musical copyrights, licensing agreements and royalty rights to defendant Sony BMG, which is organized under the laws of New York. As a result of its formation, Sony BMG now owns and controls music released under such record labels as Arista, Columbia, Epic, and RCA Records. Defendant Sony BMG produces, licenses and distributes Internet Music and CDs through a wide variety of retailers, some of whom are owned and/or controlled by defendant Sony BMG or their corporate parents, Sony and Bertelsmann.

21.     Defendant UMG Recordings, Inc. ("UMG"), is a Delaware corporation with its headquarters in Santa Monica, California. Defendant UMG is a subsidiary of Vivendi Universal S.A., headquartered in Paris, France. Vivendi is a conglomerate that in addition to its music business, owns many of the leading media and telecommunication companies in Europe and Africa and is also one of the world's largest video game developers. UMG owns and controls music sold under such record labels as Mercury, Interscope, Geffen, A&M, Island Def Jam, Philips and Polydor Records. Defendant UMG produces, licenses, and distributes Internet Music and CDs through a wide variety of retailers, some of whom are owned and/or controlled by defendant UMG.

22.     Defendant Warner Music Group Corp. ("WMG") is a Delaware corporation with its principal corporate headquarters located in New York, New York. WMG has since March 1, 2004

been the alter ego of Thomas H. Lee Partners, L.P.; Bain Capital, LLC; Providence Equity Partners, Inc.; Music Capital Partners, L.P.; and Edgar Bronfman Jr. (collectively "WMG Investor Group").

23.     WMG Investor Group purchased Defendant Warner Music Group from Time Warner, Inc. on or about March 1, 2004.  Time Warner, Inc. retained the right to buy back part of the company.  WMG Investor Group concentrated assets in itself, while concentrated liabilities in WMG.  WMG reported a net loss on its most recent financial report, but would have been profitable but for the payments on its new high-interest debt.

24.     Defendant Capitol Records, Inc., d/b/a EMI Music North America ("Capitol"), a Delaware corporation; Defendant Capitol-EMI Music, Inc. ("Capitol EMI"), a Delaware corporation; Defendant EMI Group North America, Inc. ("EMI North America"), a Delaware corporation; and Defendant Virgin Records America, Inc. ("Virgin"), a Delaware corporation are subsidiaries of  co-conspirator EMI Group, PLC ("EMI Group"), an English corporation headquartered in London, England.

25.     EMI Group operates in over 25 countries.  At various times, EMI Group has signed and released music from The Beatles, The Beach Boys, The Byrds, The Hollies, and Pink Floyd. EMI produces, licenses and distributes Internet Music and CDs through a wide variety of retailers at least one of whom is owned and/or controlled by EMI Group.

26.     Defendants, directly or through a division, parent, subsidiary, co-conspirator or agent, have had actual knowledge of, and have knowingly participated in, the conspiracy to fix the prices for Internet Music and CDs, including the restraint of the availability and distribution of Internet Music.

27.     The acts charged in this Conformed[1] Third Consolidated Amended Complaint ("Complaint") attributable to Defendants were authorized, ordered, and done by its officers, employees, agents, members or representatives while actively engaged in the management, direction, control or transaction of the business or affairs of each of the Defendants.

## OTHER CO-CONSPIRATORS

28.     Co-conspirator Recording Industry Association of America (the "RIAA") is a trade organization claiming to represent companies that "create, manufacture and/or distribute approximately 90% of all legitimate sound recordings produced and sold in the United States." It is located at 1330 Connecticut Avenue, NW, Suite 300, Washington, DC 20036. The RIAA lobbies on behalf of the industry and represents its members in litigation.

29.     Defendants provide a majority of RIAA's budget and the majority of its board of directors are employees of the Defendants. RIAA is controlled by the Defendants and has conspired with Defendants and participated in the illegal activities described herein. The self-described function of the RIAA "is to foster a business and legal climate that supports and promotes our members' creative and financial vitality." In fact, the RIAA provided and provides Defendants with a forum to exchange competitive information, and fix prices and terms under which Digital Music is sold.

30.     Various other persons, firms, corporations, or joint ventures not named Defendants in this lawsuit, the identities of which are presently unknown, may have participated as co-

---

[1] Plaintiffs submit this Complaint to conform the June 2, 2010 Third Consolidated Amended Complaint ("TAC") (Doc. No. 130) to the July 18, 2011 Opinion and Order (Doc. No. 155), as set forth in the August 15, 2011 Stipulation and Order (Doc. No. 158). Plaintiffs incorporate by reference all allegations as to all Defendants contained in the TAC, for purposes of preserving and not waiving any and all issues for appeal.

conspirators with each of the Defendants' illegal activities in this Complaint and have performed acts and made statements in furtherance of the illegal combination and conspiracy.

## JURISDICTION AND VENUE

31.    Jurisdiction is conferred upon this judicial district pursuant to the Clayton Act, 15 U.S.C. §§4, 15, 16 and 26, and 28 U.S.C. §§1331 and 1337.

32.    This Court also has diversity jurisdiction over the Classes pursuant to 28 U.S.C. §§1332(d)(2) and (6) of the Class Action Fairness Act of 2005 because one or more members of the Classes defined herein are citizens of a state different from one or more Defendants and the aggregate amount in controversy exceeds five million dollars, exclusive of interest and costs.

33.    Venue is proper in this district pursuant to the Clayton Act, 15 U.S.C. §§4, 12, 15, 16, 22 and 26, and 28 U.S.C. §1391 because Defendants transact business in this district, and because thousands of Class members are located in this district. Additionally, a substantial part of the interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within this district. The acts complained of have had, and will have, substantial anticompetitive effects in this district. Venue is proper in this district for pretrial purposes only in accordance with a transfer order issued by the Judicial Panel on Multidistrict Litigation on August 16, 2006, pursuant to 28 U.S.C. §1407. By filing this consolidated complaint, plaintiffs do not waive their right under 28 U.S.C. §1407, as recognized by the United States Supreme Court in *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998) to return to the respective district from which they were transferred at the conclusion of pretrial proceedings in this Court.

## TRADE AND COMMERCE

34.    During the Class Period, each of the Defendants, itself or through its affiliates, agents or subsidiaries, produced, licensed, distributed and/or sold Digital Music in a continuous and

uninterrupted flow of intrastate and interstate commerce throughout the United States as well as in the District of Columbia and in the states of Arizona, California, Florida, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia and Wisconsin.

## RELEVANT MARKET

35.     As to claims so requiring, the relevant product market for purposes of this action is the market for sales of Digital Music.  The relevant geographic market is the United States. Defendants function as a collusive oligopoly.  Defendants are the four largest music labels and control in excess of 80% of the market for all sales of Digital Music in the United States.  Jointly, they exercise market power over and dominate the market for Digital Music.

36.     Internet Music and CDs are viewed as substitutes by both record labels and consumers as evidenced by the inverse relationship between sales of CDs and Internet Music. Internet Music and CDs are reasonably interchangeable because: (1) both CDs and Internet Music can be played on a computer; (2) Internet Music can be converted into CDs, though Defendants have at times colluded to place terms on consumers restricting this ability; (3) Digital Music purchased in either form may be played on digital music players; (4) most Digital Music is purchased by consumers who have means of playing both Internet Music and CDs; (5) they are simply different delivery methods of identical subject matter; and (6) both forms of Digital Music offer high audio quality approaching or exceeding other forms of music such as broadcast radio, satellite radio, vinyl records and audiocassettes.

## CLASS ACTION ALLEGATIONS

37.     Plaintiffs bring this action on behalf of themselves, and all others similarly situated, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure.  Plaintiffs seek to represent the following Classes:

- 9 -

**Injunctive Relief Class**

38.     All purchasers of Internet Music produced, manufactured, licensed, distributed and/or sold by Defendants in the United States (excluding federal, state and local governmental entities, Defendants, their directors, officers and members of their families) from December 4, 2001 through the conclusion of the trial of this matter ("Class Period").

**End Purchaser Internet Music Damages Class**

39.     All persons or entities in Arizona, California, the District of Columbia, Florida, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia and Wisconsin (the "End Purchaser States") (excluding federal, state and local governmental entities, Defendants, their directors, officers and members of their families) that purchased Internet Music produced, manufactured, distributed and/or sold by Defendants during the Class Period, for their own use and not for resale, and all persons or entities in the United States (excluding federal, state and local governmental entities, Defendants, their directors, officers and members of their families) that purchased Internet Music for their own use and not for resale directly from Defendants and/or entities owned or controlled by Defendants during the Class Period.

40.     Plaintiffs reserve their right to amend the class definitions at the time of the motion for class certification.

41.     Excluded from each of the Classes are Defendants, their directors, officers and members of their families; any entity which any defendant owns, controls or has controlling interest; the affiliates, legal representatives, attorneys, heirs or assigns of any defendant; and any federal, state or local governmental entity.

42.     The Classes are so numerous that joinder of all members is impracticable.  There are thousands of members in the Classes who are geographically dispersed throughout the United States and the End Purchaser States.

43.     Plaintiffs' claims are typical of the claims of the members of the Classes because plaintiffs and all Class members were damaged by the same wrongful conduct of the Defendants alleged herein.

44.     Plaintiffs' claims are typical of the claims of the members of the Classes because the substantive legal standards that Defendants are subject to are substantially the same.

45.     There are questions of law and fact common to the Classes which predominate over any questions affecting only individual Class members.  Such common questions include:

(a)     Whether the Defendants violated the Sherman Act and relevant End Purchaser State antitrust and consumer protection statutes, which subject Defendants to substantially the same legal standards, by engaging in a continuing combination and conspiracy to restrain the availability and distribution of and fix the prices for Internet Music and, as a result, maintain the prices for CDs at supracompetitive levels;

(b)     The duration and extent of any such combination or conspiracy alleged;

(c)     Whether the Defendants and each of them were participants in any such combination or conspiracy alleged herein;

(d)     Whether Defendants fixed the price of Internet Music at supracompetitive levels;

(e)     Whether Defendants conspired to impose restrictive terms concerning the purchase and use of Internet Music; and/or

- 11 -

(f)       Whether Defendants' conduct caused damage to plaintiffs and members of the Classes, and if so, the appropriate measure of such damages.

46.       The claims of the plaintiffs are typical of the claims of the Classes, and plaintiffs have no interest adverse to the interest of other members of the Classes.

47.       Plaintiffs will fairly and adequately protect the interests of the Classes and have retained counsel experienced and competent in the prosecution of complex class actions and antitrust litigation.

48.       To the extent that any plaintiff is not adequate, plaintiffs reserve the right to add a plaintiff or Class representative.

49.       A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of relatively small claims by many Class members who could not afford to individually litigate an antitrust claim against large corporate Defendants. There are no difficulties likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of the controversy.

50.       Defendants have acted on grounds generally applicable to the entire Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole.

## FACTUAL BACKGROUND OF DEFENDANTS'
## ANTICOMPETITIVE CONDUCT

51.     Defendants produce, license and distribute Digital Music, including Internet Music and CDs, to retailers for sale throughout the United States and in some instances sell Internet Music and CDs **directly** to consumers through Internet sites, record clubs and other entities which they own or control.

52.     Defendants – subsidiaries of the EMI Group and WMG, together with Bertelsmann, Inc., sold Internet Music **directly** to consumers, including through their MusicNet joint venture.

53.     Defendant UMG, together with Sony Corporation of America ("SCA") sold Internet Music **directly** to consumers, including through their joint venture, pressplay.

54.     SCA sells and has sold Internet Music and CDs **directly** to consumers using, *inter alia*, its online store, Sony Connect.

55.     Defendant Sony BMG sells and has sold CDs to consumers **directly** on Sony Music Store and other channels.

56.     BMG Music Service sells and has sold CDs **directly** to consumers through its BMG Music Club service.

57.     Defendant WMG sells and has sold CDs and Internet Music **directly** to consumers.

58.     In 2005, Bertelsmann, Inc. acquired Columbia House, BMG Music Club Service's only major record club competitor in the United States, through which it sells and has sold CDs **directly** to consumers.

59.     Time Warner, Inc. sells and has sold Internet Music to consumers **directly** on its online store AOL Music Now, and sells CDs directly to consumers using AOL Music and through other channels.

**Overview of Antitrust Claims and Nature of the Conspiracy**

60.     The Defendants and their co-conspirators have engaged in a continuing conspiracy to restrain the availability and distribution of Internet Music, fix and maintain at artificially high and non-competitive levels the prices at which they sell such music, impose unreasonable restrictive terms in the purchase and use of such music and limit the quantities of such music sold. By restraining trade in and fixing the price of Internet Music, Defendants were able to sell CDs at supracompetitive prices.

61.     The conspiracy has had several aspects and stages.  At the outset, WMG, EMI Group and Bertelsmann, Inc. agreed to launch a service called "MusicNet" and UMG and SCA agreed to launch a service called "Duet," which was later renamed "pressplay."  During the class period, MusicNet was co-owned and controlled by various defendants, including WMG, Sony BMG and co-conspirator EMI Group.    Eventually all the Defendants signed distribution agreements with MusicNet and pressplay.  These ventures maintained prices at artificially high levels, eliminated competition among the Defendants in the pricing and terms of Internet Music sales and provided one of several forums in which the Defendants could discuss their general desires to restrain trade in Internet Music and come to agreement on the specifics.

62.     Defendants have also agreed to exchange price information and terms of sale information for Internet Music; and came to revenue sharing agreements and agreed among each other to use "Most Favored Nation" clauses (MFNs).  These and other anticompetitive agreements served and were intended to serve to limit competition among the Defendants.

63.     In addition, when Defendants eventually sold Internet Music directly to retailers who, unlike pressplay and MusicNet, they did not control, they did not compete independently. Instead, they agreed to fix the terms of sale, including digital rights management ("DRM") and the prices at which they were sold.

**History of the Conspiracy and Its Constituent Agreements**

64.     Internet Music has the potential to transform the market for Digital Music by increasing the selection of music that can be distributed while dramatically reducing costs associated with production, distribution and sale through the now traditional medium of CDs.

65.     Pricing for CDs accounts for costs such as producing master discs; producing copies of the disc; the CD case; labels and anti-shoplifting packaging; shipping CDs to distribution warehouses and then to record stores; labor to unpack and shelve the CDs, staff cash registers, and other retail overhead costs; and returning and destroying damaged and unsold inventory. All of these costs are eliminated when music is distributed via digital downloads from the Internet.

66.     As discussed previously, Defendants launched two Internet Music distribution services in late 2001. Defendant WMG agreed with EMI Group and Bertelsmann, Inc. to launch, and did in fact launch, a service called "MusicNet;" and Defendant UMG agreed with SCA to launch, and did in fact launch a service called "Duet," which was later renamed "pressplay." Eventually all of the Defendants, together with Bertelsmann, Inc. and SCA, signed distribution agreements with MusicNet and pressplay, thereby creating an agreement of all Defendants to distribute music on the terms and at the prices determined by MusicNet and pressplay.

67.     Defendants, via exchange of pricing information, terms of sale information, revenue sharing agreements, MFN's and other anticompetitive conduct conspired to fix the prices, quality and terms under which Internet Music would be sold.

68.     As a general rule in competitive markets, dramatic cost reductions such as those associated with Internet Music distribution are accompanied by dramatic price reductions and output expansion. Absent Defendants' anticompetitive conduct, including the agreements to restrain competition among themselves, Internet Music would be dramatically less expensive than CDs. Instead, despite lower costs, the labels conspired to restrain output and charge more money

for Internet Music and to provide lower quality music, well below CD-quality, which is further hampered by DRM.

69.     In order to be able to choose music from all major record labels and thereby have access to the music generally available on CDs, a consumer initially would have had to subscribe to both pressplay and MusicNet, at a cost of approximately $240 per year.  A consumer who attempted to write music onto CDs from pressplay was limited to only certain songs and no more than two songs from any particular artist per month.  Even worse, Internet Music purchased from the Defendants often would "expire" unless repurchased.  For example, with MusicNet, the amount of music contained on a normal CD would cost $20 per year to purchase (more than an average CD), and yet after that year, the consumer would need to repurchase the music for an additional $20 for another year's access.  If a consumer tried to unsubscribe from a service such as pressplay, he or she would immediately lose access and be unable to play all the music that he or she had "purchased."

70.     MusicNet and pressplay did not allow transfer of the songs to portable digital music players such as the iPod, eliminating one of the main reasons for consumers to purchase music in this format.  The Defendants adhered to this very unpopular DRM and were not competing in transferability terms as they would have absent the conspiracy complained of herein.  Any one of the Defendants might have removed these unpopular DRM and gained additional market share and profits and most or all would have but for the conspiracy, just as independent labels not party to the conspiracy sell DRM-free Internet Music via eMusic.

71.     Industry commentators stated that "[a]t the proposed prices, it is difficult to fathom how pressplay and MusicNet will be able to compete. . . .  The problem is MusicNet and pressplay

do not offer reasonable prices."[2] One prominent computer industry magazine noted that "nobody in their right mind will want to use" the services.[3]

72.     Such high prices would not occur after the introduction of a ***lower cost distribution*** system absent an agreement to restrain trade and keep prices high. In an industry free of collusion, an innovation that lowers a company's variable costs, which include distribution costs, will result in a company lowering its prices and passing on a part of the savings to the consumer. This partial pass on allows the company to increase its market share while increasing its profit margin because not all of the decreased cost is passed on. Instead, rather than pursue their individual interests by competing with each other, the new method of distribution was used as a pretext for Defendants to meet and conspire.

73.     Eventually Defendants and their joint ventures sold Internet Music to consumers through entities they did not own or control. However, they could only do so if they contracted with MusicNet to provide Internet Music for the same prices and with the same restrictions as MusicNet itself and other MusicNet licensees. Defendants imposed terms on licensees that forced them to pay penalties in the form of higher prices for Defendants' music or even terminated their licenses if the licensees attempted to license music from another company. This not only restrained trade in the Internet Music business and forestalled the time by which Internet Music would emerge as a reasonable consumer substitute for CDs, but also prevented the small independent labels that competed with Defendants from obtaining access to many outlets for Internet Music.

---

[2]     *See* Richard Menta, *PressPlay and MusicNet to Launch*, MP3newswire.net, September 17, 2001, available at http://www.mp3newswire.net/ hyperlink under "archived stories."

[3]     *See Digital Music: Worth Buying Yet?*, PCWorld.com, January 18, 2002, available at http://www.pcworld.com/article/id,80564-page,1/article.html.

74.    In June of 2001, MusicNet revived the then-bankrupt Napster service and forced it into such a license.  Defendant UMG and SCA are or were minority shareholders in the "new" Napster.  To this day, Napster's service is under many of the same restrictions as the MusicNet and pressplay services, such as the loss of access to downloaded songs once a consumer's membership expires.

75.    The failure and inefficiency of these Internet Music distribution services was a direct result of the high prices and unfavorable terms the Defendants colluded to impose on purchasers of Internet Music.  Defendants collectively refused to utilize or license a system that was convenient, not burdened with use restrictions and competitively priced.

76.    Defendants' collusion in setting high prices for Internet Music, as well as their collusion in imposing unfair and one-sided terms on its use, made Internet Music less attractive to consumers, allowing Defendants to sell CDs at supracompetitive prices.

77.    Acting alone, no defendant could sustain the supracompetitive prices for CDs prevailing in the CD market.  This inability to charge high CD prices, as market factors made consumer demand for CDs more elastic over time at the prices charged by Defendants during the conspiracy, gave Defendants motive to conspire.

78.    Defendants' collusion further allows them to engage in the anticompetitive practice of tying or "bundling" Internet Music onto a single online "album."

79.    Roger Noll, a well-respected economist and Professor at Stanford University, has characterized the Defendants' conduct as follows:

> The main findings and conclusions of this essay are as follows: First, the five distribution companies have created several joint ventures.  The two most important joint ventures are MusicNet (BMG, EMI and Warner each owned 20 percent, and Real Networks the remaining 40 percent) and pressplay (owned by Sony and Universal), both of which engage in the wholesale and retail digital distribution of recorded music.  Second, if public information about these two joint ventures is

- 18 -

accurate, each will set wholesale prices for digitally distributed recordings that are controlled by their affiliated distribution companies, while pressplay also will set retail prices, so that *both ventures constitute horizontal price-fixing agreements*. Third, if information in the public record is accurate, *these five companies apparently have engaged in vertical foreclosure* by refusing to enter into agreements on reasonable terms with other entities for digital distribution of their library of recordings and by imposing unnecessary burdensome licensing requirements on both retail competitors and their customers. Fourth, in the period immediately before and during the evolution of the policies of these companies regarding digital distribution, *these five companies engaged in anticompetitive activities that have led to several adverse antitrust rulings by competition policy agencies in the United States and abroad*.[4]

If the information in the public record that forms the basis of these conclusions is accurate, the joint ventures for digital distribution of recorded music are anticompetitive horizontal combinations, and the vertical restraints imposed by the distribution companies are also anticompetitive. The effects of these anticompetitive acts will be to reduce or even to eliminate the number of independent competitors in both wholesale and retail digital distribution, and thereby to harm consumers by raising prices and increasing price discrimination, and to harm artists by reducing competition for the right to distribute their recordings. Thus, the joint ventures and vertical foreclosure activities, if accurately reported, constitute misuse of the copyrights that are controlled by the distribution companies, their corporate affiliates, and other publishers.

Roger G. Noll, *Napster's Copyright Abuse Defense* (presented to University of Texas Law School Colloquium on Information and Communication Policy), March 24, 2003, available at www.utexas.edu/law/news/colloquium/archive/2003springsched.html, under hyperlink "Napster's Copyright Abuse Defense" at 2.

80.     Edgar Bronfman, Jr., who is currently CEO of WMG, in his prior capacity as Executive Vice Chairman of Vivendi Universal and the UMG executive in charge of his company's role in pressplay reportedly described pressplay as follows:

"Pressplay has what we call an affiliate model where *we determine the price*, and we offer a percentage of that price to the retailing partner, in this case either Microsoft or Yahoo or MP3.  The reason we've chosen that, frankly, *is because we are concerned*

---

[4]        Emphasis is added and citations are omitted here and throughout, unless otherwise noted.

*that the continuing devaluation of music will proceed unabated unless we do something about it.* If you allow an AOL or RealNetworks or Microsoft or others, who have very different business models, to use music to promote their own business model and simply pay the artists and record companies the minimums, they can advantage themselves on the back of the music industry in a way which continues to devalue music."

Cited in Noll, Napster's Copyright Abuse Defense, *id.* at 27.

81.    In addition, the main industry trade association, the RIAA, which is controlled by the Defendants, provides another forum and means through which Defendants can communicate about the pricing, terms and use restrictions they collectively agree upon with respect to Internet Music.

82.    Defendants were paid shares of the total revenue generated by a joint venture licensee rather than by receiving money on a per song basis. Each Defendants' financial interest in the joint ventures was therefore linked to the total sales of all the labels rather than its own market share. By doing so Defendants agreed to structure and did in fact structure the joint ventures such that their economic incentives were to charge monopoly prices for Internet Music rather than compete with one another on price.

83.    In addition to sharing information that violated the purported independence of these joint ventures, Defendants conspired to mask their anticompetitive conduct by pretextually establishing rules to prevent antitrust violations, ignoring them, and then using these sham rules to convince the United States Department of Justice ("DOJ") to drop the investigation it launched in 2001.

84.    In "White Papers" presented to the DOJ, Defendants claimed they had instituted firewalls, communication guidelines, safeguards, and other supposed protections to prevent exchanges of information, or other conduct, that could negatively affect competition.

85.     Defendants also had and have a common practice of using MFNs in their licenses that had the effect of guaranteeing that the licensor would receive terms that were no less favorable than the terms offered to other licensors.

86.     Defendants attempted to hide the MFNs and communications between the joint ventures and their label owners because they knew they would attract antitrust scrutiny by DOJ and others.

87.     For example, EMI Group and MusicNet had a "side letter" agreement which assured that EMI's Group core economic terms would be no less favorable than Bertelsmann's and WMG's.

88.     EMI Group CEO Rob Glaser decided to put the MFN in a secret side letter because "there are legal/antitrust reasons why it would be bad idea to have MFN clauses in any, or certainly all, of these agreements."

89.     UMG also made use of MFN clauses in its license agreements.

90.     When Defendants use MFN clauses, the result is that Defendants gets the benefit of any one negotiation by a competitor.  In a January 12, 2006 article, the Wall Street Journal confirmed that MFN clauses are used by Defendants.  In the same article, Johnathan Potter, executive director of the Digital Media Association, (the trade organization that represents digital music providers including Napster, AOL, Apple, MSN, and RealNetworks) stated that "seller-side MFNs are inherently price-increasing and anticompetitive."

91.     In sum, MusicNet and pressplay were vehicles through which the Defendants effectively exchanged price information, policed their cartel and imposed restrictive licensing arrangements that retarded the growth of Internet Music.  Defendants have maintained a price floor

for Internet Music throughout the period of their collusion, even as the prices of other products and Defendants' own variable costs have varied.

      92.     (a)    Defendants continued to engage in anticompetitive acts designed to inhibit competition after services other than their joint ventures began to distribute Internet Music. In this vein, Defendants have agreed to a wholesale price floor whereby they sell Internet Music to retailers at or about 70 cents per song.

          (b)    By early 2005, Defendants Sony BMG's, Capitol-EMI Music's, UMG's and WMG's direct costs had gone down substantially because each of these Defendants' digitization costs of the initial cataloging had been completed, technological improvements (including increased computer processing power and speed) had reduced the remaining costs of digitizing new releases, the return and store credit and other costs alleged in ¶ 65 remained at zero or virtually zero despite substantially higher sales volumes, and the fixed costs of each of these Defendants' digital business per unit of sales volume had declined by approximately two-thirds. Nonetheless, these Defendants then engaged in or about May 2005 in the parallel, highly unusual behavior of each raising prices from the 65 cents per song level to at or about 70 cents per song.

          (c)    Defendants enforce their uniform pricing and price floor, in part, by forcing Internet Music retailers to sign MFN agreements that specify that the retailers must pay each of the Defendants the same amount. These parallel, highly unusual increases in prices when direct costs had substantially decreased, enforced by MFNs, were similar to Defendants' causing, as alleged in ¶¶ 68-69, the joint ventures, via MFNs and other means, to increase the prices of Internet Music during 2002 to 2003 to unreasonably high levels despite substantial reductions in the direct costs of Internet Music relative to CDs.

93.     By setting a wholesale price floor at 70 cents per song, Defendants have fixed and maintained the price of Internet Music at supracompetitive levels.  In addition, they have placed restrictions on the use of Internet Music that unreasonably limit its utility and attractiveness to purchasers.

94.     The relative market shares of the Defendants have been largely fixed over the period of their conspiracy.  Given that the independent labels are not party to Defendants' collusive agreements, their market share relative to the market share of Defendants has increased.

95.     Absent an agreement not to compete with each other, Defendants would try to gain advantages over each other by selling Internet Music with fewer unpopular restrictions; hence the lack of such competition on price or quality shows continuing collusion.

96.     To illuminate the price and terms of Internet Music absent collusion, and to assess the impact of Defendants' anticompetitive conduct, one need only look at eMusic, the most popular online music service that sells Internet Music owned by independent labels.  eMusic charges $10 for 40 songs, or $0.25 per song, and places *no restrictions* on how purchasers may upload their music to iPods, upload to other digital music players, or burn to CDs.  By contrast, Defendants' collusive wholesale price is more than double the eMusic $0.25 retail price.

97.     Defendants' response to the challenge of eMusic was to refuse to do business with eMusic, which was the first major Internet Music retailer.  Acting against their individual self interest, none of the Defendants have joined the hundreds of independent record labels that have a successful relationships with eMusic, which has grown to become the #2 Internet Music retailer, behind only Apple, Inc.'s iTunes Store.  Nearly all of the independent record labels, unlike the Defendants, sell their music on both iTunes Store and eMusic.

98.     By conspiring to restrain the growth of Internet Music through the imposition of restrictive terms of use and to set a price floor for Internet Music at supracompetitive levels, Defendants have protected their ability to maintain sales of CDs at prices higher than they would be but for Defendants' anticompetitive conduct.

**Fraudulent Concealment**

99.     Throughout the relevant period, Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct from plaintiffs.

100.     Defendants' illegal activities are by their nature inherently self-concealing.

101.     Only on or about March 3, 2006, when the Department of Justice opened an investigation into collusion and price fixing of Internet Music by the Defendants, was the existence of the conspiracy disclosed to the public.  Plaintiffs could not have discovered the unlawful conduct at an earlier date through the exercise of reasonable diligence because of Defendants' and their co-conspirator's active and purposeful concealment of their unlawful activities.

102.     Defendants and their co-conspirators engaged in an illegal price-fixing conspiracy with respect to Internet Music, which they affirmatively concealed, in at least the following respects:

(a)     by meeting secretly to discuss the prices of Internet Music;

(b)     by agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;

(c)     by giving false and pretextual reasons for their unlawful activities; and

(d)     by masking their unlawful activities behind the cover of joint ventures and trade associations.

(e)     By colluding to and in fact making false statements in two "White Papers" submitted to the United States Department of Justice relating to claimed "safeguards" preventing the exchange of Defendants' competitively sensitive information in the operation of MusicNet and pressplay.

103.   Defendants concealed their illegal price-fixing conspiracy with respect to Internet Music with the intention of inducing Plaintiffs and class members to purchase Digital Music at supracompetitive prices.

104.   Defendants signed distribution agreements with MusicNet and pressplay.  These ventures maintained Internet Music prices at artificially high levels, eliminated competition among the Defendants in the pricing and terms of Internet Music sales and provided one of several forums in which the Defendants could discuss their general desires to restrain trade in Internet Music and come to agreement on the specifics.

105.   In addition, Defendants agreed to exchange price information, exchange terms of sale information, came to revenue sharing agreements, and agreed among each other to use "Most Favored Nation" clauses (MFNs). These and other anticompetitive agreements served and were intended to serve to limit competition among the Defendants.

106.   In addition, when Defendants eventually sold directly to retailers who unlike pressplay and MusicNet they did not control, they did not compete independently.  Instead they agreed to fix the terms of sale, including DRM specifications and the prices at which they sold. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws as alleged herein until shortly before this litigation was commenced, nor could Plaintiffs have discovered the violations earlier than that time because Defendants and their co-conspirators conducted their

- 25 -

conspiracy in secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, attempted to confine information concerning the combination and conspiracy and fraudulently concealed their activities through various other means and methods designed to avoid detection.

107.    As a direct result of the representations and concealments made by Defendants, Plaintiffs believed and relied upon them, and were thereby induced to pay supracompetitive prices for Digital Music.

108.    As a result of Defendants' and their co-conspirators' fraudulent concealment of their conspiracy, plaintiffs assert the tolling of any otherwise-applicable statute of limitations.

**COUNT I**

**For Violation of Section 1 of the Sherman Act**
**(On Behalf of All Classes)**

109.    Plaintiffs reallege and incorporate by reference each and every allegation set forth above.  This Count is brought pursuant to 15 U.S.C. §1 and 15 U.S.C. §16, for injunctive relief as to the Injunctive Relief Class, and for damages, restitution and other monetary relief for members of the End Purchaser Internet Music Damages Class, who purchased Internet Music directly from Defendants and/or entities controlled by Defendants, including without limitation the MusicNet and/or pressplay joint ventures.

110.    The Digital Music market is dominated by four entities – Defendants – subsidiaries of the EMI Group, Sony BMG, UMG and WMG – which collectively function as a highly concentrated, tightly-knit oligopoly.  Together, Defendants account for over 80% of Digital Music sold to End Purchasers in the United States.  The relatively few firms have created an industry environment which enables and facilitates Defendants' ability to coordinate their pricing and other practices such as DRM and the other restrictions on Internet Music.  These agreements explain the market share stability in this industry which could not be fully explained absent an agreement not to

compete particularly when this industry has been subject to sweeping advancements in technology and changes in public taste and fashion for music.

111.    The Digital Music market is characterized by high barriers to entry by new firms, thus further enhancing Defendants' significant market power.  The high degree of concentration in the industry and the significant barriers to entry have insulated Defendants from price competition from new entrants to the market, just as their conspiracy has insulated them from competition from one another.

112.    Beginning at least as early as December 4, 2001, the exact date being unknown to plaintiffs, and continuing to the present, Defendants and their co-conspirators have engaged in a continuing combination, conspiracy, and common course of conduct in unreasonable restraint of interstate trade and commerce in violation of §1 of the Sherman Act, 15 U.S.C. §1.  As more fully described herein, the combination, conspiracy and common course of conduct engaged in by Defendants consisted of a continuing agreement, understanding and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to restrain the availability and distribution of Internet Music, fix and maintain at artificially high and non-competitive levels the prices at which they sold Internet Music and impose unreasonably restrictive terms in the purchase and use of Internet Music.  By restraining trade in and fixing the price of Internet Music, Defendants were able to sell at artificially high and non-competitive levels the prices at which they sold CDs.  As a result of their conspiracy, combination and common course of conduct, and despite declining costs of production associated with the introduction of new technologies, Defendants sold both Internet Music and CDs at supracompetitive levels.

113.    Pursuant to their combination, conspiracy and concerted action, Defendants have adopted and adhered to virtually identical and parallel methods of distribution (including the use of

contracts with substantially identical material terms), pricing (including the use of lockstep, identical pricing for virtually every song in their catalogues for Internet Music) and modes of DRM. Defendants are the pivotal and controlling link between the artistic production of the music on the one hand, and the marketing and distribution of Digital Music on the other. Defendants distribute Digital Music throughout the United States, including recordings produced under Defendants' own labels as well as recordings produced by certain independent music companies.

114.    Currently Defendants sell Internet Music to retailers and distributors at or about $0.70 per song despite improvements in technology of the distribution of Internet Music and exponentially increased sales volume that have dramatically reduced marginal costs. Were Defendants to sell Internet Music at competitive prices and/or refrain from colluding to impose restrictive terms of use and purchase, they would be forced to cut prices of CDs. In consequence, Defendants' conspiracy to restrain the availability and distribution of Internet Music, and to fix and maintain the price of Internet Music, has protected the sale of CDs and enables Defendants to maintain CD prices at supracompetitive levels.

115.    During the Class Period, Defendants together took actions to restrain the availability and distribution of Internet Music through their refusals to deal with independent Internet distribution services and through their attempt to control the distribution of Internet Music through their proxies, MusicNet and pressplay. Defendants adopted identical terms of sale and pricing schemes for Internet Music. Pursuant to their combination, conspiracy and concerted action, Defendants have consistently agreed to have adopted parallel-pricing schemes.

116.    Defendants' current business practices are also the subject of pending investigations by the New York State Attorney General, who subpoenaed Defendants for information on the

wholesale prices they charge for Internet Music and the DOJ, which has also demanded information of Defendants.

117.    Defendants have and continue to use trade associations, including the RIAA, to restrain and control the sale of Internet Music and to plan strategy and communicate pricing. During meetings of the record industry, Defendants discussed how to put Napster out of business and rein in similar threats by distributors of Internet Music to their pricing and distribution oligopoly.  At a recent meeting, Defendants openly discussed adopting a variable online price scheme (i.e., to charge more for certain singles and less for others).

118.    Each of the Defendants has engaged in one or more overt acts in furtherance of the contract, combination and/or conspiracy alleged.  In consequence, the aforesaid combination and conspiracy had the following effects, among others:

        (a)    Plaintiffs and other members of the Classes were deprived of the benefits of free and open competition in the purchase of Defendants' Internet Music;

        (b)    Defendants' Internet Music prices were raised, fixed and maintained at artificially high and non-competitive levels;

        (c)    Plaintiffs and other members of the Classes were forced to pay artificially high, non-competitive prices for Internet Music; and

        (d)    Price competition among Defendants in the sale of Internet Music, and as a direct consequence in the sale of CDs, was restrained, suppressed and eliminated.

119.    During the Class Period, plaintiffs and other members of the Classes purchased substantial quantities of Internet Music sold by Defendants.  By reason of the violations of §1 of the Sherman Act, plaintiffs and other members of the Classes paid more for Internet Music than they would have in the absence of the illegal combination, conspiracy and common course of conduct

and, as a result, have been injured in their business and property and have suffered damages in an amount currently undetermined.

120.    Defendants have acted on grounds generally applicable to the Classes, thereby making final injunctive relief appropriate with respect to the Classes as a whole.

## COUNT II

### For Violation of State Antitrust and Unfair and Deceptive Acts and Practices Statutes
### (On Behalf of End Purchaser Internet Music Damages Class)

121.    Plaintiffs reallege and incorporate by reference each of the allegations set forth above.

122.    This Count is alleged against all Defendants on behalf of the End Purchaser Internet Music Damages Class.  Defendants' conduct as alleged herein violates the antitrust and/or unfair and deceptive acts and practices laws of each of the following jurisdictions:

(a)    **Arizona:** The aforementioned practices by Defendants were and are in violation of the Arizona Uniform State Antitrust Act, Arizona Revised Statutes §44-1401, *et seq.*;

(b)    **California:** The aforementioned practices by Defendants were and are in violation of the Cartwright Act, California Business and Professions Code §16700, *et seq.*; and the Unfair Competition Law, California Business and Professions Code §17200, *et seq.*;

(c)    **District of Columbia:** The aforementioned practices by Defendants were and are in violation of the District of Columbia Antitrust Act, District of Columbia Annotated Code §28-4501, *et seq.*; and the District of Columbia Consumer Protection Act, District of Columbia Code Annotated §§28-3901, *et seq.*;

(d)    **Florida:** The aforementioned practices by Defendants were and are in violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Statutes §501.201, *et seq.*;

(e)      **Iowa:** The aforementioned practices by Defendants were and are in violation of the Iowa Competition Law, Iowa Code §553.1, *et seq.*;

(f)      **Kansas:** The aforementioned practices by Defendants were and are in violation of the Kansas Unfair Trade and Consumer Protection Act, Kansas Statutes Annotated §50-101, *et seq.*;

(g)      **Maine:** The aforementioned practices by Defendants were and are in violation of the Maine Regulation of Trade Law of 1954, Maine Revised Statutes Annotated, Title 10, §1101, *et seq.*, and the Maine Unfair Trade Practices Act, Maine Revised Statutes Annotated, Title 5, §205-A, *et seq.*;

(h)      **Massachusetts:** The aforementioned practices by Defendants were and are in violation of the Massachusetts consumer protection act, Massachusetts General Laws, Chapter 93A, Section 2, and are actionable under Chapter 93A, Section 9.  Statutory demand has been made (pursuant to Chapter 93A Section 9 (3) upon Defendants Sony BMG, UMG, and WMG, and said Defendants have failed to make a reasonable offer of relief.  Plaintiffs are not alleging a violation under Mass. General Law Ch. 93A §§1 *et seq.* against defendants Capitol, Capitol-EMI, EMI North America and Virgin at this time, but will be doing so once they have complied with the procedural requirements set forth in Chapter 93A §9(3).

(i)      **Michigan:** The aforementioned practices by Defendants were and are in violation of the Michigan Antitrust Reform Act, Michigan Compiled Laws §445.772, *et seq.*;

(j)      **Minnesota:** The aforementioned practices by Defendants were and are in violation of the Minnesota Antitrust Act of 1971, Minnesota Statutes §325D.49, *et seq.*;

(k)      **Nebraska:** The aforementioned practices by Defendants were and are in violation of the Nebraska Consumer Protection Act, Nebraska Revised Statutes §59-1601, *et seq.*;

(l)     **Nevada:** The aforementioned practices by Defendants were and are in violation of the Nevada Unfair Trade Practice Act, Nevada Revised Statutes §598A.010, *et seq.*;

(m)     **New Mexico:** The aforementioned practices by Defendants were and are in violation of the New Mexico Antitrust Act, New Mexico Statutes Annotated §57-1-1, *et seq.*; and the New Mexico Unfair Practices Act, New Mexico Statutes Annotated §57-12-3;

(n)     **North Carolina:** The aforementioned practices by Defendants were and are in violation of the North Carolina Unfair and Deceptive Trade Practices Act, North Carolina General Statutes §75-1, *et seq.*;

(o)     **North Dakota:** The aforementioned practices by Defendants were and are in violation of North Dakota's antitrust law, North Dakota Century Code §51-08.1-01, *et seq.*;

(p)     **South Dakota:** The aforementioned practices by Defendants were and are in violation of South Dakota's antitrust law, South Dakota Codified Laws §37-1-3.1, *et seq.*;

(q)     **Tennessee:** The aforementioned practices by Defendants were and are in violation of the Tennessee Trade Practices Act, Tennessee Code Annotated §47-25-101, *et seq.*;

(r)     **Vermont:** The aforementioned practices by Defendants were and are in violation of Vermont antitrust law, Vermont Statutes Annotated, Title 9, §2451, *et seq.*;

(s)     **West Virginia:** The aforementioned practices by Defendants were and are in violation of the West Virginia Antitrust Act, West Virginia Code, Chapter 47, Article 18, §1, *et seq.*; and

(t)     **Wisconsin:** The aforementioned practices by Defendants were and are in violation of the Wisconsin Antitrust Act, Wisconsin Statutes §133.01, *et seq.*

123.     As a result of Defendants' violations of the aforementioned state laws prohibiting unfair competition, plaintiffs and the Classes are entitled to bring this claim and to recover herein

compensatory damages, and where available restitution, punitive and special damages, including but not limited to treble damages, reasonable attorneys' fees and costs and other injunctive or declaratory relief as may be available.

## COUNT III

### Unjust Enrichment Under State Law
### (On Behalf of End Purchaser Internet Music Damages Classes, but Excluding Residents of Florida, North Carolina, and North Dakota)

124.    Plaintiffs reallege and incorporate by reference each of the allegations set forth in this complaint.  This count is plead in the alternative to the legal claims alleged herein.

125.    This Count is alleged against all Defendants, on behalf of the End Purchaser Internet Music Damages Class with state law claims as alleged in Count II, but excluding residents of Florida, North Carolina, and North Dakota.  Defendants are aware and appreciate that they have been justifiably benefited financially from their unlawful and inequitable acts alleged in this Complaint.  Defendants' financial benefits resulting from their unlawful and inequitable conduct are traceable to overpayments for Internet Music stemming from Defendants' combination and conspiracy to restrain trade in Internet Music.  As a result of Defendants conspiring, Plaintiffs and class members paid supracompetitive prices for Internet Music.

126.    The Class purchased their Internet Music directly from Defendants, including without limitation the MusicNet and pressplay joint ventures.  The Class also purchased their Internet Music indirectly from Defendants through various retailers from whom it would be futile to seek any remedies for the overcharges as they have already reached the Defendants.  The Class has conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of plaintiffs and the members of the Class.  Plaintiffs were unaware of the combination and conspiracy and did not knowingly and willingly bestow this benefit on Defendants.

- 33 -

127.    The economic benefit of overcharges and unlawful profits sought by and derived by Defendants through charging supracompetitive and artificially inflated prices for Internet Music is a direct and proximate result of Defendants' unlawful practices.

128.    The financial benefits derived by Defendants by reason of their unlawful conduct rightfully belong to plaintiffs and the Classes, as they have paid anticompetitive prices during the Class Period, inuring to the benefit of Defendants.

129.    It would be inequitable for the Defendants to be permitted to retain any of the overcharges for Internet Music derived from Defendants' unfair and unconscionable methods, acts and trade practices alleged in this Complaint.

130.    Defendants should be compelled to disgorge into a common fund for the benefit of plaintiffs and the Class all unlawful or inequitable proceeds received by them.

131.    A constructive trust should be imposed upon all sums unlawfully or inequitably received by Defendants traceable to plaintiffs and the Class from which plaintiffs and the other Class members may make claims for restitution.

## COUNT IV

### For Violation of New York's Donnelly Act
### (On Behalf of End Purchaser Internet Music Damages Class)

132.    Plaintiffs reallege and incorporate by reference each of the allegations set forth above.

133.    This Count is alleged against all Defendants on behalf of the End Purchaser Internet Music Damages Class.

134.    The aforementioned practices by Defendants were and are in violation of New York's Donnelly Act, New York General Business Law § 340 *et seq.*

135.    As a result of Defendants' violations of the aforementioned state law prohibiting unfair competition, plaintiffs and the Class are entitled to bring this claim and to recover herein compensatory damages, and where available punitive and special damages, including but not limited to treble damages, reasonable attorneys' fees and costs and other injunctive relief or declaratory relief as may be available.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray that the Court declare, adjudge and decree the following:

A.    That this action may be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure with respect to plaintiffs' claims for declaratory, equitable and injunctive relief, and Rule 23(b)(3) of the Federal Rules of Civil Procedure with respect to the claims for damages and other monetary relief, and declaring plaintiffs as representatives of the Classes and their counsel as counsel for the Classes;

B.    That the conduct alleged herein constitutes an unlawful contract, combination or conspiracy to restrain trade and fix and maintain prices in violation of §1 of the Sherman Act, of the state antitrust and unfair deceptive acts and practices statutes set forth herein, and the common law of unjust enrichment;

C.    That plaintiffs and the Classes are entitled to any additional damages, penalties and other monetary relief provided by applicable law, including treble damages where allowed by federal or state law;

D.    That Defendants disgorge money illegally obtained from the Classes as a result of their unlawful activities and that members of the Classes are entitled to restitution;

E.    That plaintiffs and each member of the Classes are entitled to the amounts by which the Defendants have been unjustly enriched;

F.    That Defendants are enjoined from continuing the illegal activities alleged herein;

G.    That plaintiffs and the Classes recover their costs of suit, including reasonable attorneys' fees and expenses as provided by law; and

H.    That plaintiffs and the Classes are granted such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

**JURY DEMAND**

136.    Plaintiffs respectfully demand a trial by jury on all issues so triable.

DATED:  August 31, 2011

ROBBINS GELLER RUDMAN & DOWD LLP
JOHN J. STOIA, JR. (JS-7507)
BONNY E. SWEENEY
ALEXANDRA S. BERNAY
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone: 619/231-1058
619/231-7423 (fax)

LOVELL STEWART HALEBIAN JACOBSON LLP
CHRISTOPHER LOVELL (CL-2595)
CRAIG M. ESSENMACHER
GARY S. JACOBSON (GJ-2481)


                        GARY S. JACOBSON

61 Broadway, Suite 501
New York, NY 10006
Telephone:  212/608-1900
212/719-4677 (fax)

Interim Co-Lead Counsel

BERGER & MONTAGUE, P.C.
EDWARD W. MILLSTEIN
MERRILL G. DAVIDOFF
1622 Locust Street
Philadelphia, PA 19103
Telephone: 215/875-3000
215/875-4604 (fax)

PEARSON SIMON SOTER WARSHAW PENNY
LLP
BRUCE L. SIMON
44 Montgomery Street, Suite 1200
San Francisco, CA 94104
Telephone: 415/433-9000
415/433-9008 (fax)

FINKELSTEIN THOMPSON LLP
TRACY D. REZVANI
1050 30th Street, N.W.
Washington, DC 20007
Telephone: 202/337-8000
202/337-8090 (fax)

HULETT HARPER STEWART LLP
BLAKE M. HARPER
DENNIS STEWART
BRIDGET F. GRAMME
550 West C Street, Suite 1600
San Diego, CA 92101
Telephone: 619/338-1133
619/338-1139 (fax)

WHATLEY DRAKE & KALLAS, LLC
JOE R. WHATLEY, JR.
2001 Park Place North, Suite 1000
Birmingham, AL 35203
Telephone: 205/328-9576
205/328-9669 (fax)

Steering Committee

AUDET & PARTNERS, LLP
MICHAEL McSHANE
JOSHUA C. EZRIN
221 Main Street, Suite 1460
San Francisco, CA 94105
Telephone: 415/568-2555
415/568-2556 (fax)

BONNETT, FAIRBOURN, FRIEDMAN &
BALINT, P.C.
FRANCIS J. BALINT, JR.
WENDY J. HARRISON
2901 N. Central Avenue, Suite 1000
Phoenix, AZ 85012
Telephone: 602/274-1100
602/274-1199 (fax)

FARUQI & FARUQI, LLP
DAVID H. LEVENTHAL
369 Lexington Avenue, 10th Floor
New York, NY 10017-6531
Telephone: 212/983-9330
212/983-9331 (fax)

FINKELSTEIN & KRINSK LLP
MARK L. KNUTSON
501 West Broadway, Suite 1250
San Diego, CA 92101
Telephone: 619/238-1333
619/238-5425 (fax)

GARDY & NOTIS, LLP
MARK C. GARDY
440 Sylvan Avenue, Suite 110
Englewood Cliffs, NJ 07632
Telephone: 201/567-7377
201/567-7337 (fax)

DAVID PASTOR
DANIEL D'ANGELO
GILMAN AND PASTOR, LLP
225 Franklin Street, 16th Floor
Boston, MA 02110
Telephone: 617/742-9700
617/742-9701 (fax)

GIRARD GIBBS LLP
DANIEL C. GIRARD
ELIZABETH C. PRITZKER
SHERI L. KELLY
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: 415/981-4800
415/981-4846 (fax)

GLANCY BINKOW & GOLDBERG LLP
SUSAN G. KUPFER
SYLVIE K. KERN
455 Market Street, Suite 1810
San Francisco, CA 94105
Telephone: 415/972-8160
415/972-8166 (fax)

GLANCY BINKOW & GOLDBERG LLP
LIONEL Z. GLANCY
PETER A. BINKOW
MICHAEL GOLDBERG
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Telephone: 310/201-9150
310/201-9160 (fax)

GROSS & BELSKY LLP
ADAM C. BELSKY
MONIQUE ALONSO
TERRY GROSS
180 Montgomery Street, Suite 2200
San Francisco, CA 94104
Telephone: 415/544-0200
415/544-0201 (fax)

GUSTAFSON GLUEK PLLC
DANIEL E. GUSTAFSON
DANIEL C. HEDLUND
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
Telephone: 612/333-8844
612/339-6622 (fax)

LAW OFFICES OF ALEXANDER M. SCHACK
ALEXANDER M. SCHACK
16870 West Bernardo Drive, Suite 400
San Diego, CA 92127
Telephone: 858/485-6535
858/485-0608 (fax)

LAW OFFICES OF BRIAN BARRY
BRIAN BARRY
1801 Avenue of the Stars, Suite 307
Los Angeles, CA 90067
Telephone: 310/788-0831
310/788-0841 (fax)

LAW OFFICES OF RANDY R. RENICK
RANDY R. RENICK
JOSH PIOVIA-SCOTT
128 North Fair Oaks Avenue, Suite 204
Pasadena, CA 91103
Telephone: 626/585-9608
626/577-7079 (fax)

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
W. JOSEPH BRUCKNER
JULIE A. STROTHER
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: 612/339-6900
612/339-0981 (fax)

MAGER & GOLDSTEIN LLP
JAYNE ARNOLD GOLDSTEIN
1640 Town Center Circle, Suite 216
Weston, FL 33326
Telephone: 954/515-0123
954/515-0124 (fax)

MURRAY & HOWARD, LLP
GILMUR R. MURRAY
DEREK G. HOWARD
SCOTT J. YUNDT
436 14th Street, Suite 1413
Oakland, CA 94612
Telephone: 510/444-2660
510/444-2522 (fax)

PASKOWITZ & ASSOCIATES
LAURENCE D. PASKOWITZ
60 East 42nd Street, 46th Floor
New York, NY 10165
Telephone: 212/685-0969
212/685-2306 (fax)

REINHARDT WENDORF & BLANCHFIELD
GARRETT D. BLANCHFIELD, JR.
BRANT D. PENNEY
E-1250 First National Bank Bldg.
332 Minnesota Street
St. Paul, MN 55101
Telephone: 651/287-2100
651/287-2103 (fax)

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
610 West Ash Street, Suite 1800
San Diego, CA  92101
Telephone: 619/525-3990
619/525-3991 (fax)

ROSS DIXON & BELL, L.L.P.
JASON S. HARTLEY
550 West B Street, Suite 400
San Diego, CA 92101
Telephone: 619/235-4040
619/231-8796 (fax)

- 41 -

ROY JACOBS & ASSOCIATES
ROY L. JACOBS
60 East 42nd Street, 46th Floor
New York, NY 10165
Telephone: 212/867-1156
212/504-8343 (fax)

SAVERI & SAVERI, INC.
GUIDO SAVERI
RICHARD A. SAVERI
LISA SAVERI
CADIO ZIRPOLI
706 Sansome Street
San Francisco, CA 94111
Telephone: 415/217-6810
415/217-6813 (fax)

SHALOV STONE BONNER & ROCCO LLP
RALPH M. STONE
485 Seventh Avenue, Suite 1000
New York, NY 10018
Telephone: 212/239-4340
212/239-4310 (fax)

STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH LLP
ALLAN STEYER
BRYAN MATTHEW KREFT
D. SCOTT MACRAE
One California Street, 3rd Floor
San Francisco, CA 94111
Telephone: 415/421-3400
415/421-2234 (fax)

THE GARCIA LAW FIRM
STEPHEN M. GARCIA
DAVID M. MEDBY
SARINA M. HINSON
One World Trade Center, Suite 1950
Long Beach, CA 90831
Telephone: 562/216-5270
562/216-5271 (fax)

THE MOGIN LAW FIRM, P.C.
DANIEL J. MOGIN
CHAD M. MCMANAMY
110 Juniper Street
San Diego, CA 92101-1502
Telephone: 619/687-6611
619/687-6610 (fax)

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

|                                                    |   |                                |
|----------------------------------------------------|---|--------------------------------|
| IN RE DIGITAL MUSIC ANTITRUST                      | x |                                |
| LITIGATION                                         | : | Civil No. 1:06-md-01780(LAP)   |
| This Document Relates to: All Actions              | : |                                |
|                                                    | x |                                |

---

## Certificate of Service

I hereby certify that on August 31, 2011, I caused a true and correct copy of the

Conformed Third Consolidated Amended Complaint to be served upon:

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017-3954
jyoungwood@stblaw.com
klogan@stblaw.com
dryan@stblaw.com

Mayer Brown LLP
1675 Broadway
New York, New York, 10019
rsteuer@mayerbrown.com

Gibson, Dunn & Crutcher LLP
2029 Century Park East
Los Angeles, California 90067-3026
and
1050 Connecticut Ave., N.W.
Washington, District of Columbia 20036-5306
dflores@gibsondunn.com
sedelman@gibsondunn.com
jkattan@gibsondunn.com

Munger, Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071-1560
Glenn.Pomerantz@mto.com
Kelly.Klaus@mto.com

by electronic mail ("e-mail").

Fred T. Isquith Jr.
Lovell Stewart Halebian Jacobson LLP
61 Broadway, Suite 501
New York, NY 10006
Telephone:  212/608-1900
212/719-4677 (fax)