UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
                                :     06-md-1780 (LAP)

In re Digital Music Antitrust   :
Litigation                         :        Opinion
                                :     and Order
-----------------------------------X

LORETTA A. PRESKA, Senior United States District Judge:

Before the Court is a motion for class certification pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), (Mot. Class Cert., Mar. 19, 2014, ECF No. 227), and an accompanying memorandum of law. (Pl. Mem. Class Cert., Mar. 19, 2014, ECF No. 228). Several individual plaintiffs seek to represent a putative nationwide class of Digital Music purchasers. The operative complaint before the Court is the Fourth Consolidated Amended Complaint ("FCAC"), filed September 25, 2015. (FCAC, Sept. 25, 2015, ECF No. 319). Defendants include Sony BMG Music Entertainment ("Sony BMG"), UMG Recordings, Inc. ("UMG"), Warner Music Group Corp. ("WMG"), Capitol Records, Inc., d/b/a EMI Music North America ("Capitol"), Capitol-EMI Music, Inc. ("Capitol EMI"), EMI Group North America, Inc. ("EMI North America"), and Virgin Records America, Inc. ("Virgin"), who have filed an opposition to the motion for class certification. (Def. Opp. Class Cert., June 16, 2016, ECF No. 353). Plaintiffs have in turn replied. (Pl. Reply Class Cert., Nov. 7, 2016, ECF No. 367).

The parties have also filed motions and accompanying memoranda of law to exclude the opinions rendered by each other's experts.  (See Pl. Mot. Exclude Aaron Read, Dec. 19, 2016, ECF No. 372; Def. Mot. Exclude Roger Noll, Dec. 19, 2016, ECF No. 375; Pl. Mot. Exclude Janusz Ordover, Dec. 19, 2016, ECF No. 376; Pl. Mot. Exclude Supp. Decl. Janusz Ordover, Jan. 19, 2017, ECF No. 388).  Additionally, Plaintiffs have moved to strike the supplemental declaration of Janusz Ordover attached to Defendants' motion to exclude the opinion of Roger Noll. (Letter from Alexandra Bernay, Dec. 23, 2016, ECF No. 384).  For reasons explained in detail below, (1) Plaintiffs' motion to exclude the opinion of Aaron Read is denied, (2) Defendants' motion to exclude the opinion of Professor Noll is denied, (3) Plaintiffs' motion to exclude Professor Ordover's opinion is denied except insofar as it relates to price variability for digital downloads and albums, (4) Plaintiffs' motion to exclude the supplemental declaration of Professor Ordover is granted, and (5) Plaintiffs' motion to strike the supplemental declaration of Professor Ordover is denied.

The Court also finds that Plaintiffs have failed to satisfy Rule 23(a)'s typicality requirement for the reason that the proposed class members would be subject to unique unclean hands defenses, while the Proposed Class Representatives would not.

Failure to satisfy the threshold criteria of Rule 23(a) precludes class certification pursuant to Rule 23(b).

Plaintiffs seek to certify two separate classes. Pursuant to Federal Rule of Civil Procedure 23(b)(2), Plaintiffs move to certify a nationwide injunctive relief class consisting of all purchasers of music downloads sold by Defendants indirectly to persons and entities residing in the United States. Plaintiffs seek to "enjoin Defendants' collusive practices and policies that violate Section 1 of the Sherman Act (15 U.S.C. § 1), and operate to artificially maintain/inflate Digital Music prices in the U.S." (Pl. Mem. Class Cert. at 17-18). Because (1) there is no basis to Plaintiffs' claim that there is a threat of future harm to the proposed class and (2) Plaintiffs have failed to show that injunctive relief would inure to the benefit of all members of the class, the motion for class certification pursuant to Rule 23(b)(2) is denied.

Pursuant to Federal Rule of Civil Procedure 23(b)(3), Plaintiffs also move to certify nine separate damages classes under the antitrust and/or consumer protection laws of California, the District of Columbia, Arizona, Florida, Iowa, Michigan, Minnesota, Nevada, and South Dakota, for persons and entities who, while residents or within those states, purchased Digital Music indirectly from the Defendants. (Pl. Mem. Class Cert. at 1). For reasons explained below, Plaintiffs have

failed to satisfy Rule 23(b)(3)'s predominance and superiority requirements.  Accordingly, the motion for class certification pursuant to Rule 23(b)(3) is denied.

BACKGROUND

The allegations in this long-lived litigation as set forth in the FCAC are well-known to the Court.  See In re Digital Music Antitrust Litig., 812 F.Supp.2d 390 (S.D.N.Y. 2011)("In re Digital Music II"); Starr v. Sony BMG Music Entm't, 592 F.3d 314 (2d Cir. 2010); In re Digital Music Antitrust Litig., 592 F.Supp.2d 435 (S.D.N.Y. 2008)("In re Digital Music I").  The Court assumes familiarity with the alleged facts at issue, but in order to situate the discussion a brief summary follows.

Defendants produce, license, and distribute music sold online ("Digital Music" or "Internet Music") and on compact discs ("CDs").  (FCAC ¶ 47).  Together, they control eighty percent of the market for Digital Music in the United States. (FCAC ¶ 108).  Plaintiffs allege that Defendants have conspired to restrain trade in and fix prices of Digital Music in order to sell CDs at supracompetitive prices.  (FCAC ¶ 56).

In the initial stages of the alleged conspiracy, Defendants Bertlesmann, Inc., Warner Music Group Corp., and EMI launched an online service called MusicNet, a joint venture entity owned and controlled by various Defendants.  (FCAC ¶ 57).  Defendants UMG and Sony Corporation of America launched a similar online music

service called Duet, later renamed pressplay.  (FCAC ¶ 57).  It too was a joint venture.  All Defendants signed distribution agreements with MusicNet and pressplay.  (FCAC ¶ 57).  These joint ventures, along with the Recording Industry Association of America, allowed Defendants to "maintain[] prices at artificially high levels, eliminate[] competition among the Defendants in the pricing and terms of Internet Music sales, and provide[] one of several forums in which the Defendants could discuss their general desires to restrain trade in Internet Music and come to agreement on the specifics."  (FCAC ¶ 57). Defendants also allegedly used these joint ventures to share licensing terms and pricing information and to police the alleged agreements, among other things.  (FCAC ¶ 87).

Plaintiffs also allege that Defendants used Most Favored Nation ("MFN") clauses in Defendants' licensing agreements in order to guarantee that a licensor would receive at least equivalent licensing terms as another licensor.  (FCAC ¶¶ 58, 81).  The alleged effect of the MFN agreements was to set a wholesale price floor for Digital Music of 70 cents per song. (FCAC ¶¶ 89-90).  Plaintiffs allege that despite the fact that the price of distributing Digital Music fell to essentially zero, the wholesale price of Digital Music increased uniformly. (FCAC ¶¶ 89-90).  This was due in material part to Defendants' enforcement of the MFN clauses, which Defendants attempted to

hide.  (FCAC ¶¶ 82, 90-91).  In addition, Defendants allegedly
fixed the terms of sale of Digital Music, including digital
rights management terms ("DRM"), which restricted transfer of
songs to portable players, among other things.  (FCAC ¶¶ 59,
66).  Plaintiffs allege that but for the conspiracy, a defendant
may have removed DRMs to gain market share.  (FCAC ¶ 66).
Allegedly, both the wholesale price and DRMs included with
Defendants' music was fixed among Defendants because of
Defendants' collusion, even when they sold to unaffiliated
retailers.  (FCAC ¶ 59).

The core allegation is that Defendants' behavior sustained
high prices for Digital Music, which made it less attractive to
consumers and hampered the growth of Digital Music services
generally.  (FCAC ¶¶ 71-72).  Plaintiffs point to eMusic, an
independent competitor in the online music business, as an
example of competitive pricing.  It was the second-largest
online retailer and charged -- at retail -- less than half of
Defendants' wholesale price, and Defendants refused to do
business with it.  (FCAC ¶¶ 94-95).  Plaintiffs allege that
Defendants' motive to conspire was to support their ability to
charge supracompetitive prices for CDs; they could do so because
Digital Music was priced, through the alleged conspiracy, so as
to be an unattractive or economically uncompetitive substitute.
(FCAC ¶ 73).

The procedural history of this case is also well-described in the Court's earlier opinions.  See Starr, 592 F.3d at 320-21. From December 29, 2005, until July 2006, Plaintiffs filed various state court actions alleging that Defendants fixed the prices of Digital Music.  Id. at 320.  These actions were consolidated and transferred to this Court by the Judicial Panel on Multidistrict Litigation.  Id.  Plaintiffs filed a First Consolidated Amended Complaint in April 2007 and a Second Consolidated Amended Complaint in June 2007.  Id.

Defendants moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), which the Court granted by Memorandum and Order dated October 8, 2008, finding that Plaintiffs had failed to state a plausible claim under Twombly.  See In re Digital Music I, 592 F.Supp.2d at 447.  The Court of Appeals vacated the Court's Order and remanded for further proceedings consistent with its opinion.  Starr, 592 F.3d at 317.  The Defendants again moved to dismiss the action, which the Court granted in part and denied in part by Opinion and Order dated July 18, 2011.  See In re Digital Music II, 812 F. Supp. 2d at 420.  Plaintiffs then filed the Third Consolidated Amended Complaint in August 2011.  (ECF No. 159).

Following the Court's 2011 Order, the parties proceeded to conduct discovery in advance of the instant motion for class certification.  During that time, the parties have engaged in

extensive discovery disputes -- most recently, Plaintiffs'
motion to compel production of highly detailed transactional
data, (Oct. 12, 2016, ECF No. 362) -- resulting in a delay in
resolving these proceedings of over five years.  Plaintiffs
filed the Fourth Consolidated Amended Complaint in September
2015.  (Sept. 25, 2015, ECF No. 319).

The Court turns first to the parties' motions to exclude
the opinions of each other's experts.

DISCUSSION

I.   Motions to Exclude

a. Legal Standard

The admissibility of expert testimony is governed by
Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized
> knowledge will assist the trier of fact to
> understand the evidence or to determine a fact
> in issue, a witness qualified as an expert by
> knowledge, skill, experience, training, or
> education, may testify thereto in the form of
> an opinion or otherwise, if (1) the testimony
> is based upon sufficient facts or data, (2) the
> testimony is the product of reliable principles
> and methods, and (3) the witness has applied
> the principles and methods reliably to the
> facts of the case.

Fed. R. Evid. 702.

In order for the expert opinion to be admissible, the
witness "must be qualified as an expert, the testimony must be
reliable, and the testimony must assist the trier of fact."  In

re Fosamax Prods. Liab. Litig., 645 F. Supp. 2d 164, 172
(S.D.N.Y. 2009).

"Courts within the Second Circuit have liberally construed
expert qualification requirements." In re Methyl Tertiary Butyl
Ether ("MTBE") Prods. Liab. Litig., 2008 WL 1971538, at *5
(S.D.N.Y. May 7, 2008)(internal quotation marks omitted).  "A
witness's qualifications 'can only be determined by comparing
the area in which the witness has superior knowledge, skill,
experience, or education with the subject matter of the
witness's testimony.'"  In re Fosamax, 645 F. Supp. 2d at 172
(quoting Carroll v. Otis Elevator Co., 896 F.2d 210, 212 (7th
Cir. 1990)).

The Advisory Committee's note to Rule 702 explains that the
Rule was amended to include the three reliability-based
requirements in response to Daubert v. Merrell Dow
Pharmaceuticals, Inc., 509 U.S. 579 (1993) and its progeny,
Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), and General
Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).  See Fed. R.
Evid. 702 advisory committee's note.  In Daubert, the Supreme
Court interpreted Rule 702 to require district courts to act as
gatekeepers by ensuring that expert scientific testimony "both
rests on a reliable foundation and is relevant to the task at
hand."  509 U.S. at 597.  This requires "a preliminary
assessment of whether the reasoning or methodology underlying

the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Id. at 592-93; see also Kumho Tire, 526 U.S. 137 (holding that the gatekeeping function applies to all expert testimony, whether based on scientific, technical or other specialized knowledge).

To be scientifically valid, the subject of expert testimony must rest on "good grounds, based on what is known." Daubert, 509 U.S. at 590 (internal quotation marks omitted).  In Daubert, the Court set forth a non-exclusive list of factors that district courts might consider in gauging the reliability of scientific testimony.  Id. at 593-95.  These factors include: (1) whether the theory has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error and whether standards and controls exist and have been maintained with respect to the technique; and (4) the general acceptance of the methodology in the scientific community.  Id.  "Whether some or all of these factors apply in a particular case depends on the facts, the expert's particular expertise, and the subject of his testimony." In re Fosamax, 645 F. Supp. 2d at 173 (citing Kumho Tire, 526 U.S. at 138).  A district court has broad discretion both in determining the relevant factors to be employed in assessing reliability and in determining whether that testimony

is in fact reliable.  Kumho Tire, 526 U.S. at 153; Zuchowicz v. United States, 140 F.3d 381, 386 (2d Cir. 1998).

Weighing whether the expert testimony assists the trier of fact goes primarily to relevance.  Daubert, 509 U.S. at 591. Relevance can be expressed as a question of "fit" -- "whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."  Id. (citing United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985)).  In addition, expert testimony is not helpful if it simply addresses "lay matters which a jury is capable of understanding and deciding without the expert's help."  United States v. Mulder, 273 F.3d 91, 101 (2d Cir. 2001)(internal citation and quotation omitted).  Finally, the testimony is not helpful if it "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it."  United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994)(internal citation and quotation omitted).

"In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d

Cir. 2002).  However, in accordance with the liberal
admissibility standards of the Federal Rules of Evidence, only
serious flaws in reasoning or methodology will warrant
exclusion.  Id.  "As long as an expert's scientific testimony
rests upon 'good grounds, based on what is known,' it should be
tested by the adversary process -- competing expert testimony
and active cross-examination -- rather than excluded from
jurors' scrutiny for fear that they will not grasp its
complexities or satisfactorily weigh its inadequacies."  Ruiz-
Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77,
85 (1st Cir. 1998)(quoting Daubert, 509 U.S. at 596); see also
Amorgianos, 303 F.3d at 267.  If an expert's testimony lies
within "the range where experts might reasonably differ," the
jury, and not the trial court, should "decide among the
conflicting views of different experts."  Kumho Tire, 526 U.S.
at 153.

        b. Professor Roger G. Noll

     Professor Roger Noll is a Professor Emeritus of Economics
at Stanford University and a Senior Fellow at the Stanford
Institute for Economic Policy Research, where he is the Director
of the Program on Regulatory Policy.  (Noll Report at 1, Mar.
19, 2014, ECF No. 231).  He has a Ph.D. in economics from
Harvard University and has served as a consultant to the
Antitrust Division of the U.S. Department of Justice, the U.S.

Federal Trade Commission, the Federal Communications Commission, and the Senate Subcommittee on Antitrust and Monopoly. (Id.) Professor Noll has published widely in the field of antitrust economics and has taught the subject to undergraduate and graduate students for over 50 years. (Id.)

Defendants seek to exclude the opinion of Professor Noll on the grounds that it is "implausible as a matter of economics and antitrust theory and inconsistent with both the record and evidence and Prof. Noll's own data and analysis." (Def. Mem. Exclude Noll at 1, Dec. 19, 2016, ECF No. 380). Defendants' argument centers on the contention that Professor Noll has materially changed his theory of liability in the course of this litigation. In particular, Professor Noll has "always alleged that the Defendants conspired to fix wholesale prices for music downloads," whereas Professor Noll's reply declaration "opines that Defendants conspired to fix the profit margins that Defendants would make on each sale of music downloads sold to online music distribution services." (Id.) Defendants claim that Professor Noll changed his analysis as a result of making a series of admissions during his deposition that allegedly exposed flaws in his methodology. (Id.)

Having staked their Daubert motion entirely on the argument that Professor Noll has changed his antitrust theory from one of price-fixing to margin-fixing, Defendants' support for this

assertion is remarkably thin.  Defendants cite Professor Noll's
reply declaration, where he states that "nearly all download
products . . . have approximately the same profit margin at both
wholesale and retail."  (Def. Mem. Exclude Noll at 5 (citing
Noll Reply at 38, Nov. 7, 2016, ECF No. 368)).  Defendants also
cite Professor Noll's assertion that the "validity of [his]
method [] depends on whether different download products (with
different prices) have approximately the same profit margin."
(Id. (citing Noll Reply at 27))

    It is readily apparent, however, that none of the
statements cited by Defendants aver that the conspiracy took the
form of collusion on profit margins.  The Court is not surprised
that Professor Noll would cite profit margins as a measure of
price collusion because prices and profit margins are inherently
related.  As Professor Noll explains in his supplemental
declaration, "the percentage unit profit margin is the Lerner
Index: $L = (P - m)/P$, where P is price and m is the marginal
cost.  Hence, if defendants agree to fix the price and if m is a
constant, the price-fixing agreement also fixes the profit
margin."  (Noll Supp. Decl. at 5, Jan. 23, 2017, ECF No. 393).
Accordingly, the mere mention of using differences in profit
margins to measure the impact and damages of a price-fixing
conspiracy between the Defendants does not imply that Professor

Noll changed his theory of the liability between the Noll Report and the Noll Reply.

Further, Defendants have ignored the many statements made by Professor Noll that are consistent with Plaintiffs' theory of a price-fixing conspiracy. (See, e.g., Noll Reply at 30 ("[I]f the goal of the defendants was in part to keep download prices high to reduce cannibalization of CD album sales. . . . More generally, because the purpose of collusion is to raise prices, members of a price-fixing cartel who charge some customers more than the collusive price are hardly guilty of violating the cartel agreement."); 37 ("The appropriate model for a market with heterogeneous products is that each product enjoys some market power. . . . If download products compete in this way, collusively raising the prices of some products will cause an increase in the demand for and the prices of products."); 16 ("[I]f CDs are competitively priced and are perfect substitutes for downloads, then competition from CDs will force the price of downloads to the competitive level. Consequently, an attempt to engage in collusion to increase download prices above the competitive level would be unprofitable unless . . .")).

Accordingly, Professor Noll has provided a single method to show common proof of the alleged price-fixing conspiracy and one formula for calculating damages, namely, "us[ing] the difference in the percentage mark-up of price over marginal cost between

digital downloads and the competitive benchmark products (CDs) to measure the anticompetitive effect of collusion on the prices of downloads and to generate a common formula for calculating damages for all digital downloads." (Noll Supp. Decl. at 2).

Defendants cite four reasons why Professor Noll's opinion is inadmissible, three of which rest on the predicate assumption that Professor Noll changed his theory of liability. First, Defendants argue that a margin-fixing theory is implausible because antitrust conspiracies generally require that the conspirators be able to observe, and thereby adhere to, each other's behavior. (Def. Mem. Exclude Noll at 1, 7-10). Defendants may well be correct that a margin-fixing conspiracy is implausible because of the difficulty of policing any such agreement by the co-conspirators. However, because Defendants mischaracterize Professor Noll's theory of the conspiracy, the Court rejects Defendants' argument as frivolous.

Second, Defendants argue that a margin-fixing theory is not consistent with evidence in the record, which shows that Defendants' margins on Digital Music varied dramatically as a result of variable royalty rates for different artists. (Id. at 2, 10-14). Once again, the premise of Defendants' argument is incorrect: Plaintiffs allege a price-fixing conspiracy, not a margin-fixing conspiracy. Further, because Defendants have not produced cost data broken down by individual artist, (see Pl.

Opp. Exclude Roger Noll, Jan. 19, 2017, ECF No. 388) --
notwithstanding the vague assertions by record company
executives that royalty rates differ, (see Def. Mem. Exclude
Roger Noll at 12-13) -- the Court will not hold Plaintiffs
responsible for failing to analyze data to which they did not
have access.  See In re Zurn Pex Plumbing Prods. Liab. Litig.,
644 F.3d 604, 613 (8th Cir. 2011) ("While there is little doubt
that bifurcated discovery may increase efficiency in a complex
case such as this, it also means there may be gaps in the
available evidence.  Expert opinions may have to adapt as such
gaps are filled by merits discovery, and the district court will
be able to reexamine its evidentiary rulings.").

Third, Defendants argue that a margin-fixing theory is
unreliable because it assumes any music download above $0.00
includes an overcharge and therefore cannot discern between a
collusive and non-collusive price.  (Def. Mem. Exclude Noll at
3, 14-16).  Again, Defendants' argument depends on a
mischaracterization of Professor Noll's theory of liability and
therefore lacks merit.

Fourth, Defendants' only argument that does not depend on
assuming a margin-fixing conspiracy contends that Professor Noll
fails to account for relevant data concerning varied pricing
throughout the class period that undermines Professor Noll's
pass-through regression analysis, in particular by excluding all

observations of retail sales at $.99.  (Id. at 3, 16-17).
However, Professor Noll explains that the pass-through
regression tests the hypothesis that retail prices are 1.4 times
wholesale prices, which is the ratio for hundreds of millions of
transactions at the most common prices.  (Noll Reply at 42).
"Because these ratios tell us the retail price mark-up on a
large fraction of sales, the point of the regression is to test
whether products that are not at the standard prices also have
essentially the same retail mark-up."  (Id. at 44).  Defendants
fail to respond in their Daubert motion to Professor Noll's
justification for excluding certain price data from the pass-
through regression, and the Court does not find a flaw in his
methodology serious enough to warrant exclusion.  See
Amorgianos, 303 F.3d at 267.

Finally, citing Comcast Corp. v. Behrend, which held that
"any model supporting a plaintiff's damages must be consistent
with its liability case," 133 S. Ct. 1426, 1433 (2013),
Defendants conclude that Professor Noll's opinion is
inadmissible "because it purports to assess liability and
damages based on a margin-fixing conspiracy, whereas Plaintiffs'
theory is that Defendants injured them with a wholesale price-
floor conspiracy."  (Def. Mem. Exclude Noll at 18).  As
explained above, Plaintiffs and Professor Noll have articulated
a consistent price-fixing conspiracy regarding liability and in

support of the damages model.  Defendants' reliance on Comcast
therefore fails.

On December 16, 2016, Defendants filed a supplemental
declaration by Professor Janusz Ordover in support of their
motion to exclude Professor Noll's opinion.  (Ordover Supp.
Decl, Dec. 22, 2016, ECF No. 382).  Plaintiffs moved to strike
Professor Ordover's supplemental declaration on the grounds that
it is a rebuttal to Professor Noll's reply declaration rather
than a declaration in support of Defendants' Daubert motion.
(Letter from Alexandra Bernay, Dec. 23, 2016, ECF No. 384).  In
their opposition to Defendants' motion to exclude, Plaintiffs
also move to exclude Professor Ordover's supplemental
declaration on the grounds that it is unreliable under Daubert.

Like Defendants' motion to exclude, the entirety of
Professor Ordover's supplemental declaration incorrectly assumes
that Professor Noll changed his theory of liability from a
conspiracy of price-fixing to margin-fixing.  As explained
above, Defendants' premise is contradicted by substantial
evidence in the record of this case.  The Court of Appeals has
instructed that expert analysis must be "reliable at every
step," Amorgianos, 303 F.3d at 267, and that "a trial judge
should exclude expert testimony if it is . . . based on
assumptions that are so unrealistic and contradictory as to
suggest bad faith," Zerega Ave. Realty Corp. v. Hornbeck

Offshore Transp., LLC, 571 F.3d 206, 213-14 (internal citation and quotation marks omitted).  Professor Noll propounds the same theory of liability on the basis of price-fixing in both the Noll Report and Noll Reply.  Professor Ordover's supplemental declaration therefore amounts to little more than a frivolous strawman and is accordingly unreliable under Daubert.  It will play no further role in the Court's consideration.

On the other hand, Plaintiffs cite no authority that would prevent Defendants from supporting a Daubert motion to exclude the opposing side's expert with a declaration from their own expert witness.  Professor Ordover writes in his supplemental declaration that Professor Noll changed his theory of liability, and Defendants rely upon Professor Ordover's supplemental declaration to argue that Professor Noll's opinion is unreliable.  Even if the Court were to consider Professor Ordover's supplemental declaration an untimely sur-reply, "[u]ntimely expert submissions should be disregarded unless the proponent of the evidence can demonstrate that his delay in complying with the required deadlines was substantially justified or that it was harmless, that is, that it did not prejudice the other side."  Bickham v. Coca Cola Refreshments USA, Inc., 2015 U.S. Dist. LEXIS 156066, at *11 (S.D.N.Y. Nov. 18, 2015).  As the Court explains above, Professor Ordover's supplemental declaration is unreliable under Daubert and is

therefore excluded.  Accordingly, Plaintiffs have suffered no prejudice, and the motion to strike is denied.

For the foregoing reasons, Defendants' motion to exclude the opinion of Professor Roger Noll is denied, Plaintiffs' motion to strike Professor Ordover's supplemental declaration is denied, and Plaintiffs' motion to exclude Professor Ordover's supplemental declaration is granted.

c. Professor Janusz Ordover

Professor Janusz Ordover is a Professor Emeritus of Economics and former Director of the Masters in Economics Program at New York University, where he taught for 43 years. (Ordover Decl. ¶ 1, June 16, 2016, ECF No. 354).  His areas of specialization include industrial organization, antitrust, regulation economics, and the intersection between antitrust and intellectual property.  (Id.)  Professor Ordover earned his Ph.D. in economics from Columbia University.  (Id. at Attachment 1).  From 1991 to 1992, he served as Deputy Assistant Attorney General for Economics at the Antitrust Division of the United States Department of Justice.  (Id. at 1).  Professor Ordover has also served as an advisor on antitrust and regulatory issues to organizations including the American Bar Association, the World Bank, the Organization for Economic Cooperation and Development, the Inter-American Development Bank, and the

governments of Poland, Hungary, Russia, the Czech Republic, Australia, and others.  (Id. ¶ 2).

Plaintiffs move to exclude the declaration of Professor Ordover on a variety of grounds.  As an initial matter, the Court notes that it is incumbent upon Plaintiffs, not Defendants, to "present a damages model that can be used on a class-wide basis based on common proof."  In re Fresh Del Monte Pineapples Antitrust Litig., 2008 WL 5661873, at *9 (S.D.N.Y. Feb. 20, 2008).  Rebuttal experts, on the other hand, have a "less demanding task" because "they have no burden to produce models or methods of their own; they need only attack those of plaintiffs' expert[]."  In re Zyprexa Prods. Liab. Litig., 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007).  Further, contradictory expert testimony does not control admissibility.  So long as the rebuttal expert's testimony is reliable, it is the role of the factfinder to determine issues of trustworthiness and credibility through "conventional devices" of "cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."  Daubert, 509 U.S. at 596.

i. Professor Ordover's opinion that class members illegally downloaded music

Plaintiffs argue that Professor Ordover's assertion that a majority of the proposed class members illegally downloaded Digital Music is unreliable.  (Pl. Mem. Exclude Ordover at 3,

Dec. 20, 2016, ECF No. 378).  Plaintiffs take particular issue with a May 2004 Ipsos Insight study because it was (1) commissioned by Defendant Sony, (2) conducted early in 2000 and therefore ignores the later class period, and (3) contradicted by findings in several other studies.  (Id. at 3-4).

Defendants' argument is meritless.  Professor Ordover cites a number of authorities in addition to the 2004 Ipsos report, including Plaintiffs' own expert, Professor Noll, that support the proposition that illegal downloading of Digital Music was rampant during the class period.  (See Ordover Decl. ¶ 103).  These studies are consistent with the Court's prior finding that there was "widespread unauthorized downloading of Digital Music during the class period."  (Mem. and Op., Oct. 9, 2008, ECF No. 111).  In citing these studies, Professor Ordover does not seek to "establish a reliable connection showing that class members illegally downloaded," (Pl. Reply Exclude Ordover, Feb. 2, 2017, ECF No. 398), as Plaintiffs contend.  Rather, the purpose of Professor Ordover's observation is to show why individualized inquiries will be necessary to determine which class members engaged in such illegal downloading in order to offset their damages.  (See Ordover Decl. ¶ 104 n. 121 ("I note that there is an overlap between consumers who downloaded music legally and consumers who pirated music.")).  To the extent that Plaintiffs wish to dispute the interpretation of this evidence, a Daubert

motion is an inappropriate stage in the litigation to do so.

Campbell v. Metro. Prop. & Cas. Ins. Co., 239 F.3d 179, 186 (2d Cir. 2001) ("[T]he weight of the evidence is a matter to be argued to the trier of fact."). Rather, the Supreme Court has instructed that district courts must focus "solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595. Plaintiffs have raised no issues with Professor Orover's principles or methodology that would warrant exclusion of his analysis of this issue.

> ii. Professor Ordover's opinion that CDs are not a valid benchmark because of the lack of broadband internet penetration

Plaintiffs seek to exclude Professor Ordover's opinion that CDs are not a valid benchmark for Digital Music because of the lack of broadband internet penetration during the class period. (Pl. Mem. Exclude Ordover at 5). Plaintiffs dispute Professor Ordover's finding of low broadband penetration in the United States applies specifically to music buyers, who may have had higher adoption rates. However, Plaintiffs ignore the fact that Professor Ordover is responding to an assertion made by their own expert, Professor Noll.

In his Report, Professor Noll states that "for the large majority of consumers who own computers and high-speed Internet connections, the two products are functionally equivalent."

(Noll Report at 6).  Further, "if a consumer has the necessary electronic devices, a CD and a digital download are functionally equivalent in that either can be converted to the other at a small cost."  (Id. at 20).  A finding of functional equivalency affects Professor Noll's analysis in determining whether or not CDs and Digital Music are economic substitutes, thereby helping to define the relevant market.  (Id. at 19, 20).  Professor Ordover merely introduces evidence in the form of FCC and Pew Research reports showing that there were low levels of broadband penetration during the early years of the class period, (Ordover Decl. ¶ 47), which Professor Noll corroborates in his own declaration.  (See Noll Report at 20 ("Early in the class period, the penetration of home computers and wireless devices with high speed Internet access was low . . .").  Plaintiffs may speculate that broadband penetration for class members is "likely" to be much higher than the United States as a whole, (see Pl. Reply Exclude Ordover at 5) -- although the Court notes that Professor Noll has cited no empirical evidence demonstrating this likelihood -- but Plaintiffs' argument goes to the weight of Defendants' evidence rather than its admissibility and should therefore be left to the trier-of-fact's consideration.  E.E.O.C. v. Bloomberg L.P., 2010 WL 3466370, at *7 (S.D.N.Y. Aug 31, 2010).

### iii. Professor Ordover's opinion that tiered pricing would have existed in the but-for world

Plaintiffs contend that Professor Ordover's opinion that variable pricing would have existed in the but-for world (i.e., a world without the alleged conspiracy) is unreliable because he ignores contrary evidence. (Pl. Mem. Exclude Ordover at 6). However, Professor Ordover does cite evidence in support of his opinion demonstrating that single-track downloads wholesaled at a range of prices between 2002 and 2007, (Ordover Decl. Ex. 4), and that Amazon adopted variable pricing when it debuted its music download store in 2007, (id. at 33 n. 92). Evidence in the record further establishes that "wholesale pricing ranged from 70 cents to 75 cents to 80 cents to 83 cents to a dollar . . ." between 2002 and 2005. (Def. Opp. Exclude Ordover Ex. 1 (Sony 30(b)(6) Dep. Tr.) 166:6-12, Jan. 24, 2017, ECF No. 395). Professor Ordover also notes that there is a high degree of price heterogeneity across products in the music world, including CDs, which Professor Noll uses as a benchmark in his model of liability. (Ordover Decl. ¶¶ 79-86). Plaintiffs' only basis for excluding Professor Ordover's opinion is a three-page section of Professor Noll's reply declaration, which itself cites no empirical evidence. (See Pl. Mem. Exclude Ordover at 6 n. 13 (citing Noll Reply at 38-41)). Plaintiffs have therefore

failed to show why Professor Ordover's opinion is unreliable on this basis.

iv. Professor Ordover's opinion that Apple set pricing of Digital Music and concerning his pass-through calculations of cost increases

Plaintiffs argue that Professor Ordover's opinion that Apple, rather than the Defendants, controlled the price of Digital Music and his pass-through calculations of cost increases should be excluded because they are unreliable. (Pl. Mem. Exclude Ordover at 7). Plaintiffs cite a number of documents, including internal e-mails and presentations, investor presentations, and pricing documents, purporting to show that various Defendants in fact determined the wholesale price of Digital Music. (Id. Ex 3). Professor Ordover also concedes in his deposition testimony that Apple and the Defendants were engaging in negotiations over the wholesale price of Digital Music. (Pl. Mem. Exclude Ordover Ex. 1 (Ordover Dep. Tr.) 299-304).

On the other hand, Professor Ordover has introduced admissible evidence demonstrating that Apple did set the terms for wholesale pricing, including public reporting of the negotiations between the Defendants and Apple, testimony of Defendants' corporate representatives, and documents produced by Defendants. (See Ordover Decl. ¶¶ 107-15 (citing deposition

27

testimony of Universal's 30(b)(6) witness, Jason Gallien at 55:4-14, 66:10-23; Joshua Chaffin & Kevin Allison, Apple sets tune for pricing of song downloads, Financial Times, May 1, 2006; Apple wins iTunes pricing battle, CNN Money, May 2, 2006 ("Four largest record companies defeated in behind-the-scenes battle to charge different prices for songs; downloads still 99 cents, paper says."))).  Considering this evidence in addition to the documents cited by Plaintiffs, Professor Ordover concludes that "these negotiations were very intense," that Apple was in a "very strong position" to set "rates and prices and terms" and that "[t]he question becomes who has the strength and the power to drive the negotiations to the levels that the parties ultimately agreed upon."  (Pl. Mem. Exclude Ordover Ex. 1 (Ordover Dep. Tr.) 300:3-20).  Where expert witnesses disagree on the interpretation of evidence properly admitted before the Court, it is not the Court's role to resolve the dispute through exclusion of one of the expert's opinions.  See Washington v. Kellwood Co., 105 F. Supp. 3d 293, 316 (S.D.N.Y. 2015) ("While defendant and its expert may take issue with the ultimate conclusions . . . drawn from the evidence, we leave it to their no-doubt robust efforts at trial to 'call[] into question the weight that the jury should accord [the expert's] testimony.'" (citations omitted)).  The Court therefore declines to exclude Professor Ordover's opinion regarding this issue.

Plaintiffs also move to exclude Professor Ordover's opinion that Apple would have likely maintained its $.99 cent price even if wholesale prices were to drop because it is speculative. (Pl. Mem. Exclude Ordover at 8-9). However, Plaintiffs selectively excerpt Professor Ordover's opinion. Professor Ordover in fact states that "it is plausible, and perhaps even likely, that Apple would have maintained its pricing at $.99 per track (retail) with or without the purported conspiracy, at least during some portion of the alleged conspiracy period and for some ranges of wholesale prices." (Ordover Decl. ¶ 119) (emphasis added). Plaintiffs' pointing to Apple's adoption of tiered retail pricing in 2009 as evidence contrary to Professor Ordover's analysis does not undermine this opinion. (See Pl. Mem. Exclude Ordover at 9). Accordingly, it is not a basis for exclusion.

Finally, Plaintiffs object to Professor Ordover's decision to cut off his pass-through regression analysis at $1.00, arguing that Professor Ordover did so in order to achieve Defendants' desired results. (Id.) The purpose of Professor Ordover's opinion is to critique Professor Noll's assumption that "the retail price is a linear function of the wholesale price," which, according to Defendants, ignores Apple's role in setting prices. (Ordover Decl. ¶¶ 116-21). Furthermore, by modifying Professor Noll's regression to exclude prices greater

than $1.00, Professor Ordover attempts to demonstrate that
Professor Noll's pass-through regression shows a zero pass-
through for single tracks within the price range relevant for
determining Plaintiffs' alleged damages.  (Id. ¶ 122).
Professor Ordover has also explained the reasoning behind his
decision to exclude prices greater than $1.00 from his pass-
through regression: "the transactions above a dollar w[ere] a
very small portion of all of the transactions that were 70 cents
or above."  (Def. Opp. Exclude Ordover Ex. 2 (Ordover Dep. Tr.)
339:19-24; see also Ordover Decl. ¶ 122 (Downloads in this price
range account for over 95% of all units in dataset that
Professor Noll uses (excluding products priced at zero).")).

Plaintiffs do not explain why Professor Ordover's methodology is
flawed other than to say that it "makes no economic sense" and
that "[n]o retail seller of music could remain in business if
some or all increased costs were not passed on to consumers."
(Pl. Mem. Exclude Ordover at 10).  Plaintiffs' disagreement,
however, is not a basis for exclusion.  See Washington, 105 F.
Supp. at 326 ("[A]lthough he based his report on somewhat
different assumptions and arrived at wholly different
conclusions [the expert] should not be precluded from testifying
because his effort is archetypal rebuttal testimony.")(internal
citation and quotation marks omitted).

      v.  Professor Ordover's opinion that the pass-through

      rate for non-Apple DSPs was zero

Plaintiffs contend that Professor Ordover's opinion that

Walmart had a zero pass-through rate should be excluded because

it is based on unreliable news sources.  (Pl. Mem. Exclude

Ordover at 10).  In his declaration, Professor Ordover cites two

articles reporting that Walmart set prices at $.88 per track for

digital downloads.  (Ordover Decl. ¶ 125 n. 139).  By showing

that the wholesale prices charged by each Defendants to Walmart

███████████████████████,[1] while Walmart set a uniform $.88

---

[1] Defendants have requested the Court to redact and seal certain
evidentiary submissions that the Court has relied upon in this
Opinion.  The basis for Defendants' application is that the
submissions concern confidential information relating to
competitive pricing data and strategy and that they are subject
to confidentiality agreements between Defendants and innocent
non-parties.  The documents at issue are "judicial documents"
within the framework of Lugosch v. Pyramid Co. of Onondaga, 435
F.3d 110, 119 (2d Cir. 2006).  Accordingly, there exists a
strong presumption of public access to the information under
both the common law and the First Amendment.  However, the Court
finds that the privacy interests of the affected non-parties are
sufficient to overcome the presumption of access and that the
proposed redactions are "narrowly tailored to serve [such]
interest[s]" and are "essential to preserve higher values."
United States v. Erie Cty., 763 F.3d 235, 239 (2d Cir.
2014)(internal quotation marks omitted).  While it is true that
"the mere existence of a confidentiality agreement covering
judicial documents is insufficient to overcome the First
Amendment presumption of access," Aioi Nissay Dowa Ins. Co. v.
Prosight Specialty Mgmt. Co., Inc., 2012 WL 3583176, at *6
(S.D.N.Y. Aug. 21, 2012)(internal quotation marks omitted), the
nature of the information at issue, which concerns internal
pricing strategies and competitive pricing data, is sufficiently
sensitive to warrant redaction.  See, e.g., Dodona I, LLC v.
Goldman, Sachs & Co., 119 F. Supp. 3d 152, 156-57 (S.D.N.Y.

retail price, Professor Ordover concludes that there was a zero pass-through rate for such sales.  (Id. at 47-48).  Plaintiffs do not explain why these data points are "inadequate to support the conclusions reached," Amorgianos, 303 F.3d at 266, particularly where, as here, retail prices of Digital Music were publicly available and received regular coverage by the news media.  Furthermore, Plaintiffs do not explain how Professor Ordover "cherrypicked the facts," see LeClerkcq v. The Lockformer Co., 2005 WL 1162979, at *4 (N.D. Ill. Apr. 28, 2005), although the Court notes that Plaintiffs did subpoena data from Walmart in the course of this litigation that could have called into question the uniform $.88 retail price charged by Walmart, (Pl. Mem. Class Cert. Ex. 12 (Walmart Subpoena)).  Accordingly, there is no basis for the Court to exclude Professor Ordover's opinion regarding this issue.

---

2015)(finding that information disclosing innocent third-parties' "information concerning their trading strategies, objectives, and transactions" and "pricing information" overcomes presumption of public access); see also Lown v. Salvation Army, Inc., 2012 WL 4888534, at *2 (S.D.N.Y. Oct. 12, 2012)(privacy interests of "innocent third part[ies]" are "entitled to significant weight in the balancing against the public's right to access")(citing Gardner v. Newsday, Inc., 895 F.2d 74, 79 (2d Cir. 1990)).  Accordingly, Defendants' sealing applications are granted, and the protected material will be redacted from this Opinion.  An unredacted copy will be filed under seal.

vi. Professor Ordover's opinion that margins vary
between artists

Plaintiffs argue that there is no basis for Professor
Ordover's assertion that "there are different margins across
artists because of consumer preferences as to more popular
artists." (Pl. Mem. Exclude Ordover at 11). However,
Plaintiffs mischaracterize the purpose of Professor Ordover's
opinion. Professor Ordover argues that Professor Noll's model
is unreliable because different margins for CDs and Digital
Music do not necessarily indicate a conspiracy to fix prices or
provide a class-wide basis for calculating damages. (Ordover
Decl. at 16-21). Rather, he notes that CDs are an appropriate
benchmark for Digital Music only if Professor Noll can show that
the product mix (i.e., full-album product versus single-track
product) between CDs and downloads are the same and that margins
should be the same across all types of music sales. (Id. at
21). In his declaration, Professor Ordover points to evidence
showing that the product mix between CDs and Digital Music is
different because most of the former are full albums and most of
the latter are single tracks and that margins for single-track
products (like digital downloads) may differ from the margins on
CDs for a variety of reasons, including a different mix of
titles, and differences in artist popularity and royalty rates.
(Id. at 20-21).

Professor Ordover's assertion regarding differences in margins across artists is therefore offered to refute an assumption of Professor Noll's model -- an assumption that Plaintiffs bear the burden of proving.  Professor Noll concedes this point in his deposition testimony, stating that "[d]ifferent artists earn different royalties" and that "if there were two artists and they had two different royalty rates, then the two different royalty rates could produce difference in margins."  (Def. Opp. Exclude Ordover Ex. 3 (Ordover Dep. Tr.) at 206:3-207:22).  The fact that Professor Ordover identifies assumptions in Professor Noll's model and points to evidence that those assumptions may be incorrect are not bases for excluding Professor Ordover's opinion.

vii.  Professor Ordover's opinion that margins vary between singles and albums

Plaintiffs also seek to exclude Professor Ordover's opinion that Professor Noll's model automatically shows an "overcharge" regardless of the presence of any collusion.  (Pl. Mem. Exclude Ordover at 12-13).  However, Plaintiffs' argument that Professor Ordover's opinion lacks a basis in evidence is a simple mischaracterization of the declaration.  Professor Ordover rather provides a hypothetical in which the profit margin on albums is 20% and on singles is 40% and explains that under such a scenario Professor Noll's model could "artificially generate

damages where none exist." (Ordover Decl. ¶ 38). Professor
Ordover thereby purports to show why Professor Noll's model is
too unreliable to calculate damages accurately on a class-wide
basis. Accordingly, Plaintiffs' critique -- that Professor
Ordover lacks evidence to support his assumption that profit
margins for albums and singlers differ -- misses the point of
Professor Ordover's argument, and the Court declines to exclude
his opinion on this basis.

> viii. Professor Ordover's opinion that margins are
> different for Digital Music sold at different
> prices and albums with different numbers of
> tracks

Finally, Plaintiffs seek to exclude Professor Ordover's
opinion that (1) Professor Noll's model fails to account for
Digital Music that was sold at a wholesale price other than $.70
and that (2) album prices differ from a standard price of $7.00
and vary in the number of tracks, which, according to Professor
Ordover, means that there is no standard per-track price for
different albums. (Pl. Mem. Exclude Ordover at 14-15).
Plaintiffs argue that Professor Noll's model is not limited only
to those digital downloads that had a wholesale price of $.70
but rather that the model proposes to measure the overcharge as
the difference in marginal costs between Digital Music and CDs,
or the benchmark product. (Id. at 14). Similarly, Professor

Noll measures the overcharge for albums as the difference in percentage marginal costs of the whole album price.  (Id. at 15).  Accordingly, Plaintiffs contend that Professor Noll's model does not depend on how many tracks an album has and that Professor Ordover has mischaracterized Professor Noll's analysis.  (Id.)

In response, Defendants recycle the same argument that Professor Noll changed his model between the Noll Report and the Noll Reply from one of price fixing to one of margin fixing.  For reasons explained in greater detail above, supra at 12-21, the Court finds this argument wholly unpersuasive.  Defendants have therefore failed to provide a meaningful response to Plaintiffs' argument that price variations for Digital Music and albums do not change the margins that Professor Noll uses to determine damages and impact.

Accordingly, Plaintiffs' motion to exclude Professor Ordover's opinion is denied except insofar as it relates to price variability for digital downloads and albums, which will play no further role in the Court's consideration.

d. Aaron Read

Aaron Read is a Director of Digital Forensics at Stroz Friedberg, a global consulting and technical services firm specializing in digital forensics, data breach and computer crime response, cyber investigations, and electronic data

preservation, analysis, and production.  (Read Decl. ¶¶ 1, 3,
June 13, 2016, ECF No. 349).  Mr. Read received a Master's
Degree in Digital Forensics, has extensive training and
experience in the use of computer forensic tools and techniques,
and regularly conducts and oversees digital forensic
acquisitions and analyses of laptops, desktops, servers, and
mobile devices in civil litigation, criminal matters, and
internal investigations.  (Id. ¶ 4).

     Mr. Read analyzed the Digital Music files produced by the
Plaintiffs and reached two principal conclusions, both of which
Plaintiffs seek to exclude.  First, Mr. Read concludes that the
only way to determine whether each track was lawfully purchased
by a putative class member is to analyze the metadata on the
particular track, which would then be compared with the
individual's account information with a specific DSP to
determine whether an individual track is associated with the
account used or owned by each individual proposed class member.
(Id. ¶¶ 6, 8).  Second, of the hundreds of available metadata
fields associated with the Digital Music files produced by
Plaintiffs, Mr. Read identified no fields indicating the prices
paid by consumers for each track or album.  (Id. ¶ 9).

               i. Mr. Read's opinion that Digital Music files must
                be analyzed on a track-by-track basis

Plaintiffs seek to exclude Mr. Read's opinion that individualized inquiries are necessary to determine that a given track was lawfully purchased on the grounds that he improperly draws a legal conclusion and that his opinion is not based on specialized knowledge that will assist the trier of fact. (Pl. Mem. Exclude Read at 6-9, Dec. 18, 2016, ECF No. 373). Neither argument has merit.

First, Mr. Read's opinion solely addresses the methodology required to assess whether Plaintiffs' Digital Music files contain indicia of legitimate purchases and does not apply the legal standards applicable to class certification to the record evidence. (Def. Opp. Exclude Read at 11, Jan. 24, 2017, ECF No. 394). Namely, "[t]he opinion is that it would require an individual analysis of the files." (Id.) Legal analysis is wholly irrelevant to the question of whether the metadata embedded in Plaintffs' digital files indicate whether they are associated with a user account for a legitimate DSP, a network for illegal downloading, or neither. (Id. at 12).

Second, it is clear from Mr. Read's declaration and deposition testimony that he performed a thorough analysis of Plaintiffs' Digital Music files, relying on an accepted forensic tool and his own expertise and experience. Mr. Read explains

that he chose to use a program named "ExifTool," which is a
commonly accepted tool used for forensic data extraction, to
extract metadata from Plaintiffs' Digital Music files. (Id. at
8). He states that he chose to use ExifTool because of his
experience with it and because it would allow him to handle "the
sheer amount of data that was produced," including thousands of
files. (Id. Ex. 1 (Read Dep.) at 95:4-19). The Digital Music
files "generally have data relating to the recording
specifications (e.g. duration, audio bitrate), track identifying
information (e.g. song and album title, artist) and
source/supplier information (e.g. purchase date, transaction
ID)." (Read Decl. ¶ 6). Accordingly, Mr. Read "categorize[d]
the metadata fields based on different things such as . . .
specification, source/supplier information, track identifying
information, things like that." (Read Dep. at 110:11-15). Mr.
Read proceeded to conduct a "comparative analysis to understand
basically the content of the data," and, after examining
metafields related to the provenance of the Digital Music files,
he found that some tracks had indicia associated with illegal
downloading (torrent) sites while others had indicia of
legitimate purchases. (Def. Opp. Exclude Read at 6).
Accordingly, Mr. Read concluded that determining the provenance
of the Digital Music files requires conducting an individualized
inquiry on a track-by-track basis. (Id. ¶¶ 6, 8).

Plaintiffs assert that Mr. Read did not speak to any representative of a Digital Music provider to elicit "information related to determining if a track was legally acquired." (Pl. Mem. Exclude Read at 8). However, Mr. Read's deposition testimony indicates that he did purchase Digital Music from Apple to use as a baseline against which to compare Plaintiffs' digital files. (See Read Dep. at 116:21-117:16). Experts often use benchmarks as a comparison for evidence under examination, see e.g., Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co., 301 F.R.D. 116, 130 (S.D.N.Y. 2014)(describing expert's use of third-party prices as benchmarks in a securities class action), and the Court finds no issue with Mr. Read's decision to do so here.

Plaintiffs claim that Mr. Read's opinion regarding the content of the metadata in Plaintiffs' Digital Music files is irrelevant because Mr. Read is able to produce a receipt to prove his own purchase of a digital file. (Pl. Mem. Exclude Read at 8-9). However, the Court notes that numerous Proposed Class Representatives have indicated that they did not have access to proofs of purchase for Digital Music and that they could not identify the prices they paid for the files they did purchase. (See Def. Opp. Exclude Read at 9 n. 5). Accordingly, Mr. Read's opinion is particularly relevant to determine (1) whether the metadata in Plaintiffs' Digital Music files can be

used to show that each of the tracks in their possession was legitimately purchased at some point during the class period and (2) whether Plaintiffs also possess illegally downloaded music, which can be determined only by means of a track-by-track analysis.  The Court is therefore unpersuaded by Plaintiffs' attempt to discredit the relevance of Mr. Read's opinion.

Finally, Plaintiffs claim that Mr. Read's opinion does not require specialized knowledge.  However, Plaintiffs have failed to explain how the Court or the jury could convert a Digital Music file into a set of cognizable metadata fields that they could then review to conclude that a Digital Music file was associated with a particular user account for a specific DSP. The Court therefore has no difficulty concluding that Mr. Read's opinion constitutes "scientific, technical, or other specialized knowledge" within the scope of Rule 702 and that it will assist the trier-of-fact.  Fed. R. Evid. 702.  Furthermore, it is clear that Mr. Read's opinion is based on sufficient evidence (i.e., the Plaintiffs' Digital Music tracks) and reliable methods and principles, including a commonly accepted digital forensic tool, ExifTool, Mr. Read's years-long experience as a forensic examiner, and the same type of analysis he has employed in IP infringement cases to determine the disputed source of data. (See Def. Opp. Exclude Read at 1).  Accordingly, the Court declines to exclude Mr. Read's opinion regarding the need to

perform an individualized inquiry into the provenance of Digital Music tracks.

ii. Mr. Read's opinion that Plaintiffs' Digital Music files do not contain a price paid field

Plaintiffs also seek to exclude Mr. Read's opinion that their Digital Music files do not show the price they paid for digital downloads on the grounds that Mr. Read "conducted no real analysis." (Pl. Mem. Exclude Read at 5). Plaintiffs contend that Mr. Read merely looked at the various metadata fields and determined there was no field labelled "price," which they claim is not a form of specialized knowledge under Rule 702. (Id.)

However, as described above, Mr. Read's analysis involved using a forensic tool to convert Plaintiffs' Digital Music metadata into data readable in an Excel spreadsheet, reviewing hundreds of data fields, and performing a comparative analysis. (See Def. Opp. Exclude Read at 10). Plaintiffs make no showing that a lay person could have performed any of these tasks without specialized knowledge or training. Furthermore, various courts have rejected assertions that an expert "does not really offer expert testimony, in the sense that he has done no more than run a search that any lay person could run," where, as here, the expert "offers expertise beyond that of the typical lay juror" that "would therefore be helpful to a jury." Marten

Transp., Ltd. v. Plattform Advert., Inc., 184 F. Supp. 3d 1006,
1010 (D. Kan. 2016); see also United States v. Ganier, 468 F.3d
920, 926 (6th Cir. 2006)("The average layperson today may be
able to interpret the outputs of popular software programs as
easily as he or she interprets everyday vernacular, but the
interpretation [the expert] needed to apply to make sense of the
software reports is more similar to the specialized knowledge
police officers use to interpret slang and code words used by
drug dealers."). Mr. Read has carried out tasks and performed
analysis that is well beyond the capabilities of a typical lay
person. Accordingly, the Court finds that Mr. Read's opinion
that Plaintiffs' Digital Music files do not contain price fields
is based on "scientific, technical, or other specialized
knowledge" and declines to exclude it under Rule 702.

Plaintiffs' motion to exclude the opinions of Aaron Read is
denied in its entirety.

II. Motion for Class Certification

Plaintiffs seek to certify a nationwide class for
injunctive relief on Plaintiffs' federal antitrust claims
pursuant to Federal Rule of Civil Procedure 23(b)(2) and nine
classes for damages under the laws, respectively, of the
District of Columbia, Arizona, California, Florida, Iowa,
Michigan, Minnesota, Nevada, and South Dakota pursuant to Rule
23(b)(3). Defendants oppose the motion for class certification

on several grounds, including that Plaintiffs have failed to
satisfy Rule 23(b)(3)'s predominance and superiority
requirements, failed to satisfy numerous requirements under Rule
23(b)(2), failed to satisfy Rule 23's ascertainability
requirement, and failed to satisfy Rule 23(a)'s typicality
requirement.

>    a. Legal Standard

A party seeking certification of a class must
"affirmatively demonstrate" compliance with each of the
requirements of Rule 23.  <u>Comcast Corp. v. Behrend</u>, 133 S. Ct.
1426, 1432 (2013)(citation omitted). Thus, Plaintiffs will be
able to sue as representatives of a class only if

> (1) the class is so numerous that joinder of all
> members is impracticable; (2) there are questions of
> law or fact common to the class; (3) the claims or
> defenses of the representative parties are typical of
> the claims or defenses of the class; and (4) the
> representative parties will fairly and adequately
> protect the interests of the class.

Fed. R. Civ. P. 23(a).

If the Rule 23(a) criteria are satisfied, an action may be
maintained as a class action only if it also qualifies under at
least one of the categories provided in Rule 23(b).  Fed. R.
Civ. P. 23(b); <u>In re U.S. Foodservice Inc. Pricing Litig.</u>, 729
F.3d 108, 117 (2d Cir. 2013).  Plaintiffs seek to certify a
class under Rules 23(b)(2) and (b)(3).  Rule 23(b)(2) permits
certification where "the party opposing the class has acted or

refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).  Rule 23(b)(3) allows a class action to be maintained if the "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . [it] is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); In re U.S. Foodservice, 729 F.3d at 117 (citation omitted).  Rule 23(b)(3) includes a number of factors that courts may consider, including the likely difficulty in managing the class action.  Id.  Finally, Plaintiffs must satisfy the implied requirement of "ascertainability."  In re Petrobras Secs., No. 16-1914-cv, at 39 (2d Cir. July 7, 2017).

"To certify a class, a district court must make a definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues, must resolve material factual disputes relevant to each Rule 23 requirement, and must find that each requirement is established by at least a preponderance of the evidence." In re U.S. Foodservice, 729 F.3d at 117 (internal citation and quotation marks omitted).  In other words, the district judge must "receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each

Rule 23 requirement has been met." In re Initial Pub. Offerings Secs. Litig., 471 F.3d 24, 41 (2d Cir. 2006)("In re IPO").

      b. Rule 23(a) Requirements

         i. Numerosity

Rule 23(a) requires a finding that the putative class members are so numerous as to make joinder of each "impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity is presumed when a class consists of forty or more members. See Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995).

Plaintiffs allege that the indirect-purchaser state classes will include millions of members interspersed throughout the United States, which Defendants do not dispute. Such a proposed class meets the numerosity requirement.

         ii. Commonality

Commonality is established where "plaintiffs' grievances share a common question of law or of fact." Shahriar v. Smith & Wollensky Rest. Grp., Inc., 659 F.3d 234, 252 (2d Cir. 2011) (citation omitted). Rule 23(a)(2) does not require all questions of law or fact to be common; even a single common question suffices. Sykes v. Mel Harris and Assocs., LLC, 285 F.R.D. 279, 286 (S.D.N.Y. 2012)(citation omitted). The common question must lend itself to "classwide resolution" such that "determination of its truth or falsity will resolve an issue

that is central to the validity of each one of the claims in one stroke." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011)("Dukes").  Therefore, what matters is "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." Id. (emphasis in original)(internal citation and quotation omitted).  Commonality may be shown where the plaintiffs' injuries "derive from a unitary course of conduct. . . ." Marisol A. v. Giuliani, 126 F.3d 372, 377 (2d Cir. 1997).

There are numerous common issues in this case that will generate common answers.  These include: whether Defendants formed and operated a conspiracy to fix the prices of Digital Music; whether Defendants' alleged conspiracy resulted in an unlawful overcharge on the price of Digital Music; whether the unlawful overcharge on the price of Digital Music was passed through to the indirect purchasers; and whether the overcharge to indirect purchasers can be calculated using a common method. (See Pl. Mem. Class Cert. at 14-15).  Defendants do not dispute that Plaintiffs have met the commonality requirement, and it is clear that Plaintiffs' alleged injuries derive from a uniform course of conduct by the Defendants.  Accordingly, the Court finds that Plaintiffs have satisfied their burden with respect to the commonality requirement.

iii. Typicality

Rule 23(a)(3) requires that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). As a general matter, the typicality and commonality requirements "tend to merge in the Second Circuit's class certification inquiry." Iglesias-Mendoza v. La Belle Farm, Inc., 239 F.R.D. 363, 370 (S.D.N.Y. 2007)(citing Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 291 (2d Cir. 1999). The typicality requirement is satisfied where "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." See In re Flag Telecom Holdings, Ltd. Secs. Litig, 574 F.3d 29, 35 (2d Cir. 2009)(internal citation and quotation marks omitted). This requirement has been liberally construed by courts. See Scholes v. Stone, McGuire & Benjamin, 143 F.R.D. 181, 185 (N.D. Ill. 1992); In re Disposable Contact Lens Antitrust Litig., 170 F.R.D. 524, 532 (M.D. Fla. 1996). Accordingly, "typicality in the antitrust context will be established by plaintiffs and all class members alleging the same antitrust violations by the defendants." In re Playmobil Antitrust Litig., 35 F. Supp. 2d 231, 241 (E.D.N.Y. 1998)(internal citation and quotation marks omitted).

However, "[w]hile it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." Gary Plastic Packaging Corp. v. Merrill Lynch, 903 F.2d 176, 180 (2d Cir. 1990)("Gary Plastic")(internal citations omitted), abrogated on other grounds by Microsoft Corp. v. Baker, 137 S. Ct. 1702 (2017).  A primary underlying concern is the "danger that absent class members will suffer if their representative is preoccupied with defenses unique to it."  Id.

As an initial matter, Defendants argue that Plaintiffs have made only conclusory statements alleging typicality, which is insufficient as a matter of law.  See Rossini v. Ogilvy & Mather, Inc., 798 F.2d 590, 597-98 (2d Cir. 1986)(citing Paxton v. Union Nat'l Bank, 688 F.2d 552, 562 (8th Cir. 1982)(burden of showing typicality not onerous, but requires "something more than general conclusory allegations")).  However, Plaintiffs note that all of the proposed members of the indirect-purchaser classes will prove the existence of a conspiracy and their damages in the same way: first, by establishing the conspiracy existed through evidence that is common to each member; second, by determining the amount of the unlawful overcharge for Digital

Music; and third, by demonstrating the amount of the unlawful overcharge that was passed through to the class members.  (Pl. Mem. Class Cert. at 16).  Because the Plaintiffs and the class members allege the same antitrust violation, the Court does not find that Plaintiffs' statements regarding the typicality of the legal issues are conclusory or insufficient as a matter of law.

Defendants further argue that the Proposed Class Representatives cannot show that they were harmed and therefore lack Article III standing.  (Def. Opp. Class Cert. at 46).  The Court has previously held that it will consider any standing arguments after class certification has been resolved.  See In re Digital Music II, 812 F. Supp. 2d at 405-07.  The Court adheres to its prior decision.

Finally, Defendants argue that the Proposed Class Representatives were cherry-picked and therefore are not typical of the class.  (Def. Opp. Class Cert. at 45-46).  The Court is well-aware that Plaintiffs have dedicated years of this litigation to adding and withdrawing Proposed Class Representatives in order to find individuals who can both provide proof of music download purchases during the class period and did not engage in illegal downloading.  (See Order at 10, Mar. 2, 2015, ECF No. 311)("[B]oth the timing of the efforts to withdraw the specified Proposed Class Representatives -- which came after the orders [dkt nos. 179, 253] compelling

discovery of unauthorized downloading -- and the affidavits submitted by some of the Proposed Class Representatives confirm the same thing: Plaintiffs want to avoid Court-ordered discovery."). In total, Plaintiffs have added 13 Proposed Class Representatives and withdrawn 13 others. (Def. Opp. Class Cert. at 45). Plaintiffs also repeatedly attempted to evade the Court's discovery orders requiring them to produce evidence of illegal downloading and complied only after five such orders. (See Discovery Order I, Dec. 27, 2012, ECF No. 179; Discovery Order II, May 5, 2014, ECF No. 253; Discovery Order III, June 6, 2014, ECF No. 261; Discovery Order IV, Aug. 12, 2014, ECF No 290; Order, Mar. 2, 2015, ECF No. 311). Defendants note that the current set of Proposed Class Representatives deny engaging in illegal downloading and produced some proofs of purchase, whereas the proposed class is filled with members who cannot demonstrate proof of purchase and downloaded music illegally. (Def. Opp. Class Cert. at 45-46). Defendants conclude that Plaintiffs have failed to meet the typicality requirement because the Proposed Class Representatives are not representative of the proposed class members. (Id. at 46).

    The Court is indeed mindful that many proposed class members will be subject to counterclaims for a setoff of Plaintiffs' damages as a result of having engaged in illegal downloading. See Memorex Corp. v. Int'l Bus. Mach. Corp., 555

F.2d 1379, 1382-8 (9th Cir. 1977)(explaining that "wrongdoing by
the plaintiff against the defendant[]" is "analogous to a
counterclaim, because it seeks an offset to plaintiff's
damages[]"); Valley Disposal Inc. v. Cent. Vt. Solid Waste Mgmt.
Dist., 113 F.3d 357, 364-365 (2d Cir. 1997)(stating that under
the Federal Rules a setoff claim "is to be made by means of
counterclaim")(citations omitted); see infra at 81-82.  The
Court of Appeals has instructed that class certification is
inappropriate where the Proposed Class Representatives -- as
opposed to absent class members -- are subject to unique
defenses on the grounds that the Representatives will become
preoccupied with addressing those defenses.  See Gary Plastic,
903 F.2d at 180.  It does not necessarily follow, however, that
class certification is appropriate under Gary Plastic where, as
here, it is the proposed class members who are subject to unique
defenses rather than the Representatives.

     The Court first notes that the composition of the proposed
class and the Proposed Class Representatives in terms of the
defenses available against them runs afoul of the plain text of
Rule 23(b)(3), which states that "the claims or defenses of the
representative parties are typical of the claims or defenses of
the class."  Fed. R. Civ. Proc. 23(b)(3)(emphasis added).  This
language persuades the Court that class certification is
inappropriate not only where Proposed Class Representatives are

subject to unique defenses, as under Gary Plastic, but also proposed class members.  Requiring at least some symmetry in the defenses to which the class and Representatives are subject also provides a necessary backstop to the discovery abuses evident in this litigation, where Plaintiffs have spent years engineering the current set of Class Representatives presumably in order to circumvent the rule in Gary Plastic.

Furthermore, the Court of Appeals has instructed that "the named plaintiff's claim and the class claims [must be] so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Mariso A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997)(quoting General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 157 n. 13).  While the Court of Appeals refers only to the Class Representative's claims, the language of Rule 23(b)(3) indicates that this reasoning applies also to available defenses.  Here, large numbers of the proposed class members engaged in illegal downloading of Digital Music and would therefore be subject to counterclaims on the basis of an unclean hands theory, while the Proposed Class Representatives would not.  These counterclaims would likely become the "focus of the litigation" if the Court were to grant Plaintiffs' motion for class certification.  See Gary Plastic, 903 F.2d at 180.  Accordingly, the Court cannot conclude that the interests of the Class Representatives and

proposed class are aligned or that the Representatives will be able to protect the interests of absent class members either fairly or adequately when Defendants advance counterclaims against only the latter.

The Court therefore finds that Plaintiffs have failed to satisfy the typicality requirement.  Plaintiffs' failure to satisfy all of the threshold criteria included in Rule 23(a) precludes class certification under Rule 23(b)(2) and Rule 23(b)(3).  Accordingly, the motion for class certification pursuant to Rule 23(b)(2) and Rule 23(b)(3) is denied.

iv. Adequacy of Representation

The adequacy requirement requires the Court to determine whether "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. Proc. 23(a)(4).  The district court must determine whether: "1) plaintiff's interests are antagonistic to the interest of other class members and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation."  In re Flag Telecom Holdings, Ltd. Secs. Litig., 574 F.3d 29, 35 (2d Cir. 2009)(citation omitted).  The adequacy inquiry serves to "uncover[] conflicts of interest between named parties and the class they seek to represent."  Id. (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997)).  However, "[t]he conflict that will prevent a plaintiff from meeting the Rule 23(a)(4)

prerequisite must be fundamental, and speculative conflict should be disregarded at the class certification stage." In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 145 (2d Cir. 2001)(citation omitted), overruled on other grounds by In re IPO, 471 F.3d 24 (2d Cir. 2006).

Defendants do not dispute that the adequacy of the Proposed Class Representatives to conduct this litigation.  There are no conflicts among the members of the classes, and the Court finds that counsel are qualified, experienced, and able to conduct this litigation.  Accordingly, the adequacy requirement is satisfied.

c. Ascertainability

Plaintiffs must also satisfy the "implied requirement of ascertainability" in order to certify a class pursuant to Rule 23(b)(2) and (b)(3).  In re IPO, 471 F.3d at 30; see also McBean v. City of New York, 260 F.R.D. 120, 132-33 (S.D.N.Y. 2009)("The requirement of ascertainability, though not expressly mentioned in Rule 23, is fundamental.").  The Court of Appeals has recently explained that the ascertainability requirement "asks district courts to consider whether a proposed class is defined using objective criteria that establish a membership with definite boundaries." In re Petrobras Secs., No. 16-1914-cv, at 39.  "[T]he touchstone of ascertainability is whether the class is 'sufficiently definite so that it is administratively

feasible for the court to determine whether a particular individual is a member.'" Brecher, 2015 WL 5438797 at *2 (quoting 7A Charles Alan Wright & Arther R. Miller et al., Federal Practice & Procedure § 1760 (3d ed. 1998)). Furthermore, "[a] class is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case." Charron v. Pinnacle Grp. N.Y. LLC, 269 F.R.D. 221, 229 (S.D.N.Y. 2010)(citations and internal quotation marks omitted). The standard for ascertainability is not a demanding one; it is "designed only to prevent the certification of a class whose membership is truly indeterminable." Ebin v. Kangadis Food, Inc., 297 F.R.D. 561, 567 (S.D.N.Y. 2014)(citation omitted).

Relying on the depositions of the Proposed Class Representatives, Defendants note that only six of the 20 Proposed Class Representatives produced proofs of music download purchases between 2001 and 2005. (See Def. Opp. Class Cert. at 42-43). Because most of the Proposed Class Representatives were unable to provide proofs of purchase of Digital Music during the early years of the class period, Defendants argue that Plaintiffs cannot show that the proposed classes are ascertainable by objective criteria. (Id.)

First, the Proposed Class Representatives have in fact provided proofs of purchase of their Digital Music purchases, except in a few exceptional circumstances. (See Youngwood Decl. Ex. 3, June 16, 2016, ECF No. 355). The cases on which Defendants rely involve situations where the plaintiffs could provide no record of their purchases. See Brecher, 806 F.3d at 26 (finding that ascertainability requirement is not satisfied where it is "practically impossible to trace purchases and sales"); Weiner v. Snapple Beverage Corp., 2010 WL 3119452, at *13 (S.D.N.Y. Aug. 5, 2010)("Snapple")("Plaintiffs offer no basis to find that putative class members will have retained a receipt, bottle label, or any other concrete documentation of their purchases . . ."); Ault v. J.M. Smucker Co., 310 F.R.D. 59, 64 (S.D.N.Y. 2015)(holding that allowing putative class members to "self-identify" was not administratively feasible for the purposes of ascertainability). Here, Plaintiffs have provided detailed information related to class member purchases of Digital Music, including credit card payments, confirmatory emails, records kept by digital retailers, and the Digital Music product itself, (see Pl. Reply Class Cert. at 23; Youngwood Decl. Ex. 3) -- criteria that is sufficiently objective to satisfy the ascertainability requirement. To the extent that proposed class members are unable to provide proofs of purchase or show the price paid for digital downloads, (see Def. Opp.

Class Cert. at 43-44; Read Decl. ¶ 9), their recovery would be limited or reduced.  The Court also finds that the class membership has definite boundaries: those persons who acquired Digital Music during the class period.  Accordingly, Plaintiffs have satisfied the ascertainability requirement.

Second, Plaintiffs propose an alternative methodology for ascertaining the identity of putative class members.  Professor Noll explains in his declaration that "e-retailers keep extensive records about their customers for the purpose of direct advertising and promotion, and geographic identification of their customers has been produced in other antitrust cases." (Noll Decl. at 55).  He further states that he "had access to retail transactions from Apple, Sony and other e-retailers . . . in the e-book antitrust litigation." (Id. at 55 n. 62).  In that case, In re Elec. Books Antitrust Litig., the Court held that the existence of digital transaction records made the class members readily ascertainable.  2014 WL 1282293, at *24 (S.D.N.Y. Mar. 28, 2014).

Defendants argue that Plaintiffs have provided no evidence that the "DSPs retained records of music download sales to specific consumers, let alone records for sales going back 15 years," except for the ipse dixit statements Professor Noll makes in his declaration.  (Def. Opp. Class Cert. at 43).  It is certainly true that a statement in the record from Apple or

another DSP substantiating that it possesses Digital Music
transaction data throughout the proposed class period would have
greatly simplified the Court's ascertainability determination.
The Court notes that Professor Noll is qualified as an expert in
the field of antitrust economics and the economics of specific
industries, including the entertainment industry and the
information technology industry.  (See Noll Decl. at 1; see also
In re Napster, Inc., Copyright Litig., 191 F. Supp. 2d 1087,
1108 (N.D. Cal. 2002)(arguments "based primarily on the
declaration of Roger Noll, a Stanford professor who specializes
in antitrust economics and the recording industry").  He is not,
however, qualified as an expert in the data retention policies
of DSPs, and there is no objective criteria that would allow the
Court to infer that DSPs retain transaction data for e-books in
the same manner that they do for Digital Music.  The "mere
assertion that records exist to identify many class members does
not suffice" where the Defendants "sell[] to retailers and
distributors, not to consumers, and therefore has no records
regarding the ultimate purchasers."  Ault, 310 F.R.D. at 64
(internal quotation marks omitted).  Accordingly, while
Plaintiffs have independently satisfied the ascertainability
requirement on the basis of the transaction records produced by
the Proposed Class Representatives, the Court does not find that
the transaction data allegedly retained by Apple and other DSPs

will render the proposed class members ascertainable if the
class is certified.

      d. Rule 23(b)(2) Requirements

    Plaintiffs seek to certify a Rule 23(b)(2) class in order
to enjoin Defendants' allegedly "collusive practices and
polices" that artificially maintain or inflate Digital Music
prices in the United States.  (Pl. Mem. Class Cert. at 17-18).
Rule 23(b)(2) certification is warranted where Defendants have
"acted or refused to act on grounds generally applicable to the
class, thereby making appropriate final injunctive relief or
declaratory relief with respect to the class as a whole."
Freeland v. AT&T Corp., 238 F.R.D. 130, 139-40 (S.D.N.Y.
2006)(internal quotation marks and citation omitted); MacNamara
v. City of New York, 275 F.R.D. 125, 141 (S.D.N.Y.
2011)("[C]ertification under Rule 23(b)(2) is appropriate only
where injunctive . . . relief applies to the class as a
whole[.]").  Plaintiffs' motion for class certification pursuant
to Rule 23(b)(2) fails for two reasons.

    First, class certification under Rule 23(b)(2) is
"inappropriate when the majority of the class does not face
future harm." Maldonado v. Ochsner Clinic Found., 493 F.3d 521,
525 (5th Cir. 2007)(citation omitted).  As Defendants note,
Plaintiffs have proffered no evidence that Defendants are
currently engaging in anticompetitive conduct or that there is a

risk to the class of future harm.  (Def. Opp. Class Cert. at

37).  Plaintiffs state that they "believe" that Defendants'

alleged anticompetitive conduct is ongoing, (Pl. Mem. Class

Cert. at 18), and that "[t]here is no indication this conduct

has halted," (Pl. Reply Class Cert. at 27), but such conclusory

allegations are insufficient to demonstrate a likelihood of

future harm, see MacNamara, 275 F.R.D. at 141.  Plaintiffs' own

expert, Professor Noll, concedes the infeasibility of

maintaining a price-fixing conspiracy in a world with variable

download pricing, which Apple first introduced eight years ago

in 2009.  (See Youngwood Decl. Ex. 16 (Noll Dep.) at 58:7-

59:15).  Accordingly, because Plaintiffs have provided no basis

for their allegation that there is a threat of future harm to

the proposed class, the Court finds that class certification

pursuant to Rule 23(b)(2) is inappropriate.

Second, "Rule 23(b)(2) applies only when a single

injunction or declaratory judgment would provide relief to each

member of the class."  Dukes, 564 U.S. at 341.  The Court of

Appeals has clarified that "relief to each member of the class"

does not "require that the relief to each member of the class be

identical, only that it be beneficial."  Sykes, 285 F.R.D. at 97

(emphasis added); Dukes, 564 U.S. at 362 (a Rule 23(b)(2) class

is designed to seek "an indivisible injunction benefitting all

its members at once.").

Plaintiffs fail to show that the proposed injunction would benefit every member of the class. Professor Noll stated in his deposition that, in the but-for world absent the alleged price-fixing conspiracy, he "would have expected that right from the beginning, there would have been variable pricing of digital downloads. (Noll. Dep. at 137:11-138:24). Furthermore, when asked whether some digital downloads would have been priced higher than the standard $.70 wholesale and $.99 retail prices that Professor Noll argues resulted from price collusion, he responded "most likely." (Id. at 144:5-24). Accordingly, in Professor Noll's own damages model, prices in the but-for world of at least some single track downloads would be higher than they are under the alleged conspiracy. (See Ordover Decl. ¶¶ 88-89). Plaintiffs' model therefore does not show that an injunction against "collusive practices and policies" would inure to the benefit of all indirect-purchaser class members in the form of lower retail prices. Indeed, the proposed injunction would in fact likely be harmful to at least some of the class members. Injunctive relief under Rule 23(b)(2) is inappropriate under these circumstances.

The Court has considered Defendants' other arguments regarding Rule 23(b)(2) and considers them to be without merit. The motion for class certification pursuant to Rule 23(b)(2) is denied.

e. Rule 23(b)(3) Requirements

To certify a class under Rule 23(b)(3), Plaintiffs must establish that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, predominate over those issues that are subject only to individualized proof." Snapple, 2010 WL 3119452, at *5 (internal quotation marks and citations omitted). Plaintiffs also must show "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. Proc. 23(b)(3).

i. Price Variability in the But-For World

Rule 23(b)(3)'s predominance requirement requires Plaintiffs to "show that they can prove, through common evidence, that all class members were . . . injured by the alleged conspiracy." Sykes, 780 F.3d at 82 (internal quotation marks and citations omitted). The predominance requirement is not satisfied if "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." Comcast, 133 S. Ct. at 1433; Abu Dhabi Commercial Bank v. Morgan Stanley & Co., 269 F.R.D. 252, 266 (S.D.N.Y. 2010)("[Where there are] individual issues necessarily involved in determining liability and damages, common issues do not predominate over individual issues that must be litigated to resolve plaintiffs' claims.").

Defendants argue that Professor Noll's model fails to account for price variability in the but-for world. (Def. Opp Class Cert. at 20-22). As explained above, supra at 61-62, Professor Noll stated in his deposition that in the but-for world he "would have expected that right from the beginning, there would have been variable pricing of digital downloads" and that "most likely" some music downloads would have been priced higher than $.70 wholesale and $.99 retail prices that resulted from the alleged conspiracy. (Noll Dep. at 137:11-138:24, 144:5-24). Accordingly, in the but-for world, prices of some digital downloads would have been higher than they were under the alleged conspiracy. (See Ordover Decl. ¶¶ 87-90). Applying Professor Noll's overcharge methodology, Professor Ordover estimates that Defendants would have charged a but-for price of $.82 for single tracks in the highest price tier, with a $1.16 retail price after incorporating Professor Noll's 140% pass-through rate. (Id. ¶ 89). These prices are significantly higher than Professor Noll's conspiracy prices of $.70 wholesale and $.99 retail.

The significance of Professor Ordover's argument for the purposes of the predominance requirement is that class members who bought music that, in the but-for world, would have been priced above the $.99 retail price cannot claim to have been overcharged for that purchase as a result of the conspiracy.

64

Determining whether any given class member was injured by the alleged conspiracy or, in fact, benefited from it by paying less for music downloads than he or she otherwise would have, would require analyzing each purchase made by that class member and determining the price at which each such track would have been sold in a world absent the alleged conspiracy.  In other words, the prevalence of price variability in the but-for world, which Professor Noll concedes mostly likely would have existed, would require the Court to perform a host of individualized inquiries regarding price tiers of Digital Music sold during the class period and the purchase histories of each of the millions of proposed class members.

While Plaintiffs offer several arguments in their reply, none is persuasive.  First, Plaintiffs state that Professor Ordover impeaches his own position when he admits in his deposition testimony that pricing would not have been variable during the early years of the class period and that he could not pinpoint when variable pricing would have occurred in the but-for world.  (Pl. Reply Class Cert. at 8).  As an initial matter, it is clear from Professor Ordover's deposition transcript that he made no such admission.  (Ordover Dep. Tr. at 220:22-221:8)("Q.: Do you believe that tiered pricing would have came [sic] before 2009?  A.: I believe if Apple were to agree to such tiered pricing before 2009, the answer is yes.  It is my

understanding that the record companies, which are very much familiar with tiered pricing and use it creatively all the time in the physical world, would have introduced tiered pricing."). Furthermore, Professor Ordover could not pinpoint the exact time tiered pricing would have emerged because "I have not set that as an assignment for myself . . ." (Id. at 221:22-23).  More importantly, Plaintiffs do not refute that it is their own expert, Professor Noll, who concedes that there would have been price variability in the but-for world and that "most likely" some prices in the but-for world would have been higher than prices under the alleged conspiracy.

Second, Plaintiffs argue that Professor Noll used a standard method of measuring damages by comparing the profitability of a benchmark product (CDs) to digital downloads, determining overcharges as a percentage of the actual amount of money charged.  (Pl. Reply Class Cert. at 8).  Accordingly,

> the wholesale price does not matter in determining
> damages -- the percentage is the same no matter the
> wholesale price.  Defendants present no evidence to
> the contrary that margins on digital downloads will
> vary based on wholesale prices once the model changes
> to a variable price model. . . . Further . . .
> Plaintiffs were denied detailed cost data necessary to
> determine if margins on higher cost digital downloads
> were not the same as standard priced digital
> downloads.

(Id. at 8-9).

Lost in Plaintiffs' discussion is an explanation of the relevance of margins on digital downloads and missing cost data to Defendants' argument that, because of price variability in the but-for world, prices of some digital downloads would have been higher than they were under the alleged conspiracy.  Even if Defendants had produced evidence that margins on digital downloads vary based on wholesale prices, it is nevertheless the case that by Professor Noll's own admission some class members would have benefited from the alleged price-fixing conspiracy. Plaintiffs' discussion of margins does not refute the argument that Plaintiffs have failed to show that they can prove by common evidence that all class members were injured by the conspiracy or that individualized inquiries into damage calculations would not overwhelm questions common to the class.

Finally, Plaintiffs argue that, if Defendants are correct, "there would be many price points based on the popularity of different artists and songs," as opposed to the only three price tiers that were introduced in 2009.  (Pl. Reply Class Cert. at 9).  Plaintiffs provide no support for this assertion. Furthermore, the lack of more than three price tiers since 2009 does not give rise to a doubt that variable pricing would have existed in the but-for world, which Plaintiffs' expert concedes.

Because Professor Noll's model fails to account for price variability in the but-for world, Plaintiffs have failed to show

that they can prove by common evidence that all class members were injured by the alleged price-fixing conspiracy. See Sykes, 780 F.3d at 82. Furthermore, if the Court were to certify the class pursuant to Rule 23(b)(3), it is clear that individual issues related to damage calculations would overwhelm questions common to the class. See Comcast, 133 S. Ct. at 1433. Accordingly, Plaintiffs have failed to satisfy Rule 23(b)(3)'s predominance requirement.

ii. Professor Noll's Uniform Pass-Through Rate

Defendants argue that Professor Noll's model is not susceptible to class-wide proof because it ignores the role of Apple in setting prices for music downloads and assumes that changes in wholesale prices drive changes in retail prices, rather than vice versa. (Def. Opp. Class Cert. at 27-28). As Professor Ordover states, "this is an assumption, not a 'result' of the regression -- [Professor Noll's] regression cannot (and does not) determine the direction of the causal effects." (Ordover Decl. ¶ 117). Determining the direction of the causal effect "must be informed by examining how the industry operates, which Professor Noll has not done." (Id.) In support of his assertion, Professor Ordover cites two newspaper articles. (Id. ¶ 114 n. 132 (Apple sets tune for pricing of song downloads, Financial Times, May 1, 2006; Apple wins iTunes pricing battle, CNN, May 2, 2006 ("Four largest record companies defeated in

behind-the-scenes battle to charge different prices for songs,
downloads still 99 cents, paper says."))).  Defendants also cite
an internal pricing document stating that the price of "█████████
███████████████████████████████████████████████████████████."
(Youngwood Decl., Ex. 12 at 1 [SME-DM0180320]).

In response, Plaintiffs cite documents purporting to show
"that it was Defendants, not Apple, that set the wholesale
price."  (Pl. Reply Class Cert. at 7).  For example, internal
WMG documents indicate ███████████████████████████████████
█████████████████, (see Rayle Decl. Ex. 5 [WMG-00006735], Nov.
7, 2016, ECF No. 369), ████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████, (see id. [WMG-DM-00004280; UMGDM000123]).
Plaintiffs also point to Professor Ordover's deposition
testimony, in which he notes that Apple and the record companies
engaged in negotiations regarding wholesale price.  (Ordover Tr.
at 299-304).

However, Plaintiffs' counterargument misses the point of
Professor Ordover's opinion.  Professor Ordover states:

> [T]he causation between wholesale and retail prices
> flows in both directions: not only do wholesale prices
> affect retail prices, but Apple's decision on what
> retail prices to charge also drives the wholesale
> prices it pays.  Presuming that causation only runs
> from wholesale prices to retail prices, as Professor
> Noll has done, renders his inference from the
> regression invalid: his regression cannot determine

how a change in wholesale prices would have affected
retail prices.

(Ordover Decl. ¶ 118).  Because Professor Noll assumes despite

contrary evidence that the retail price is a linear function of

the wholesale price, i.e., that causation runs solely from

wholesale prices to retail prices, his finding of a uniform 140%

pass-through rate is unreliable.  (See Noll Decl. at 54-55).

Accordingly, Plaintiffs have failed to show that the alleged

price-fixing conspiracy's effect on retail prices for music

downloads is susceptible to generalized proof.

Defendants further argue that Professor Noll examines data

only from Apple and that there is no basis to assume that his

uniform pass-through rate accurately describes how wholesale

prices would have affected retail prices charged by other DSPs.

(Def. Opp. Class Cert. at 28).  While Apple was the largest DSP

during the class period, Professor Ordover notes that other DSPs

account for approximately 20% of the total track sales during

the period for which Defendants provided transaction data (2002-

2007).  (Ordover Decl. ¶ 124).  For example, Walmart charged a

uniform retail price of $.88 per track from its Digital Music

store from 2004 until 2011, even though it faced ███████

███████████████████████████████████████████████████████

██████████████████████████████████████.  (See Ordover Decl.

¶ 125; Youngwood Decl. Ex. 10 [SME-DM-0159637] (internal Sony

emails discussing Walmart pricing strategy)).  Accordingly, despite facing varying wholesale prices, Walmart charged a uniform retail price, suggesting there was a zero pass-through rate for Walmart's sales of digital downloads.  Given the absence of a common pass-through rate, determining the correct pass-through would require conducting separate inquiries for each DSP.  However, "[c]lass certification is problematic where a plaintiff's method of proving pass-through requires a reseller-by-reseller analysis."  In re Graphics Processing Units Antitrust Litig., 253 F.R.D. 478, 505 (N.D. Cal. 2008).

Because the evidence does not support Professor Noll's uniform pass-through rate, his model fails to provide a common methodology for assessing either injury or damages such that Plaintiffs can show that class-wide issues predominate over individual issues.  See Del Monte, 2008 WL 5661873, at *5-6 (declining to certify indirect purchaser class where wholesale and retail price data did not support expert's conclusion of a %100 pass-through rate).

iii. Defendants' Unclean Hands Defenses

"In determining whether common issues of law or fact predominate, the Court cannot ignore the issues of fact which are likely to arise in defense of the class claims."  Cont'l Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater N.Y., Inc., 198 F.R.D. 41, 47 (E.D.N.Y. 2000)(citation omitted).

Defendants note that two of the Proposed Class Representatives
admitted in their depositions to pirating Digital Music and that
a third refused to produce documents that might expose his
participation in illegal downloading.  (Def. Opp. Class Cert. at
29).  Professor Ordover also cites evidence of widespread
illegal downloading of Defendants' music during the class
period, indicating that between 2004 and 2009 approximately 30
billion songs were illegally downloaded on file-sharing networks
and that only 37% of music acquired by U.S. consumers in 2009
was legally purchased.  (Ordover Decl. ¶¶ 102-04).  Defendants
have accordingly asserted unclean hands defenses in their
Answers.  (Sony Music Entertainment Answer at 31, Nov. 3, 2015,
ECF No. 334; Capitol-EMI Music, Inc., Universal Music Group
Recordings, Inc. Answer at 24, Nov. 3, 2015, ECF No. 335; Warner
Music Group Corp. Answer at 20, Nov. 3, 2015, ECF No. 336).

    Defendants argue that their unclean hands defenses
necessarily entail individualized inquiries into each class
member's illicit downloading activities.  See Snapple, 2010 WL
3119452, at *10 (common issues do not predominate where
determining injury would require "an examination of each of the
millions of class members' [] purchases, which the evidence
shows were made in different locations, at different times, and
for different prices, over the nearly eight-year class period").
Defendants therefore argue that individualized questions would

overwhelm any common issues, rendering class certification improper.

Plaintiffs offer several counterarguments, several of which the Court has considered and rejected on previous occasions. First, Plaintiffs argue that Defendants may not assert an unclean hands defense in an antitrust action. (Pl. Reply Class Cert. at 16). In Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., the Supreme Court held that a plaintiff in an antitrust suit could not be barred from recovery because he or she had engaged in an unrelated conspiracy to commit a separate antitrust violation. 340 U.S. 211, 214 (1951); see also In re Air Cargo Shipping Servs. Antitrust Litig., 2010 WL 4916723, at *4 (E.D.N.Y. Nov. 24, 2010)("The Supreme Court has clearly expressed that an in pari delicto defense -- i.e., a defense that rests on a claimant's own fault or unclean hands -- may be asserted in an antitrust case only where, as a direct result of the claimant's conduct, the claimant bears at least substantially equal responsibility for the violations he seeks to redress.")(internal citation and quotation omitted).

It is true that neither the unclean hands doctrine nor the in pari delicto defense may be asserted as a bar against damages in an antitrust suit. See Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 139 (1968)(in pari delicto defense); Kiefer-Stewart Co., 340 U.S. at 214 (unclean

hands defense).  However, "[n]either Perma Life nor Kiefer-
Stewart suggests that otherwise readily admissible evidence must
be excluded because it might also be relevant to an in pari
delicto or unclean-hands defense.  In fact, Perma Life
explicitly states that such evidence 'can of course be taken
into consideration in computing damages.'" U.S. Football League
v. Nat'l Football League, 842 F.2d 1335, 1369 (2d Cir.
1988)(collecting cases where evidence of plaintiff's wrongdoing
may be relevant).

Plaintiffs misconstrue Defendants' unclean hands defense.
Defendants have made clear multiple times throughout this
litigation that they do not seek to bar Plaintiffs' recovery,
but rather application of a non-fault-based theory of offset
where "[t]he court's task . . . is to award damages to put the
plaintiff into the position it would have been, absent the
antitrust violation." L.A. Mem'l Coliseum v. Nat'l Football
League, 791 F.2d 1356, 1367 (9th Cir. 1986).[2]  Under this theory,

---

[2] In a footnote, (Pl. Reply Class Cert. at 16 n. 10), Plaintiffs
argue that Defendants have waived their offset theory because
they did not include it in their opposition to the class
certification motion.  However, Defendants have advanced this
theory on multiple occasions and have informed the Court
that they intend to seek counterclaims against proposed class members
for illegal downloading of Digital Music if the damages classes
are certified.  (See e.g., Letter from Angelique Kaounis at 3,
Aug. 1, 2014, ECF No. 288; Def. Mem. in Opp. to Mot. for
Reconsid. of Aug. 11, 2014 Order at 11-12, Aug. 29, 2014, ECF
No. 296).  Accordingly, the Court does not consider Defendants

if the alleged price fixing inflated the prices for Digital
Music such that Plaintiffs responded by illegally obtaining
songs for free, the Court would necessarily have to conduct an
individualized inquiry into evidence of illegal downloading by
the proposed class members in order to determine whether such an
offset is necessary for each individual plaintiff.  Because
Plaintiffs propose nine separate damages classes with millions
of potential members, this individualized inquiry would quickly
overwhelm questions common to the class.

Second, Plaintiffs resurrect an argument initially raised
in 2012, (see Letter from Bonny E. Sweeney & Christopher Lovell
to Hon. Loretta A. Preska (Oct. 17, 2012)), asserting that the
unclean hands doctrine can only apply where Plaintiffs' conduct
is "sufficiently related to the subject matter of the
litigation."  (Pl. Reply Class Cert. at 17).  While correct,
Plaintiffs' view of "sufficiently related" is overly narrow.  Of
the nine states in which Plaintiffs seek to certify damages
classes, it does appear that Florida courts are strictest with
regard to how close the unclean hands defense must relate to the
subject matter of the litigation. See Gastaldi v. Sunvest Resort
Cmtys. LC, 2010 WL 457243, at *9 (S.D. Fla. Feb. 3,
2010)("[W]e're talking really directly related . . . matter in

---

to have waived their offset theory for the purposes of the class
certification motion.

litigation to which the unclean-hands conduct relates must be the basis of the plaintiff's claim.")(internal citation and quotation omitted)(emphasis in original).

However, in Salas v. Sierra Chem. Co., the California Supreme Court explained that the "[t]he misconduct which brings the clean hands doctrine into operation must relate directly to the transaction concerning which the complaint is made, i.e., it must pertain to the very subject matter involved and affect the equitable relations between the litigants." 59 Cal. 4th 407, 432 (Cal. 2014). Other states in which Plaintiffs seek class certification stress that the unclean hands doctrine can only apply where Plaintiffs' conduct relates to the "same transaction" as Defendants' challenged conduct. See, e.g., Int'l Tours & Travel, Inc. v. Khalil, 491 A.2d 1149, 1155 (D.C. 1985)("The equitable doctrine of unclean hands only applies where there is misconduct by the plaintiff in the same transaction that is the subject of his claim."); Peterson v. Holiday Recreational Indus., 726 N.W.2d 499, 505 (Minn. Ct. App. 2007)("The [unclean hands doctrine] does not apply where the relief sought by the plaintiff and the equitable right claimed by the defendant belong to or grow out of two entirely separate and distinct matters or transactions.")(internal citation and quotation omitted); Ezell v. Quon, 224 Ariz. 532, 538 (Ct. App. 2010)("In order for the doctrine of clean hands to bar a claim

for equitable relief, any acts of bad faith or unconscionable
conduct by [the plaintiff] must relate to the same activity that
is the basis for [the] claim.")(internal citation and quotation
omitted); Pioneer H-Bred Int'l, Inc. v. Holden Found. Seeds,
Inc., 1987 WL 341211, at *42 (S.D. Iowa Oct. 30, 1987)(relief
sought by plaintiff and the equitable defense asserted by
defendant must grow out of the transaction in suit); McKeighan
v. Citizens Commercial & Savings Bank, 302 Mich. 666, 671
(1942)("The misconduct which will move a court of equity to deny
relief must bear a more or less direct relation to the
transaction concerning which complaint is made.").

The transactions at issue in this litigation concern the
acquisition of Digital Music.  Illegal downloading of Digital
Music by Plaintiffs certainly "pertains to" or "grows out" of
this very subject matter.  Furthermore, illegal downloading
necessarily "affect[s] the equitable relations between the
litigants."  See Salas, 59 Cal. at 432; McKeighan, 302 Mich. at
671.  As Defendants have stated succinctly during this
litigation, "[a] Plaintiff may not complain that one hand is
being overcharged while the other hand is robbing the store."
(Flores Ltr. to Hon. Loretta A. Preska, at 2 (Oct. 18, 2012)).
The Court therefore rejects Plaintiffs' assertion that
Defendants' unclean hands defense is not sufficiently related to
the subject matter of this litigation.

Third, Plaintiffs argue, as they have on multiple previous occasions, that Defendants may not assert an unclean hands defense under California's Unfair Competition Law ("UCL"). (Pl. Reply Class Cert. at 17-18). Plaintiffs cite Cortez v. Purolator Air Filtration Prods. Co., which states that "equitable defenses may not be asserted to wholly defeat a UCL claim since such claims arise out of unlawful conduct." 23 Cal. 4th 163, 179 (2000).

However, Cortez also states that "[i]n deciding whether to grant the remedy or remedies sought by a UCL plaintiff, the court must permit the defendant to offer such [equitable] considerations." Id. at 181. Indeed, in cases where (1) defendants do not seek to employ equitable defenses wholly to defeat a cause of action and (2) there is no statutory bar on the use of relevant information, courts have considered unclean hands at the class certification stage. See Graham v. Overland Solutions, Inc., 2011 U.S. Dist. LEXIS 49304, at *7-8 (S.D. Cal., May 9, 2011)(denying class certification in a case involving a UCL claim where the "unclean hands defense goes directly to the heart" of the claim that class representatives "were not paid all that they were owed."); see also Mazur v. eBay, Inc., 257 F.R.D. 563, 568-69 (N.D. Cal. 2009)("Mazur . . . could be subject to unique defenses, thereby making her an atypical plaintiff. Defendants assert that Mazur is subject to

both an unreasonable reliance defense and an unclean hands
defense.  While the court need not, and does not, determine the
merits of these defenses, the fact that Mazur may be subject to
these defenses at all puts her in a different position from the
rest of the putative class.")(citations omitted).  Accordingly,
under California law, the existence of equitable claims that
will have to be considered at the remedial stage must inform the
Court's consideration of whether individual or common claims
predominate.  Plaintiffs are therefore wrong that Cortez
forecloses the assertion of an unclean hands defense; indeed,
California law affirmatively requires courts to weigh equitable
considerations as the class certification stage.

Additionally, in a footnote, Plaintiffs dispute Defendants'
assertion that, under Michigan law, "[t]he . . . clean hands
doctrine . . . is applicable to both equitable and legal damages
claims."  Maldonado v. Ford Motor Co., 476 Mich. 372, 389
(2006).  Plaintiffs argue that "Maldonado makes plain that
Michigan's antitrust statute follows federal precedent and does
not allow an unclean hands defense in an antitrust action."
(Pl. Reply Class Cert. at 18 n. 14).  Plaintiffs provide no
support for this assertion from the case.  Considering that
Maldonado concerns a sexual harassment claim, not an antitrust
statute, in which the central issue "pertains to the extent of a
trial court's authority to govern the conduct of counsel and

their clients in court proceedings," 476 Mich. at 375, the Court is unable to determine the basis of Plaintiffs' argument.

Lastly, Plaintiffs argue that Defendants have the burden of proof for their affirmative defenses, including unclean hands. (Pl. Reply Class Cert. at 19); see Gidatex, S.r.L. v. Campaniello Imports, Ltd., 82 F. Supp. 2d 126, 130 (S.D.N.Y. 1999); MBIA Ins. Corp. v. Patriarch Partners VIII, LLC, 842 F. Supp. 2d 682, 712 (S.D.N.Y. 2012). Plaintiffs urge that statistics indicative of widespread illegal downloading do not prove that it was the proposed class members who illegally downloaded Digital Music. (Pl. Reply Class Cert. at 19). Plaintiffs note that only three of the Proposed Class Representatives admitted to engaging in illegal downloading and allege, without citing any sources or evidence or providing any explanation, that "after a review of hundreds of thousands of files, only a miniscule fraction were found as potentially questionable." (Id. at 20).

While Plaintiffs are correct that Defendants bear the burden of proving any affirmative defenses, Plaintiffs appear to demand that Defendants have already conducted discovery regarding the millions of proposed class members at the class certification stage in order to determine which among them engaged in illegal downloading of Digital Music. The Court of Appeals has instructed that "[t]o avoid the risk that a Rule 23

hearing will extend into a protracted mini-trial of substantial portions of the underlying litigation, a district judge must be accorded considerable discretion to limit both discovery and the extent of the hearing on Rule 23 requirements." In re IPO, 471 F.3d at 41.  A district court must, however, receive sufficient evidence to determine that the requirements for class certification under Rule 23 have -- or have not -- been satisfied.  See id.  The Court declines to sanction Plaintiffs' onerous demand that Defendants conduct discovery regarding potentially millions of proposed class members at this still early stage in the litigation.  Moreover, Defendants have provided more than sufficient evidence for the Court make its determination regarding the predominance requirement, as explained below.

In the context of the typicality requirement, "[t]he defendant need not show at the certification stage that [a] unique defense will prevail, only that it is meritorious enough to require the plaintiff to devote considerable time to rebut the unique defense." Lapin v. Goldman Sachs & Co., 254 F.R.D. 168, 179 (S.D.N.Y. 2008)(citation and internal quotation omitted).  Although Lapin did not discuss its holding in the context of the predominance requirement, the rule is nonetheless a useful one where Defendants have credibly demonstrated that in 2001 "[l]ess than one-in-ten (8%) Downloaders . . . actually

paid for the music files they . . . downloaded" and that in 2009
-- after the advent of iTunes -- still only 37% of music
acquired by U.S. consumers was legally purchased.  (Ordover
Decl. ¶¶ 103-04).  It is also apparent that two of the Proposed
Class Representatives admitted to pirating music and another
third refused to produce documents that might have shown that he
engaged in illegal downloading.  (Def. Opp. Class Cert. at 29).
Finally, citing an Ipsos-Insight study from May 2004, Professor
Ordover notes that over half of consumers engaged in both legal
and illegal downloading of Digital Music.  (Ordover Decl. ¶ 104
n. 121).

     These overwhelming statistics, in addition to evidence from
the deposition testimony of the Proposed Class Representatives,
are relevant to the predominance requirement because they allow
the Court to draw the inference that a significant percentage of
the proposed class members engaged in illegal downloading and
that Plaintiffs will have to "devote considerable time to rebut"
Defendants' unclean hands defense.  Lapin, 254 F.R.D. at 179
(internal citation and quotation marks omitted).  Accordingly,
the Court finds that individual questions would quickly
overwhelm common issues if the Court were to grant the motion
for class certification.

     Citing Dukes, Plaintiffs argue that Defendants are barred
from sampling evidence if the sample cannot be shown to be

representative of the class as a whole.  See 564 U.S. at 358.
As an initial matter, Defendants have done more than simply
sample evidence: in addition to the three Proposed Class
Representatives who are shown to have illegally downloaded
Digital Music, Professor Ordover provides data indicating the
widespread practice of illegal downloading during the class
period.  (Ordover Decl. ¶¶ 103-04).  Furthermore, the section of
Dukes on which Plaintiffs rely concerns Rule 23's commonality
requirement, not predominance, and did not concern potential
affirmative defenses.  Dukes, 564 U.S. at 338.  While Defendants
do bear the burden of proving affirmative defenses, there is no
support in the case law that Defendants, rather than Plaintiffs,
must show that a sampling of evidence is representative of the
class as a whole.  Finally, Dukes relied in part on Teamsters v.
United States, 431 U.S. 324, 338 (1977), in which the Government
provided forty anecdotes of racial discrimination representing
one account for every eight members of the class.  Dukes deemed
this one-eighth ratio sufficient for the plaintiffs to meet the
commonality requirement.  See 564 U.S. at 358-360.  Here,
Plaintiffs allege that the proposed class includes potentially
millions of members.  (See Pl. Reply Class Cert. at 20).
Assuming arguendo that the class is comprised of only one
million members and applying the same sampling ratio of one-
eighth, Plaintiffs appear to demand that Defendants provide

evidence that at least 125,000 class members engaged in illegal downloading to determine if the sample was representative of the class as a whole.  As stated above, the Court will not sanction such an onerous discovery requirement on Defendants at the class certification stage, particularly where Defendants do not bear the burden of satisfying the Rule 23 requirements.  As indicated by Lapin, Defendants need not show that the unclean hands defense will prevail but only that it is meritorious enough to require Plaintiffs to devote considerable time to its rebuttal. Defendants have satisfied this burden.

All of Plaintiffs' arguments to exclude Defendants' unclean hands defense therefore lack merit.  Considering the scale of illegal downloading of Digital Music that took place during the class period, Defendants' counterclaims on the basis of unclean hands and individual damage calculations would rapidly become the focus of this litigation if the Court were to certify Plaintiffs' indirect purchaser classes.  Accordingly, common issues do not predominate over individual issues, and Plaintiffs have failed to meet Rule 23(b)(3)'s predominance requirement on this basis as well.

            iv. Manageability

Rule 23(b)(3) includes a nonexhaustive list of factors pertinent to the predominance and superiority requirements, one of which is the "likely difficulties in managing a class

action." Fed. R. Civ. Proc. 23(b)(3)(D); see In re Am. Int'l

Grp., Inc. Secs. Litig., 689 F.3d 229, 242 (2d Cir. 2012).

Defendants argue that Plaintiffs have failed to show that

differences in the antitrust laws of the nine different states

where they seek class certification would not render the

proposed indirect-purchaser classes unmanageable.

Where proposed classes would implicate the laws of multiple

states, the party seeking class certification "must creditably

demonstrate, through an extensive analysis of state law

variances, that class certification does not present insuperable

obstacles." Walsh v. Ford Motor Co., 807 F.2d 1000, 1016 (D.C.

Cir. 1986)(internal quotation marks omitted); see In re Am. Med.

Sys., Inc., 75 F.3d 1069, 1085 (6th Cir. 1996)("If more than a

few of the laws of the fifty states differ, the district judge

would face an impossible task of instructing a jury on the

relevant law," and class certification would be inappropriate).

However, "if the applicable state laws can be sorted into a

small number of groups, each containing materially identical

legal standards, then certification of subgroups embracing each

of the dominant legal standards can be appropriate." Sullivan

v. DB Invs., Inc., 667 F.3d 273, 302 (3d Cir. 2011)(internal

citation and quotation omitted).

Citing several state civil codes and case law, Plaintiffs

note that all the state competition laws are to be construed in

harmony with federal antitrust statutes.   (Pl. Mem. Class Cert.
at 25, 25 n. 6).   Nevertheless, there are numerous differences
between and among the states' laws.   For example, the requisite
proof of injury may vary: "the indirect purchases statutes of
Florida . . . Michigan, and Minnesota require a somewhat
stronger and more precise showing of individual impact."   In re
Relafen Antitrust Litig., 221 F.R.D. 260, 282 (D. Mass. 2004).
So too does the requisite threshold for antitrust damages:
Michigan and Arizona, for example, provide for treble damages
only upon a showing that a defendant's violation was "flagrant."
A & M Supply Co. v. Microsoft Corp., 252 Mich. App. 580, 583
(Mich. Ct. App. 2002); Ariz. Rev. Stat. § 44-1408(B).

There are also differences among the states' laws
concerning Defendants' affirmative defenses.   See Gustafson v.
BAC Home Loans Servicing, LP, 294 F.R.D. 529, 546 (C.D. Cal.
2013)(denying class certification, among other reasons, on the
grounds of "numerous variations among states' laws regarding
several of the defenses that may apply").   In Florida, the
defense of unclean hands turns in part on whether the "unclean"
conduct was generally connected to the matter in litigation and
injured the adverse party.   Gastaldi, 2010 WL 457243, at *8.
California, by contrast, applies a multi-factor test that looks
at, among other things, the nature of the misconduct and the
relationship of the misconduct to the claimed injuries.   Blain

v. Doctor's Co., 222 Cal. App. 3d 1048, 1060 (Cal. Ct. App.
1990).  In South Dakota, the defense turns on whether Plaintiffs
"acted fairly and in good faith as to the controversy in issue."
Miller v. Cty. Of Davison, 452 N.W. 2d 119, 121 (S.D. Sup. Ct.
1990); see also Clay v. Am. Tobacco Co., 188 F.R.D. 483, 501
(S.D. Ill. 1999)("Those states that permit a defense of unclean
hands vary significantly in the requirements necessary to
establish the defense.")(citations omitted).

Finally, Defendants note that this case may implicate
various choice of law determinations to resolve which state's
law will apply in situations where non-resident class members
bought Digital Music while physically located in one of the nine
states.  See Georgine v. Amchem Prods., Inc., 83 F.3d 610, 627
(3d Cir. 1996)("[B]ecause we must apply an individualized choice
of law analysis to each of plaintiff's claims . . . the
proliferation of disparate factual and legal issues is
compounded exponentially.").

In reply, Plaintiffs argue in cursory fashion that the
variations in state law are only minor and that "differences in
state law treatment of indirect purchaser claims here likely
fall into a handful of clearly discernible statutory schemes."
(Pl. Reply Class Cert. at 25-26)(emphasis added).  But such
conclusory speculation of the likely existence of legal sub-
groups falls well short of "creditably demonstrat[ing], through

an extensive analysis," that state law variances do not present insuperable obstacles to managing this class.  <u>Walsh</u>, 807 F.2d at 1016.  The Court therefore has no basis to determine how the state law variances described above would be managed.  Moreover, Plaintiffs have failed to respond to Defendants' arguments regarding variances in state law unclean hands defenses or the need for individualized choice of law determinations. Accordingly, the Court is unpersuaded that Plaintiffs have demonstrated that the proposed class would be manageable in a manner sufficient to satisfy Rule 23(b)(3)'s predominance and superiority requirements.

Defendants' other arguments concerning the predominance and superiority requirements are either meritless or were not considered on the basis of the Court's decision regarding Plaintiffs' motion to exclude the opinion of Professor Ordover. <u>Supra</u> at 35-36.  Plaintiffs' motion to certify nine indirect-purchaser classes pursuant to Rule 23(b)(3) is denied.

CONCLUSION

For the foregoing reasons, the Court resolves the various outstanding motions in the following manner:

1. Plaintiffs' motion to exclude the opinions of Aaron Read, (ECF No. 372), is denied;

2. Defendants' motion to exclude the opinion of Professor Roger Noll, (ECF No. 375), is denied;

88

3. Plaintiffs' motion to exclude Professor Ordover's opinion (ECF No. 376) is denied, except insofar as it relates to price variability for digital downloads and albums;

4. Plaintiffs' motion to strike Professor Ordover's supplemental declaration, (ECF No. 384), is denied;

5. Plaintiffs' motion to exclude Professor Ordover's supplemental declaration, (ECF No. 388), is granted;

6. Plaintiffs' motion for class certification pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3), (ECF No. 227), is denied.

Counsel shall confer and inform the Court how they propose to proceed by letter no later than August 18, 2017.

SO ORDERED.

Dated:   New York, New York
         July _18_, 2017

LORETTA A. PRESKA
Senior United States District Judge

89